**MEGA CONSTRUCTION COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 645–87C.

United States Court of Federal Claims.

Aug. 27, 1993.

Lawrence R. Greenberg, Los Angeles, CA, for plaintiff.

Brian M. Simkin, Washington, D.C., with whom was Asst. Attys. Gen., Frank W. Hunger and David M. Cohen, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

On April 17, 1992, the court issued its initial opinion in this case, reported at 25 Cl.Ct. 735 (1992), concluding that plaintiff had failed to prove it had been improperly terminated for default. On April 29, 1992, plaintiff moved to amend or modify the opinion, or for reconsideration and/or a new trial. The motion was premised on arguments that the court had not found the facts or law to be to the liking of plaintiff; the court had failed to make separate findings of liability on each of plaintiff's numerous claims; a case relied upon by the court, *Al Johnson Constr. Co. v. United States*, 854 F.2d 467 (Fed.Cir.1988), as applied was unconstitutional or at least distinguishable from the instant case in some unidentified way; and that the court's conclusion that the termination for default was proper was not supported "by any substantial evidence" or was completely unsupported by any evidence.

The law governing motions for reconsideration is ably set out in *Bishop v. United States*:

> It is well recognized that "[a] motion for reconsideration is addressed to the discretion of the trial court." *Triax Co. v. United States*, 20 Cl.Ct. 507, 509 (1990) (citing *Eyre v. McDonough Power Equip.*, 755 F.2d 416, 420 (5th Cir.1985) (construing FRCP 59)); *see Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1583 (Fed.Cir.1990); *Gelco Builders & Burjay Constr. Corp. v. United States*, [177 Ct.Cl. 1025, 369 F.2d 992, 1000 n. 7 (1966)]. Post-opinion motions to reconsider are not favored[.] *General Elec. Co. v. United States*, [189 Ct.Cl. 116, 416 F.2d 1320, 1321 (1969)]. It is well-settled that "[t]he court has a right to know before it decides [the controversy at hand] whether the parties have anything further to present." [*Id.*, 416 F.2d] at 1322.

Generally, "[a] motion under RUSCC 59 must be based upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an addi-

tional chance to sway the court." *Circle K Corp. v. United States*, 23 Cl.Ct. 659, 664–65 (1991). The movant must show either that an intervening change in the controlling law has occurred, evidence not previously available has become available, or that the motion is necessary to prevent manifest injustice. *Weyerhaeuser Corp. v. Koppers Co.*, 771 F.Supp. 1406, 1419 (D.Md.1991). "Litigants should not, on a motion for reconsideration, be permitted to attempt an extensive retrial based on evidence which was manifestly available at [the] time of the hearing." *Gelco*, [369 F.2d at 1000 n. 7]. The litigation process rests on the assumption that both parties present their case once, to their best advantage. *Bishop v. United States*, 26 Cl.Ct. 281, 285–86 (1992).

Plaintiff has not argued or presented any credible argument or evidence that any of the conditions cited in *Weyerhaeuser Corp.* are present here. However, to provide the parties with a basis upon which to determine quantum, the court will reissue its opinion to give a detailed discourse on the reasons why the termination for default was proper, and to fully address the delay and non-delay claims. Plaintiff provided no support for its contention that *Al Johnson* was unconstitutional or distinguishable, and the court can imagine of none: That argument need not be addressed. Plaintiff's motion to amend or modify is granted; plaintiff's motion for reconsideration and/or for a new trial is denied. The opinion of the court reported at 25 Cl.Ct. 735 (1992) is vacated. The modified opinion follows.

## I. INTRODUCTION

On August 20, 1985, plaintiff, Mega Construction Company, Inc., entered into a fixed-price construction contract with defendant, through the United States Postal Service (U.S.P.S. or Postal Service), for the construction of the Main Post Office at Canoga Park, California. The contract price, as amended was $2,316,609.68. On September 9, 1985, defendant issued its Notice To Proceed, and on either September 17 or 23, 1985, plaintiff commenced work on the project.[1] The contract originally contemplated completion of the project on October 20, 1986, but defendant administratively allowed several of plaintiff's requested extensions of the completion date, adding a total of 118 days to the performance period. The amended completion date was February 15, 1987. In December 1986, after the discovery of cracks in the concrete floor of the main workroom of the postal service building, the contracting officer determined that the concrete floor slab failed to conform to contract specifications. The contracting officer directed plaintiff on several occasions to submit a plan to remove and replace the slab. Plaintiff refused to comply with the contracting officer's directives, and on July 22, 1987 defendant terminated the contract for default based on plaintiff's failure to comply with directives of the contracting officer, lack of job action, and abandonment. Both parties alleged incompetence and mismanagement of the project on the part of the opposing party. Plaintiff also alleged bad faith and malice on the part of defendant and several of its contracting officials. The case will not turn on a finding that one party or the other acted with the least malice or incompetence. Each party must prove its claims and the case will be disposed of in favor of the party who has provided the requisite degree of credible evidence. *All* facts are disputed.

## II. PROCEDURAL HISTORY

Following the termination for default, plaintiff filed suit in this court on October 14, 1987, requesting a conversion of the termination for default to a termination for convenience of defendant. The complaint

---

1. Plaintiff provided conflicting statements of when it actually commenced work. Mr. Marvin N. Kaplan, president of Mega Construction Company, Inc. (Mega), testified that work commenced September 17, 1985. However, plaintiff's principal expert witness on construction delays testified that work actually commenced a week later, on September 23, 1985. The start date is immaterial at this point, although it further confuses the delay claim discussed in detail later in this opinion.

was arguably defective at the time because it did not contain a monetary claim. On December 14, 1987, defendant filed a motion to dismiss the complaint on the grounds that the court lacked subject matter jurisdiction over the suit because (1) plaintiff filed suit before submitting a monetary claim to the contracting officer, and (2) the complaint did not seek monetary damages. However, on December 9, 1987 the contracting officer issued a final decision that assessed partial reprocurement costs. The sole issue before the court in December 1987 was the propriety of the termination for default and assessment of reprocurement costs. Oral argument on the motion to dismiss was heard February 19, 1988. The court held that a bare termination for default, unaccompanied by a monetary claim did not—at that time—constitute a basis for a claim cognizable before this court, *Mega Constr. Co. v. United States*, 14 Cl.Ct. 555, 557 (1988) (*Mega I*), but that once defendant made its monetary counterclaim, jurisdiction was perfected, bringing this case within the jurisdiction of the court. *Id.* at 557–58. The court held that it lacked jurisdiction at the time the complaint was filed.

In the interest of substantial justice this court concludes that plaintiff's earlier pleadings in response to defendant's motion to dismiss brought the issues properly before this court. [RUSCC] 8(f). This is not a case in which the complaint would be statutorily time-barred or otherwise dismissed as untimely. The court concludes that it would be a waste of judicial resources and a denial of justice to dismiss plaintiff's complaint only to have it immediately refiled. Instead, the court concludes, and the parties are noticed that the suit is properly and timely before the court. In order to clarify the issues, plaintiff is ordered to amend its complaint within 30 days of the date of oral argument to specifically address the December 9, 1987 monetary demand of the contracting officer.

*Id.* at 557.[2] The court concluded that it unquestionably had jurisdiction to determine the propriety of the termination for default and assessment of reprocurement costs. *Id.* at 558. Courts strive to avoid nonsensical interpretations of the law. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982). Defendant's motion to dismiss was accordingly denied. *Mega I*, 14 Cl.Ct. at 558.

Plaintiff submitted its claim for $2,569,-380.58 to the contracting officer on August 30, 1988. On September 21, 1988, the contracting officer issued a second final decision which allowed part and denied part of plaintiff's claim, and assessed $531,495.44 in reprocurement costs. On November 25, 1988, the contracting officer issued a third final decision allowing plaintiff an additional $31,323.30. On May 9, 1989 plaintiff filed its second amended complaint, challenging the contracting officer's second final decision, and stating an affirmative claim in the same amount presented to the contracting officer on August 30, 1988. On October 26, 1989, defendant filed an amended counterclaim increasing the assessed reprocurement costs to $559,460.08. This opinion issues following trial.

## III. THE TERMINATION FOR DEFAULT

### A. FACTS

Plaintiff is a corporation organized under the laws of California, doing business in that state as a licensed general contractor. Mr. Marvin N. Kaplan is president of plaintiff, and his assistant, Mr. Barry Harman, was construction manager on the Canoga Park Main Post Office project. As the general contractor, plaintiff was responsible for coordinating and managing the work of the various subcontractors on the job-site.

Among the many tasks that plaintiff performed under the contract was the installation of a poured-concrete (non-prestressed), non-structural slab on grade measuring ap-

---

**2.** Title IX of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, enacted October 29, 1992, renamed this court The United States Court of Federal Claims. The Rules of the court are now abbreviated "RCFC." *See* General Order No. 32 (Dec. 4, 1992).

proximately 22,000 square feet that was to be the floor of the Canoga Park Main Post Office (the slab). The contract specifications required a slab four inches thick, with No. 4 steel reinforcing bars (rebar) embedded in a checkerboard pattern, twenty-four inches apart and at least one inch below the upper surface of the slab. Because the slab was non-structural, the rebar was present to prevent cracking as the concrete shrank, not to provide reinforcement. The contract also required plaintiff to insert the rebar through control joints, placed every thirty-seven feet in a north-south direction and every twenty-nine feet in an east-west direction. A control joint is any purposeful break made in the concrete to control cracking. Control joints take different forms. One type of control joint consists of a galvanized steel stakes embedded approximately one inch below the surface of the concrete. After the concrete is poured, the stakes in conjunction with the rebar act as a control break in the concrete to contain cracking as the concrete cures. As one structural engineering expert noted at trial, the lines that appear every three to four feet in sidewalks perform the same function, but, for aesthetic reasons, owners of buildings do not want cut or drawn lines every three to four feet in the floor. Here, the control joints were "Keyed Kold" joints.

The slab sat atop two inches of sand that covered a layer of 6 MIL plastic vapor barrier. The vapor barrier covered another two inches of sand. The layers of sand rested on approximately five to six feet of compacted fill. The slab was to be finished covered with ½–inch asphalt plank. Because the slab was non-structural, its most important feature was its ability to endure the weight of loaded mail carts weighing up to 2000 pounds, as well as substantial foot traffic. Defendant's engineering consultant, R.T. Frankian & Associates (Frankian), specified to defendant's structural engineering subcontractor, Mr. Gordon Kelsen of Martin & Kelsen, Inc., one of defendant's contract consultants, that the fill under the slab was to be non-expansive, meaning that it was not to expand if, for example, water seeped into the fill due to

heavy rains or a broken water pipe. A non-expansive soil is composed of a mixture of small, medium, and large grains, carefully compacted to specification. If water seeps into a properly mixed fill, the large and medium particles will provide space for the water, thereby preventing the fill from expanding and causing the slab on top to shift and crack. If fill is comprised of too many small grains, water is simply absorbed into the fill like water into a compressed dry sponge; the reaction is the same. If the fill is five feet deep and experiences a three percent expansion, the fill will expand three inches, which, in turn, will cause substantial movement, and therefore cracking, in the slab. Frankian performed soils tests prior to installation of the slab and found the fill to be non-expansive.

The floor of the post office building's main workroom, measuring approximately 10,300 square feet, comprised the largest section of the slab. In December 1986, cracking, and, in at least one or two areas, vertical displacement (also known as "differential settlement") were discovered in the main workroom portion of the slab. Differential settlement is a severe form of cracking in which one side of a crack sinks or rises, resulting in a rough, uneven surface. On January 16, 1987, defendant's architect, Lane Architectural Group (Lane), instructed Mr. Kelsen to inspect the slab. In a January 27, 1987, letter to Mr. Edward Jones, Jr., Lane's manager for the project, Mr. Kelsen recommended coring the areas of vertical displacement to obtain a sample of the slab in hopes of determining the cause of the cracking. Mr. Kelsen also stated that the cracks and vertical displacement did not affect the structural integrity of the building, but that repairs should be effected for "architectural considerations."

On February 26, 1987, the contracting officer, Mr. Joseph M. Cipriani, directed plaintiff to investigate the cracks and differential settlement of the slab and submit soil and concrete samples for testing. By letter of March 10, 1987, Mr. Harman, plaintiff's construction manager, protested that physical testing was the owner's re-

sponsibility, and that plaintiff was "unwilling to expend costs in connection with testing." However, Mr. Harman also stated that plaintiff was "more than willing to furnish all necessary facilities, labor, material and equipment to accommodate all such removal, tearing out and/or replacement, understanding that [the Postal Service's] endorsement would equitably adjust the contract price should the examination substantially reflect conformance."[3] The cracks worsened, and on March 27, 1987, Mr. Cipriani formally determined that the slab was defective pursuant to General Provision 51 of the contract, entitled *Inspection and Acceptance.*[4] Mr. Cipriani wanted a slab no better and no worse than the one for which defendant had contracted. He also testified that he did not want a "glued-together" slab in a new facility; he did not want a slab with different elevations caused by vertical displacement, nor one that would continue to crack so seriously. He especially did not want to have to tear up a new building a few months or years after completion to replace the slab because it had become unusable.

The trial record demonstrated that the extent of the cracking in the slab was massive, with at least four cracks running the entire distance of the workroom portion of the slab in an east-west direction, and numerous other smaller east-west cracks as well. There were also at least ten smaller north-south cracks running through this area of the slab. Some of the cracks, according to Mr. Cipriani, were approximately three-sixteenths of an inch wide. While the trial concentrated on the slab in the main workroom because that was the portion ultimately removed, the entire slab, including areas in all of the other rooms, also contained cracks, albeit to a lesser extent than in the main workroom. For instance, there was evidence of vertical displacement of the slab in at least one office or hall area. According to Mr. Phillips T. Ruffalo, a registered architect and structural engineer under contract to defendant as its on-site representative and project manager, some of the cracks were typical hairline cracks, while others were large enough in places to see the sand beneath the slab.

3. Plaintiff's counsel ignored the obvious. In a letter to the contracting officer dated July 14, 1987, a week before the termination for default, he stated, without support, that

Your approach to replace the entire slab may very well be totally unsuitable and an overreaction, ... (As you know, Mega opened up two different areas of the slab for you at locations that, Mega contends, did not manifest the alleged [rebar placement] problems)....

Mega is prepared to work with you to evaluate whether a problem exists, and if so, how to solve it, but you must be ready to cooperate. Please contact Marvin Kaplan or the undersigned at your earliest convenience with regard to the above.

The court noted that plaintiff did not "open" two areas of the slab. To the contrary, until the slab was removed, no more than one section or area, other than several small core samples taken by various design and engineering consultants, had been removed.

4. General Provision 51, *Inspection and Acceptance,* states in pertinent part:

(b) The Contractor shall, without charge, replace any material or correct any workmanship found by the Postal Service not to conform to the contract requirements, unless in the public interest the Postal Service consents to accept such material or workmanship with

an appropriate adjustment in contract price. The Contractor shall promptly segregate and remove rejected material from the premises. (c) If the Contractor does not promptly replace rejected material or correct rejected workmanship, the Postal Service (1) may, by contract or otherwise, replace such material or correct such workmanship and charge the cost thereof to the Contractor, or (2) may terminate the Contractor's right to proceed in accordance with the "Termination for Default" clause of these General Provisions. (d) The Contractor shall furnish promptly, without additional charge, all facilities, labor, and material reasonably needed for performing such safe and convenient *inspection and test* as may be required by the Contracting Officer.

\* \* \* \* \* \*

(e) Should it be considered necessary or advisable by the Postal Service at any time before acceptance of the entire work to make an examination of work already completed, by removing or tearing out same, the Contractor shall, on request, promptly furnish all necessary facilities, labor and material. If such work is found to be defective or nonconforming in any material respect, due to the default of the Contractor or his Subcontractors, he shall defray all the expenses of such examination and of satisfactory reconstruction. (emphasis added).

It was clear from testimony at trial that the cracks worsened in both length and width between December 1986 and June 1987. Mr. Daniel Whalen, an architect employed by Joncich, Sturm and Associates [5] (JS & A), the architectural firm employed to replace Lane on the reprocurement, testified that

> During my time of association with this project before the slab was removed ... October 19, 1987 through early January of 1988, I noticed the cracks were getting worse. I—I would say that the slab ... had dynamic characteristics.... [I]t didn't crack and then just stop cracking, and that was the end of it. The cracks were getting deeper, wider, and there were more of them every time I [visited the site.]

Mr. Ruffalo confirmed Mr. Whalen's observations about the growth in size and number of the cracks. Mr. Ruffalo also testified that he saw worsening of the vertical displacement and actual "curling" of the concrete where several cracks came together.

After the major cracks in the slab appeared, defendant contracted with several engineering consultants to obtain independent appraisals of the cracking. One such firm, Pacific Architects and Engineers, retained Mr. Paul Winter, a structural engineer, to examine the slab design and specifications, and inspect the slab. Mr. Winter concluded that the cracking was caused by the wide spacing of control joints in the design of the slab. He stated in his March 30, 1987 letter that:

> control joints in the main area of the building occur at from [sic] 30 to 37½ feet on center.... 'Textbook' spacing of control joints varies from 15 to 20 feet on center.... Shrinkage cracks will always occur in non-prestressed slab on grade, and control joints are provided to confine the cracks to pre-determined locations.

Mr. Kelsen countered that it was not uncommon to place expansion joints as far apart as forty feet by forty feet. Mr. Winter concluded his report with the recommendation that part of the slab should be repaired and part replaced. He suggested filling small cracks with non-shrink grout and replacing areas where vertical displacement had occurred.

Mr. Richard Levitt of Wagner, Hohns, Inglis, Inc., a construction consulting firm retained by defendant, also inspected the slab. In a memorandum dated March 24, 1987, Mr. Levitt stated:

> The concrete slab ... had cracks as had been reported, mostly midway between the joints at approx. 20 foot spacings. Looks like an expansive soil problem or insufficient reinforcing in the design or construction. Most of the cracks are of no consequence.... Otherwise, the momentum observed today tells me it would not be a good time to terminate the contract, if that is being considered.

On May 14, 1987, two and half months after being directed to do so by the contracting officer, plaintiff finally removed a four foot by ten foot section of the slab. Mr. Kelsen reported in a letter to Lane that all of the rebar in the cut section, but one, lay in the sand under the floor and was not embedded in the slab as required by the contract. Mr. Kelsen also reported that no "Key[ed] Kold" control joint was present, although the contract drawings indicated that a control joint was to be used at that location. Mr. Kaplan reluctantly agreed, even though the photographs taken of the cut section overwhelmingly demonstrated that the rebar in the cut section had not been installed in conformance with the requirements of the contract. Mr. Kelsen, as did several other consultants, recommended that defendant ignore the almost-certain long term problems with the slab,

---

5. Joncich, Sturm and Associates (JS & A) was one of several architectural-engineering firms employed by defendant, at the time, under a "general term contract." This was explained as a one-year contract with options for two more years to provide general architectural services including engineering and consulting services that defendant might need on either small projects or for emergency use when it did not have the necessary time to formally compete a contract for architectural services. Defendant gave JS & A a work order under the general term contract for its services on this project.

and the fact that defendant had not received the slab for which it had contracted, and apply a "quick fix" to the slab by filling the cracks with a non-shrink material and cutting the main workroom slab with one inch deep saw cuts in place of control joints to prevent *further* cracking and vertical displacement. No consultant of the "quick-fix" school of thought would guarantee how long any repaired slab would last, much less the thirty years for which the taxpayer had paid. Mr. Kelsen testified that he qualifiedly recommended that the slab be repaired for aesthetic reasons, "from the standpoint of acceptability to the client of a cracked slab," and for safety reasons. "The only advice I gave [defendant] was that they were buying the building, [and] if they were not happy with that building the way it was, with the cracked slab, then it was up to them to make [the] decision [to accept or reject the slab.]" When asked by counsel for plaintiff if he believed as late as September 1987 that the slab could be repaired, Mr. Kelsen responded, "[y]es, if acceptable to the client."

On June 8, 1987, Mr. Cipriani met at the job-site with Mr. William Peterson, a senior structural engineer with the architectural and engineering firm of Daniel, Mann, Johnson & Mendenhall to seek yet another independent appraisal of the cracking. In confirming what Mr. Kelsen had observed, Mr. Peterson reported that in the section of slab cut for sampling, the rebar rested on the top sand layer of the fill beneath the slab. Mr. Peterson did find some control joints but noted that they were improperly placed; i.e., the control joints were placed too low, and were parallel to columns rather than intersecting the column corners as specified in the contract drawings. Mr. Peterson opined that the fill underneath the slab was of proper quality and had been compacted sufficiently to ensure that the slab had not shifted unreasonably due to poor soil quality. Mr. Peterson's June 8, 1987 report concluded:

The owner did not get what was contracted for however, and this is the main problem. My recommendation is not to do anything to the slab, just use it as it is. But the owner should be reimbursed for the cost of the reinforcing [the rebar] as well as the placement of it. He [sic] should also be reimbursed about 50% of the cost of the joint materials and placement.[6]

Mr. Whalen, who personally observed removal of the concrete slab in the workroom, testified that in his estimation, seventy percent of the rebar lay beneath the concrete.

I was there when the whole slab was removed, and the only portions [of the rebar] I saw that were embedded in the slab, would pass through the key[ed] joints. [The rebar] would go up ... through the key joint and back down a few feet [on] either side of the key joint. So you count those sections, it's about 30 percent of the slab.

Mr. Rudolph Paolini, whom the court found to be an impressive witness, was also present during the demolition of workroom slab. Mr. Paolini, an architect employed by Wagner, Hohns, Inglis, Inc., also under contract to defendant, "engaged principally in construction claims investigation" was an expert witness called by defendant. He testified that he saw approximately eighty percent of the rebar lying on the sand under, not in, the slab. Mr. Cipriani testified that the majority of the rebar was "all down in the sand." Photographs entered into evidence typically showed large sections of the slab—after being removed—with the rebar "just stuck to the bottom."

Fidelity & Deposit Company of Maryland (F & D), plaintiff's surety on the contract, retained the Construction Consulting Group, Inc., a subsidiary of the American Concrete Institute, to perform tests on the slab to determine whether the rebar in the slab was properly positioned. Before demolition, Mr. Edward R. Fiske of CCG used an electronic device known as a pachometer to determine the distance of the rebar from

---

6. The court infers from Mr. Peterson's comments that he concluded that the quality of the slab was half of what defendant contracted with plaintiff to construct.

the center of the slab in eighty locations. Astoundingly, in view of what was already known about placement of the rebar and what was subsequently discovered, Mr. Fiske reported that only nineteen percent of the rebar was not positioned in the concrete according to contract specifications.

Mr. Charles MacIntosh, an independent construction consultant, called by plaintiff as an expert witness, also disagreed that eighty percent of the rebar lay beneath the slab on the sand for the same reason that Mr. Kelsen testified that it was, and that he would *expect* rebar to fall beneath the concrete because he knew of no contractual requirement that required plaintiff to take even ordinary steps to place "[the rebar] in the middle of the slab at the center of the span." He also testified that if the rebar was held up in the concrete on the "Keyed Kold" joints, it would have been impossible for so much rebar to have fallen to the bottom. He testified that "there was probably[,] as on most jobs, 20 percent" on the ground. He also testified, however, that when he viewed the exposed soil on August 26, 1987, he saw only one instance where the rebar was placed too low in the concrete, and two instances where the rebar "was exposed near the middle of the slab." In this regard, Mr. MacIntosh testified as a fact witness, and his testimony is flawed because he did not consider that so many supports had fallen during pouring of the concrete. Neither had Mr. MacIntosh read the design specifications at any time prior to his appearance in court. Mr. MacIntosh further testified that the largest vertical displacement which he personally saw was not $3/16$ of an inch as reported by most witnesses but only $1/32$ of an inch, 600 percent smaller, "which was nothing and would be completely covered up when you put any covering on it of any kind." Mr. MacIntosh did not even ascribe to the gen-

eral consensus that the slab would have to be repaired by grinding down the vertical displacement before covering it with tile or carpet. The photographic evidence alone clearly shows a much larger vertical displacement than Mr. MacIntosh said he saw, and credible testimony by other witnesses supported the photographic evidence of a larger vertical displacement. In a hapless attempt to negate the value of the photographic evidence, Mr. MacIntosh at one point testified that a length of rebar shown lying on the ground beneath an overturned piece of concrete had been simply "pushed" down and out of the concrete when it was removed, notwithstanding that the concrete was unbroken horizontally.

Mr. MacIntosh's testimony consisted in the main of his disagreement with the design of the slab, though there was no credible evidence that the design was not sufficient for its purpose. He also completely ignored the fact that plaintiff failed to construct the slab as per the design, as even Mr. Kaplan admitted.[7] Mr. MacIntosh's presumptuous "determination" that the slab was "perfectly satisfactory to use for the purpose intended" could not pass the smile test. Judge Cardozo, addressing the rights of an owner, aptly put it when he stated "[t]here is no general license [for a builder] to install whatever, in the builder's judgment, may be regarded as 'just as good,'" *Jacob & Youngs, Inc. v. Kent*, 230 N.Y. 239, 243, 129 N.E. 889, 891 (1921) (citation omitted). Mr. MacIntosh's comments on other aspects of the project were equally unbelievable and as a witness he was methodically impeached by defendant. Because so much of Mr. MacIntosh's testimony was at odds with the testimony of other witnesses, and with the facts as they became known later, his testimony was as unbelievable as Mr. Fiske's. The court gave no weight to his testimony.[8]

---

7. Even though all of the evidence proved that the slab was not built to the contract specifications, and despite Mr. Kaplan's admission that plaintiff had not built the slab in accordance with the contract specifications, plaintiff's counsel foolishly adhered to the position throughout trial and his post-hearing briefs that plaintiff had built the slab in strict accordance with the specifications.

8. A trial court is not obligated to adopt a conclusion stated by an expert witness, but to weigh both the expert and lay testimony and decide the probity and veracity of each. *Del Mar Avionics, Inc. v. Quinton Instrument Co.,* 836 F.2d 1320, 1325 (Fed.Cir.1987). "Evidence has 'probative value' if it tends to prove an issue," *Liquor Control Comm'n v. Bartolas,* 10 Ohio

In a June 9, 1987 letter to defendant, Mr. Alan Wing of Frankian presented the results of tests from the soil beneath the four-foot-by-ten-foot section of the slab which had been removed. Frankian tested two samples of the soil, one from six inches below the slab and another from fifteen inches below the slab. The tests concluded that the subgrade soils were non-expansive.

In another directive dated June 17, 1987, Mr. Cipriani repeated his determination that the workroom portion of the slab did not conform to the contract specifications and ordered plaintiff to provide defendant with a plan and schedule to remove and replace the workroom slab within seven days of plaintiff's receipt of this directive. Instead of providing defendant with a plan and schedule for the work, plaintiff waited nine days, until June 26, 1987, and demanded copies of the various structural engineering reports that defendant had obtained from its contractors, Messrs. Kelsen, Winter, Levitt, and Peterson. Mr. Cipriani did not provide plaintiff with the requested reports.

On July 9, 1987, Mr. Cipriani again ordered plaintiff to remove and replace the slab, and to provide a plan to do so within five days of receipt of the letter, or be subject to termination for default. Mr. Cipriani simultaneously informed F & D, plaintiff's surety, that grounds for default termination existed by reason of plaintiff's failure to comply with the directive of June 17, 1987. Mr. Kaplan, long after the fact, and for the first time, asserted at trial that he did not understand what was required of him. He did not, however, ever contemporaneously ask defendant for advice, instructions, or clarification. Plaintiff's argument that it did not understand the contracting officer's directives to provide a plan to demonstrate how and when it would correct its defective work was not invented until years later. Plaintiff's correspondence with the contracting officer, contemporaneous with the notices, never expressed confusion or doubt about what was expected of plaintiff. Instead of complying with the directives, Mr. Kaplan contacted his attorney who, in response to the June 17 and July 9, 1987 directives, wrote to Mr. Cipriani on July 14, 1987 reiterating plaintiff's request for the reports and disputing Mr. Cipriani's rejection of the slab. Plaintiff's attorney, who at the time apparently did not grasp the critical position of his client, informed the contracting officer that "Mega is prepared to work with you to evaluate whether a problem exists, and if so, how to solve it, but you must be prepared to cooperate." *See* note 3, *supra.* Plaintiff did not comply with Mr. Cipriani's directives.

On July 22, 1987, Mr. Cipriani's supervisor, Mr. Russell W. Harter, also a contracting officer, terminated plaintiff for default based upon lack of action, job abandonment, and failure to follow directives of the contracting officer. The evidence is clear that at about the time the first notice was issued, plaintiff had virtually no employees or subcontractors at the job-site. Following the last directive giving plaintiff one more opportunity to comply, plaintiff—for all practical purposes—had abandoned the project. Defendant gave plaintiff two clear directives in June and July 1987, both of which plaintiff failed or refused to follow.[9]

Following the termination for default of plaintiff's contract, JS & A contracted with the soils engineering firm of Smith–Emery Company (Smith–Emery) to perform a series of tests on the soils beneath the slab. The court found the several Smith–Emery reports to be the most credible of all the

Misc. 225, 39 O.O.2d 343, 225 N.E.2d 859, 862 (1963), but "[the judgments] of an expert can be no better than the soundness of the reasons that stand in support of them." *Fehrs v. United States,* 223 Ct.Cl. 488, 620 F.2d 255, 265 (1980).

**9.** Despite the contracting officer's directives and warnings, plaintiff complained that it was not given adequate notice of defendant's intent to terminate the contract for default. Plaintiff's complaint is not only incredible in light of the notices and conversations between the parties between February and July 1987, but also inconsequential as notice in a construction contract is not required as in a supply contract. *Compare* General Provision 11 *with* 48 CFR § 52.249–8 (1985); *see also Halifax Eng'g, Inc. v. United States,* 915 F.2d 689, 691 (Fed.Cir.1990).

soils reports, in part because there was no express or implied organizational conflict of interest presenting even a hint of the need to "preserve or protect" any earlier action on the project, and because its reports were more straightforward and objective than the several other soils reports submitted into evidence. In August 1987, Smith–Emery tested nine samples and concluded that the soil under the slab had been compacted according to contract specifications, and that

> 2. ... soils are not the cause of the cracks observed in the slab.
>
> 3. It is our opinion that the cracks in the concrete slab are due to the reinforcing stee[l] not located at the proper depth in the slab and the lack of expansion joints around the columns and at other appropriate locations in the slab.

The following month, on September 28, 1987, F & D also contracted with Smith–Emery to investigate the soils beneath the slab. Smith–Emery took and tested another nineteen samples and concluded, for the second time, that the fill soils were "not the cause of the distress observed in the floor slab ... [t]he fill soils have a low expansion potential." Between October 26 and 27, 1987, Smith–Emery extracted and tested samples from nine or ten more locations under the slab. In contrast to its reports of August and September 1987, Smith–Emery concluded in its report of November 3, 1987, that boring locations one, five, seven, nine, and ten exhibited a medium potential for soil expansion, while locations two, three, four, and six exhibited a low potential.

Defendant redesigned the slab based on Smith–Emery's November 3d report that the soil placed by plaintiff under the existing slab was, low-to-moderately expansive. Mr. Paolini testified that in his expert opinion the soil was slightly expansive. In a November 13, 1987 letter to defendant, Mr. Kelsen, who re-designed the slab, stated:

Recent tests by Smith–Emery indicate potentially expansive soil in the low-to-medium range. We have increased the slab thickness and the amount of slab reinforcing due to these tests.

If the compacted fill had tested non-expansive, we would have recommended replacement with the same slab and reinforcing as shown on the [original] contract documents.[10]

On the reprocurement, Mr. Kelsen increased the thickness of the slab from four inches to five inches, placed the rebar eighteen inches apart rather than twenty-four, and spaced control joints approximately twenty-nine feet apart in both directions *vice* twenty-nine feet east to west and thirty-seven feet north to south. On November 6, 1987, Mr. Cipriani met with Messrs. Ruffalo, Kelsen, and Paolini, among others, to discuss possible solutions to the cracking in the slab. None of the consultants at the meeting recommended removing and replacing the slab in the main workroom, and, indeed, all advanced theories on how to solve the cracking in the slab through filling and grinding. Mr. Paolini explained that even though he believed the soil was slightly expansive, the contract, as a matter of principle, should not have been terminated. He explained:

> It just—it messes a project up. It's so difficult to get a bonding company or a surety to perform after that and it just delays the project even more. And as a firm we have taken a position and in fact have given seminars advising owners if at all possible, do not terminate either a designer or a contractor.

However, Mr. Paolini also stated that, in his opinion based on the contract specifications, defendant had cause to terminate the contract for default because of his observations of the nature of the slab and the November 3d Smith–Emery report identifying the low-to-medium expansive nature of the underlying soil.

---

10. Mr. Kelsen also stated in the November 13, 1987 letter

On the other hand, we cannot guarantee that the 5″ slab will prevent cracking if expansion should occur. However, the increase in slab reinforcing will offer greater resistance to uplift forces.

After terminating plaintiff for default, defendant undertook negotiations with F & D to complete the project. F & D refused, and on December 11, 1987, defendant contracted with B.G. Construction Company to complete the remainder of work under plaintiff's contract, including demolition of the old slab and installation of a new workroom floor. JS & A discovered approximately four hundred construction deficiencies in other areas of the project. B.G. Construction completed the project in six months for $559,460.08, and defendant took beneficial occupancy on June 6, 1988.

### B. DISCUSSION

 Default termination is a "drastic sanction," and should be imposed only on the basis of "solid evidence." *J.D. Hedin Constr. Co. v. United States*, 187 Ct.Cl. 45, 408 F.2d 424, 431 (1969); *Sun Cal, Inc. v. United States*, 21 Cl.Ct. 31, 39 (1990) (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987)). It is a type of forfeiture. *De Vito v. United States*, 188 Ct.Cl. 979, 413 F.2d 1147, 1153 (1969). Nevertheless, it is well settled that the contracting officer possesses authority to terminate a contract for default, and under the proper circumstances is obligated to exercise his discretion to do so. *Schlesinger v. United States*, 182 Ct.Cl. 571, 390 F.2d 702, 707–08 (1968). The government bears the burden of proof, by a preponderance of the evidence, to establish that the default termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987).

Pursuant to General Provision 4 of the contract, all claims arising under the contract were subject to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–613 (1988). In proceedings under the CDA, "the facts, as well as the law, are decided *de novo* by the ... court." *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed.Cir.1990) (citing 41 U.S.C. § 609(a)(3) (1982)), *cert. denied*, 499 U.S. 919, 111 S.Ct. 1308, 113 L.Ed.2d 243 (1991); *accord Lathan Co., Inc v. United States*, 20 Cl.Ct. 122, 125 (1990) (citing *Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed.Cir.1987)). "The court is not bound by either the findings of fact or the conclusions [of law] of the [contracting officer]." *Lathan Co. v. United States*, 20 Cl.Ct. 122, 125 (1990); *accord* 41 U.S.C. § 605(a). The administrative award of time or money under the *Changes* clause is not to be treated as if it were the unappealed determination of a lower court or a board of contract appeals that might be owed some sort of special deference on appeal. *Wilner v. United States*, 994 F.2d 783 (Fed.Cir.1993). "However, contracting officer testimony is not without value. It constitutes evidence which may be considered and weighed by [the court] in the same way as any other piece of evidence." *Id.* (citing *J.D. Hedin v. United States*, 171 Ct.Cl. 70, 347 F.2d 235, 245 (1965)). The contracting officer has discretion, but it is not unbridled and it must be exercised in a fair and reasonable manner, never arbitrary and capricious, and always in the best interest of the government. *Id.* (citing *Udis v. United States*, 7 Cl.Ct. 379, 387 (1985)). It is with these rules in mind that the court evaluated and weighed the administrative determinations and testimony of the contracting officer. In its role as the finder-of-fact the court gave the contracting officer's testimony weight, not deference.

### 1. *Breach of Contract*

 Plaintiff pled that the termination for default constituted a breach of the contract by defendant because it was not premised on legal or sound grounds and thereby entitled plaintiff to common law damages outside of the scope of General Provision 11, the *Disputes* clause of the contract. Plaintiff argued that the rules of the court permitted it to plead in the alternative, either in one count or in separate counts, and that it may also assert alternative theories of recovery which may conflict with one another. Upon first glance, plaintiff's position appears to have merit. *See In re King Enters.*, 678 F.2d 73, 76–77 (8th Cir.1982); *Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 463 (9th Cir.1977). However, its application to government contract cases is limited, and, under the

circumstances of this case, precluded. *H.H.O. Co. v. United States*, 12 Cl.Ct. 147, 162 (1987). "A contractor cannot maintain breach claims based on claims for which contractual relief is available." *Id.* (citing *Hoel–Steffen Constr. Co. v. United States*, 197 Ct.Cl. 561, 456 F.2d 760, 768 (1972)). Plaintiff cannot give life to breach of contract claim by merely relabeling claims for which relief is available under the contract. *Northbridge Elecs. Inc. v. United States*, 195 Ct.Cl. 453, 444 F.2d 1124, 1127 (1971); *Edward R. Marden Corp. v. United States*, 194 Ct.Cl. 799, 442 F.2d 364, 369 (1971). This is so because the contract converted what would have been deemed a breach of contract into a claim for an equitable adjustment.[11]

11. The court observes that following implementation of the "all-disputes" clause mandated by the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–613 (1976 & Supp. II 1978), it is possible that defendant may not accurately ever be deemed to have "breached" a contract. Prior to implementation of the CDA, the disputes clause provided an avenue for contractors seeking relief specifically provided for in clauses of the contract. A contractor could initiate a claim in a board of contract appeals to correct an injustice committed in the government's course of contract administration so long as a contract clause recognized the type of wrong of which the contractor complained. Jurisdiction of claims resolution was defined by the specific terms of the contract. *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 405, 86 S.Ct. 1545, 1551, 16 L.Ed.2d 642 (1966), *superseded by statute.* If the contract did not contain a clause addressing a particular wrong, a board of contract appeals had no jurisdiction to decide the dispute. Axiomatically, the dispute was a breach of contract which could be adjudicated only in the United States Court of Claims. *See Essex Electro Engineers, Inc. v. United States*, 702 F.2d 998, 1002 (Fed.Cir.1983) (citing *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)).

Following much debate and study in the early 1970's, particularly by the Congressional Commission on Government Procurement, the government recognized that its contractors were faced with a Hobson's Choice. If a claim was brought in the Court of Claims, but should have been brought before a board, the contractor was deemed to have breached the contract. Conversely, if the claim was brought before a board and there was no contract clause providing for the relief sought, the board lacked jurisdiction to decide the claim. Many contractors complained of the unnecessary time and expense incurred in selecting the proper forum. *See G & H Mach. Co. v. United States*, 7 Cl.Ct. 199, 201 (1985), explaining that under the CDA's precursor (the so-called Wunderlich Act, 41 U.S.C. §§ 321, 322 (1976)), the disputes clause of a government contract did not include claims based upon an alleged breach of contract. Following passage of the CDA, all claims by a contractor against the government were to be in writing and were to be submitted to the contracting officer. "Thus, the filing of all claims, including breach claims [came within the ambit of the CDA]." *G & H Mach.*, 7 Cl.Ct. at 202.

The all-disputes clause sought to rectify the jurisdictional problem by providing that all disputes arising under the contract were to be decided under *that* clause. The CDA abolished the jurisdictional requirement of a specific relief-granting clause, giving contractors the right, and the obligation, to bring any and all disputes before a board or the court as a contract dispute under the all-disputes clause. *See Essex,* 702 F.2d at 1002–03. This eliminated the potential for a contractor to bring a breach of contract claim, as the term is normally construed, outside of the contract. If the court should construe the terms of the all-disputes clause to mean *all* disputes as the language is normally used, *see Thanet Corp. v. United States*, 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979) ("Words are to be given their plain and ordinary meanings.") (citations omitted), what form of relief is left to be litigated outside of the terms of the contract? The answer is none, with the possible exception of a claim for cardinal change, which by its very definition is a claim outside of the scope of the contract: i.e., a substantial deviation from the scope of the work that would have changed the nature of the bargain between the parties. *See John J. Kirlin, Inc. v. United States*, 827 F.2d 1538, 1540–41 (Fed.Cir.1987) (citing *Air–A–Plane Corp. v. United States*, 187 Ct.Cl. 269, 408 F.2d 1030, 1033 (1969)). "A cardinal change is considered a breach of contract and therefore further work, even when a disputes clause exists, is not required." *In re Boston Shipyard*, 886 F.2d 451, 456 (1st Cir.1989) (citing *General Dynamics Corp. v. United States*, 218 Ct.Cl. 40, 585 F.2d 457, 462 (1978)). The all-disputes clause necessarily includes claims for relief that were traditionally considered to be claims under the limited pre-CDA disputes clause, as well as claims for the violation of such duties by the government as to not hinder or unduly interfere with the contractor's progress, or any of the myriad other responsibilities one contracting party owes the other. The result of the amendment restructuring the government contract disputes resolution process in the CDA is that plaintiff is limited to bringing all claims and disputes, of any nature, under the disputes clause and, upon proof, recovering only damages provided in the contract.

Under pre-CDA procedure, "breach of contract" was a term of art referring to claims alleging that the Government failed to perform an express or implied duty (such as the duty to cooperate and not hinder) for which

## 2. Defective Workmanship

■ Contract clause 3.07, entitled *Defective Concrete* in section 03300, Concrete Work, of the Scope of Work, stated that "[a]ny concrete not in accordance with these specifications, ... or showing cracks, [or] ... exposed reinforcing ... will be considered defective.... Correct and replace defective concrete as directed by the Architect at no additional cost to the Owner." In addition, the contract drawings called for the rebar to be placed one inch below the top surface of the concrete. Without exception, the architectural and structural engineering experts who testified at trial agreed that concrete shrinks when it cures, and that hairline cracks in poured concrete slabs are normal occurrences. However, credible evidence made it clear beyond doubt that the cracks in defendant's slab were far more than the usual hairline cracks. It was uncontroverted that at least four of the cracks ran the entire length of the slab, and that some were so wide that the sand under the slab was clearly visible and a coin could fall to the sand fill through the crack. It is also clear from the record that seventy to eighty percent of the rebar lay exposed on the sand beneath the slab, and that the cracking was caused by plaintiff's failure to install the rebar according to the contract. Mr. Kelsen, the designer of both the original and replacement slabs noted that if the rebar lay at the bottom of the concrete, it would act as a crack *inducer* whereas properly placed rebar controls and minimizes cracking. All credible expert testimony confirmed this elementary principle of concrete engineering. Ample testimony and photographic evidence revealed that most of the rebar in the four foot by ten foot section that plaintiff removed on May 14, 1987, was not inserted through the holes of the "Keyed Kold" control joints and that a number of the control joints were either absent or improperly placed. Mr. Kaplan had to concede that the rebar in that section of the main workroom floor was in the sand, not the concrete, and that plaintiff had not installed it in accordance with the contract specifications.

Had plaintiff installed the control joints properly, the rebar would have run through the pre-formed holes in the control joints according to the specifications, which in turn would have secured the rebar in its proper position. Properly placed, the rebar would have functioned as designed to control excessive shrinkage cracking and differential settlement as the concrete cured. Mr. Kaplan's assertion at trial that plaintiff had complied "completely" with the contract specifications directing placement of the rebar, because it had placed the rebar properly *before* the concrete was poured, was at best a nonsequitur, albeit an expression of his attitude about the contract and plaintiff's case; i.e., to prevail at any cost including the lack of logic, sound legal advice, the contract, and law.

According to the deposition of Mr. James Hearn, plaintiff's on-site project superintendent, Amber Steel Co., plaintiff's subcontractor, placed the rebar in a checkerboard fashion.[12] Before the concrete was poured into the wooden forms, the rebar was elevated on masonry blocks so that the rebar was the proper height above the top layer of sand. The rebar was wired together at every intersection. The evidence was that, plaintiff's pumping subcontractor poured the concrete from six-inch hoses,

no relief was available under the terms of the contract and which thus fell outside the scope of the disputes process. Since such breach of contract claims are "related to" the contract, they are now within the scope of the CDA disputes process.

Richard J. Bednar, *The Disputes Process in Federal, State, and Local Construction Contracts, in Construction Contracting*, 957, 964 (George Washington University 1991) (citations omitted).

The contractual bargain eliminates plaintiff's right to seek common law, or any other form, of extra-contractual damages. However, in drafting the all-disputes clause, language was retained by the Congress reserving to the government the right to seek common law damages as well as contractually provided damages. *Compare* General Provision 11(a), (f) *with Tester Corp. v. United States*, 1 Cl.Ct. 370, 376 (1982). *See* section VI.A.2. of this opinion, *infra*.

12. Mr. Hearn was unavailable to testify at trial because of illness. The court allowed his deposition to be entered into the record.

swaying the heavy hoses to-and-fro spreading the concrete over the fill and rebar. Mr. Hearn was present during the entire concrete pour and observed at least one masonry block fall during the pour, causing the rebar in that area to sag. He also noted that as concrete accumulated atop the rebar, it caused the rebar to sag at the midpoints between the blocks. He, however, claimed in his deposition that those instances of misplaced and sagging rebar were corrected immediately, even though he failed to note that fact in his daily log. In fact, Mr. Hearn failed to note any significant problem of rebar support in his daily log. According to the testimony of Messrs. Cipriani and Paolini, after the slab was removed, it was clearly apparent to them that as the concrete spewed from the six-inch hoses, it overturned many of the blocks that supported the rebar, causing the rebar to fall into the sand.

Based on Mr. Hearn's firsthand account of the crucial concrete pours, the court was not totally persuaded by Messrs. Cipriani and Paolini that plaintiff's carelessness in pouring the concrete was the principal cause of the misplaced rebar. Rather, it was plaintiff's slipshod misplacement of control joints which caused the fatal fall of the rebar from its proper position. The court was also not convinced that the cracking of the slab was due to the expansive nature of the soils beneath the slab. Even though Smith–Emery's November 3, 1987 report found the soils to be of low-to-medium expansiveness, there was no evidence of water seepage into the fill or expansion of the soils beneath the slab. In the absence of water seepage into the fill, expansion was not the reason for the severe cracking.

Mr. Cipriani testified that the original slab design used at the Canoga Park Main Post Office was a generic concrete slab design used in dozens of post offices in California. Although the design of the slab was changed on the reprocurement, the court disagrees with plaintiff's argument that the redesign *proved* the original design was defective. According to Mr. Hearn, it was not uncommon for rebar to

be spaced at twenty-four inches, as demonstrated by the pre-formed cut-outs on the control joints that were located twelve, sixteen, and twenty-four inches apart. As a result of tests showing that the fill had low-to-moderate potential for expansion, defendant reasonably redesigned the slab in an attempt to safeguard against the effects of future fill expansion. The court agreed with Mr. Cipriani's common sense observation that redesigning the slab was less expensive than removing and replacing approximately 50,000 cubic feet of low-to-moderately expansive, and hence, defective fill.

At trial, Mr. Kaplan testified that an unknown employee of plaintiff's alleged that an ambiguity existed in the structural drawings governing placement of the rebar, but not in the specifications. This argument was not presented to the contracting officer as required by the CDA, and the court has no jurisdiction to consider it a claim under the contract. *See Transamerica Ins. Corp. ex rel. Stroup Sheet Metal Works v. United States,* 973 F.2d 1572, 1578–79 (Fed.Cir.1992). In any event, the argument is without merit because General Provision 60(a) provides in part that "[i]n case of difference between the drawings and specifications, the specifications shall govern." Moreover, plaintiff's argument that the slab specifications were somehow defective has no basis in fact; what was obviously defective was plaintiff's workmanship.

Plaintiff also argued that the termination for default was improper because the slab specifications were defective. Government liability for faulty design specifications is well settled. "[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918) (citations omitted).

When the Government contracts for supplies to be manufactured in accordance with Government specifications, there is an implied warranty that if the specifica-

tions are followed, a satisfactory product will result. If the warranty is breached, i.e., the specifications are defective, the plaintiff is entitled to damages equal to the amount expended in trying to comply with the defective specifications.

*Hol–Gar Mfg. Corp. v. United States,* 175 Ct.Cl. 518, 360 F.2d 634, 638 (1966) (citations omitted).

In particular, this court has stated that "[t]he implied warranty of adequacy of specifications applies only to design specifications such as detailed measurements, tolerances, materials, i.e., elaborate instructions on how to perform the contract...." *Stuyvesant Dredging Co. v. United States,* 11 Cl.Ct. 853, 860, *aff'd,* 834 F.2d 1576 (Fed.Cir.1987). Counsel for defendant "conceded" that the specifications, including the drawings, in this contract were design specifications. Plaintiff naturally agreed. The court believes that while the slab design was more in the nature of a design specification than a performance specification, this was not the case for all of the contract specifications. "Contracts may have both design and performance characteristics." *Blake Constr. Co. v. United States,* 987 F.2d 743, 746 (Fed.Cir. 1993) (citing *Utility Contractors, Inc. v. United States,* 8 Cl.Ct. 42, 50 n. 7 (1985); *Aleutian Constructors v. United States,* 24 Cl.Ct. 372, 379 (1991)). Further,

> [o]n occasion the labels "design specification" and "performance specification" have been used to connote the degree to which the government has prescribed certain details of performance on which the contractor could rely. However, those labels do not independently create, limit, or remove a contractor's obligations.... Contracts are viewed in their entirety and given the meaning imputed to a "reasonably intelligent contractor" acquainted with the involved circumstances, regardless of whether labelled "design," "performance," or both.

*Id.* (quoting *Zinger Constr. Co. v. United States,* 807 F.2d 979, 981 (Fed.Cir.1986)). "It is the obligations imposed by the specification which determine the extent to which it is 'performance' or 'design,' not

the other way around." *Id.* The issue of the amount of discretion given a contractor in meeting the terms of the contract is a matter of legal interpretation for the court to decide. *Id.* (citing *R.B. Wright Constr. Co. v. United States,* 919 F.2d 1569, 1571 (Fed.Cir.1990)).

■ The Federal Circuit has refined the *Spearin* test by requiring the court to inquire whether the contractor complied fully with the design specifications that it asserted were defective. *See Al Johnson Constr. Co. v. United States,* 854 F.2d 467, 469–70 (Fed.Cir.1988). If the contractor failed to comply fully with even faulty design specifications, recovery on the implied warranty is precluded. The photographic evidence showed vividly, and the testimony was overwhelming, that plaintiff did not position the rebar and control joints according to the specifications. Therefore, even if the contract specifications were defective—which the court does not find—plaintiff is precluded from recovery based on the government's implied warranty because plaintiff failed to comply fully with the specifications.

### 3. Failure to Submit Plan to Remove and Replace Slab; Consultants' Reports

On two occasions, June 17 and July 9, 1987 the contracting officer directed plaintiff to submit a plan to remove and replace the rejected slab. Plaintiff refused to comply with either directive, complaining that it could not proceed unless Mr. Cipriani forwarded the consultants' reports. Plaintiff argued that Mr. Cipriani withheld the reports in bad faith because he sought to prevent plaintiff's compliance, thereby obtaining a new slab at no additional cost to defendant. Plaintiff also contended that Mr. Cipriani was under pressure from the U.S.P.S. to complete the project and therefore had an ulterior motive for terminating plaintiff for default without sufficient cause. Plaintiff asserted that the November 6, 1987 meeting, at which defendant discussed repair of the slab with its consultants, proved that the prior directives to

remove and replace the slab were an artifice to terminate plaintiff.

The court finds plaintiff's argument unconvincing. Even if plaintiff disagreed with the merit of Mr. Cipriani's position, it was bound by General Provisions 4 [13] and 51 of the contract to proceed in accordance with his June 17, and July 9, 1987 directives. The contract unequivocally required plaintiff to submit a plan pursuant to the contracting officer's directives and to proceed with the contract as directed. If plaintiff was dissatisfied with the directives it could then seek an equitable adjustment to the contract, with the right to appeal the contracting officer's decision to the Postal Service Board of Contract Appeals, or this court. *See* 41 U.S.C. §§ 606, 609 and General Provision 4(e)(i)(ii) of the contract. Plaintiff pointedly refused to comply with a lawful directives of the contracting officer to provide a plan and schedule to remove and replace the slab. Instead, plaintiff took an intractable position and made unwarranted demands upon the contracting officer. Plaintiff was properly terminated for default because it refused to comply with Mr. Cipriani's directives. *Stoeckert v. United States,* 183 Ct.Cl. 152, 391 F.2d 639, 645 (1968).[14]

It took plaintiff considerable time to realize its position with respect to the project subsequent to the termination. Plaintiff's counsel's letter of August 27, 1987, over a month after the default, is illustrative of plaintiff's irresponsible behavior. In that letter, Mr. Lawrence R. Greenberg, with more than a minimum degree of arrogance, stated that plaintiff was

> ready, willing, and able to complete the ... project *while leaving in abeyance the issue pertaining to the slab until it can be determined what is the cause and remedy for the alleged problem with regard to the slab.*
>
> If the above is agreeable with you, please forward your consent in writing so that the same is received by the undersigned by September 1, 1987. If same is not received by the undersigned by September 1, 1987, time being expressly of the essence, *my client will assume that you are unwilling to allow it to proceed on the above construction project.* (emphasis added).

The coveted consultants' reports, which would no doubt have been of general interest to plaintiff, discussed possible repair of the slab, not its removal and replacement,

---

**13.** General Provision 4 of the contract, entitled *Claims and Disputes,* contractually bound plaintiff to follow Mr. Cipriani's directives. Paragraph (h) states:

> Except as the parties may otherwise agree, pending final resolution of a claim by the Contractor arising under the contract, the Contractor shall proceed diligently with the performance of the contract in accordance with the Contracting Officer's decision.

**14.** The court notes that on December 3, 1986, Mr. Cipriani gave several instructions to plaintiff, and that by letter dated December 16, 1986, plaintiff refused to comply in part because the letter had been signed by Mr. Cipriani and not by Mr. Hunter, the contracting officer who executed the contract. In the December 16 letter, plaintiff stated that it "[would] only act upon such approval to proceed with any recommendations and resulting costs after Mr. Hunter has authorized and/or directed such recommendation be performed." By letter dated December 17, 1986, Lane Architectural Group informed Mr. Hunter that plaintiff claimed to be confused by "all these personnel changes" and that plaintiff was using this as an excuse not to perform. Mr. Harman, plaintiff's construction manager,

claimed not to know who Mr. Cipriani was, even though he had met with Mr. Cipriani on several previous occasions, and elected to wait for instructions from Mr. Hunter only.

Plaintiff's position is specious. Mr. Cipriani was a contracting officer and had signed the December 3, 1986 letter as such. Plaintiff did not seek clarification of Mr. Cipriani's authority, if it in fact needed clarification. Clause No. 1 of the contract General Provisions contemplates that more than one contracting officer may be assigned to the project. It defines the term "contracting officer" as "any ... officer or employee who is properly designated Contracting Officer...." Plaintiff, by its own assertion, was not a neophyte in the public construction contract arena and cannot be heard to legitimately claim that it needed to only respond to the contracting officer of its choice. Moreover, Mr. Kaplan testified that the parties discussed General Provision No. 1 at the pre-bid conference held in September 1985. There was no indication given that there would not be more than one contracting officer assigned to the project; in fact, it would indeed be rare if there was not more than one contracting officer assigned to any significant construction project.

and therefore, were irrelevant to Mr. Cipriani's directives. Contrary to plaintiff's contentions the reports would not have not made plaintiff's task easier, as they did not address removal and replacement of the workroom slab. In *PBI Elec. Corp. v. United States*, 17 Cl.Ct. 128, 135 (1989), a factually similar case, the court held that defendant did not breach any duty it owed its contractor by refusing to give further information to the contractor because the information was not needed to finish the project. Under the facts presented, Mr. Cipriani was under no obligation to provide plaintiff with government-owned reports, and his refusal to do so did not undermine plaintiff's ability to perform. The consultants recommendations were just that—recommendations. Defendant did not know at the time it issued the February 26 and March 27, 1987 determinations to plaintiff whether it would accept the consultant's recommendations, or not. The court is convinced that Mr. Cipriani sincerely wanted plaintiff's independent recommendations on how to proceed. Had plaintiff presented any recommendations, Mr. Cipriani and his staff would have considered them in conjunction with its views and those of its consultants. After discovering the full story of plaintiff's shoddy construction of the slab, Mr. Cipriani, in a legitimate effort to protect the best interests of the government acted within the scope of his responsibility and duty to demand a slab in accordance with the contract, and not to accept a defective slab that had been repaired, even in the face of apparent contrary advice of several consultants.

Plaintiff was in clear and incontrovertible violation of the contract and the government is entitled to compliance with the contract requirements. *Jet Constr. Co. v. United States*, 209 Ct.Cl. 200, 531 F.2d 538, 543 (1976); *Farwell Co. v. United States*, 137 Ct.Cl. 832, 148 F.Supp. 947, 949 (1957). Defendant had "a near absolute right to insist on strict compliance" with the specifications, *Martin J. Simko Constr., Inc. v. United States*, 11 Cl.Ct. 257, 268 (1986), *vacated in part on other grounds*, 852 F.2d 540 (Fed.Cir.1988), and was under no obligation to accept defective work even

with a price adjustment. *See* General Provision 51(b) and (c), the *Inspection and Acceptance* clause of the contract; *S.S. Silberblatt, Inc. v. United States*, 193 Ct. Cl., 269, 433 F.2d 1314, 1323 (1970). *Cascade Pacific Int'l v. United States*, 773 F.2d 287 (Fed.Cir.1985) held that "the Government, just as any other party, is entitled to receive that for which it contracted and has the right to accept only goods that conform to the specifications." *Cascade Pac.*, 773 F.2d at 291 (citing *American Elec. Contracting Corp. v. United States*, 217 Ct.Cl. 338, 579 F.2d 602, 608 (1978) (*per curiam*)). It is the contracting officer who is commissioned to protect the best interests of the United States in matters of government procurement, not its hired consultants and engineers.

■ There is an implied duty in contract law that both parties will cooperate and refrain from hindering each other's performance. *Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 550 F.2d 26, 32 (1977); *Cedar Lumber, Inc. v. United States*, 5 Cl.Ct. 539, 549 (1984). To determine if defendant violated its implied obligation not to hinder plaintiff or delay the contract the court must analyze the reasonableness of defendant's actions in the particular context of the issues presented. *L.L. Hall Constr. Co. v. United States*, 177 Ct.Cl. 870, 379 F.2d 559, 563 (1966); *Commerce Int'l. Co. v. United States*, 167 Ct. Cl. 529, 338 F.2d 81, 86 (1964). Even if the consultants' reports would have made plaintiff's tasks under the directives easier, plaintiff was not "stranded," as plaintiff would have the court believe. Messrs. Kaplan, Harman, and Hearn, and plaintiff's subcontractors, all qualified construction professionals, were quite capable of submitting a plan to Mr. Cipriani to satisfy the directives. It is clear from the record that plaintiff was more interested in using the known conclusions of the consultants' reports as arrows in its quiver to take aim at Mr. Cipriani's directives, rather than to assist plaintiff in complying with the directives. The court finds that defendant did not hinder plaintiff's performance un-

der the contract. *See PBI Elec.*, 17 Cl.Ct. at 135.

### 4. *Bad Faith Allegations*

 Plaintiff argued that defendant's agents acted in bad faith in terminating the contract and that the termination should be converted to one for the convenience of the government pursuant to General Provision 10 and 11 of the contract, the *Termination for Convenience of the Government* and *Termination for Default* clauses, and damages for defendant's "bad faith" termination of the contract. Plaintiff has a high burden of proof to meet. This court assumes that government officials act in good faith. *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 770–71 (1982); *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *Librach v. United States*, 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959) (citations omitted). Plaintiff must establish "well-nigh irrefragable proof" of bad faith. *Torncello*, 681 F.2d at 770. In cases where bad faith is alleged, this quantum of proof requires evidence of "specific intent to injure the plaintiff." *Kalvar*, 543 F.2d at 1302.

As evidence of bad faith, plaintiff pointed to several unrelated instances in which defendant's agents acted, or failed to act, with which plaintiff disagreed. There was no analysis of the alleged misdeeds, nor did plaintiff present evidence that the alleged misdeeds were causative of delay or other damages. It is amply clear that as the contract began to disintegrate, relationships between the parties deteriorated to the point where defendant, pursuant to General Provision 16(b), the *Material and Workmanship* clause of the contract, directed that plaintiff remove Mr. Hearn, its project superintendent, from the project.

 Although plaintiff implied bad faith specifically on the part of Mr. Cipriani, it was unable to produce the quantum of proof necessary to dislodge the presumption that public officials act in good faith. *Sanders v. United States Postal Serv.*, 801 F.2d 1328, 1331 (Fed.Cir.1986); *McEachern*

*v. Office of Personnel Management*, 776 F.2d 1539, 1545 (Fed.Cir.1985) (citing *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977)). Plaintiff failed to prove that the contracting officer or any of defendant's other agents acted outside the reasonable scope of their duties. Plaintiff argued that defendant consciously and intentionally acted to interfere with or endanger plaintiff's work on the project, but provided no proof of such acts. Defendant took a tough stance with plaintiff, but there was no proof that any person acted with malice or bad faith towards plaintiff. There was no evidence that the contracting officer specifically intended to injure plaintiff. *See Kalvar*, 543 F.2d at 1302. In sum, the actions of defendant do not show bad faith by "well-nigh irrefragable proof." *Id.* at 1301; *Embrey v. United States*, 17 Cl.Ct. 617, 626 (1989).

### 5. *Subsequently Discovered Reasons for Termination*

The contracting officer's decision to terminate plaintiff for default was also supported by clear documented evidence of plaintiff's substandard performance in other areas of the contract as well. As noted, the record demonstrated over four hundred instances of deficient work discovered on the reprocurement.

 Plaintiff argued, without support, at trial, in its post-hearing briefs, and request for reconsideration that the government cannot use information discovered "after the fact" to justify a termination for default. The law says otherwise. Any extant reasons supporting a default termination are sufficient to sustain the default, even if not known or discovered until after the decision to terminate for default is made. *College Point Boat Corp. v. United States*, 267 U.S. 12, 15–16, 45 S.Ct. 199, 200–01, 69 L.Ed. 490 (1925); *Pots Unlimited, Ltd. v. United States*, 220 Ct.Cl. 405, 600 F.2d 790, 793 (1979) (citations omitted); *Samuel T. Isaac & Assocs., Inc. v. United States*, 7 Cl.Ct. 255, 258 (1985); *Joseph Morton Co. v. United States*, 3 Cl.Ct. 120

(1983), *aff'd*, 757 F.2d 1273 (Fed.Cir.1985). The termination for default was initially based on plaintiff's refusal to comply with the June 17 and July 9, 1987 directives of the contracting officer. The termination was justified, as well, by the later-discovered shoddy workmanship, and failure to meet contract specifications.

◼ Plaintiff was obligated under General Provision 4, paragraph (h), the *Claims and Disputes* clause of the contract, to continue work in accordance with the directives while simultaneously disputing the directives. *See Stoeckert*, 391 F.2d at 645; *H & H Mfg. Co. v. United States*, 168 Ct.Cl. 873, 879, 1964 WL 8568 (1964). Plaintiff had no right under the contract to cease work and appeal the contracting officer's directives. It is irrelevant whether the contracting officer was right or wrong in directing plaintiff to furnish a plan addressing what appeared to be a serious problem. A. McBride and I. Wachtel, *Government Contracts* § 31.150[1] (1978). The *quid pro quo* for defendant's mandate that plaintiff continue work in the face of disputed directives of the contracting officer is found in General Provision 51, paragraph (e), the *Inspection and Acceptance* clause of the contract. Under that provision of the contract, had plaintiff prepared a plan, tested the concrete, and made necessary repairs or removed and replaced the slab, and found to have been without fault for the cracking, plaintiff would have been reimbursed all its costs, plus interest. *See also* General Provision 4(g) of the contract.

Because it so finds, the court need not address the other reasons for the termination for default (e.g., lack of job action and abandonment) at this time, though there will be reference to inaction and abandonment by plaintiff in the following discussion of the delay and other claims. Defendant has shown that it had reasonable and proper grounds for the default termination. Plaintiff's work on the slab, and in other areas, clearly did not meet its contractual requirements, and it refused to obey two properly issued directives of the contracting officer. The court cannot find that any of defendant's agents acted so

improperly as to justify conversion of the default termination to one for the convenience of the government. *See Norwood Mfg., Inc. v. United States*, 21 Cl.Ct. 300, 309–10 (1990), *aff'd*, 930 F.2d 38 (Fed.Cir. 1991).

### 6. *Alleged Abuse of Discretion and Bad Faith*

◼ Plaintiff argued that the contracting officer acted arbitrarily and abused his discretion by terminating the contract. It is indisputable that the contracting officer had the power and authority to terminate the contract. *Schlesinger v. United States*, 182 Ct.Cl. 571, 390 F.2d 702, 707 (1968). Plaintiff must satisfy a significant burden of proof to show abuse of discretion. *Continental Business Enters., Inc. v. United States*, 196 Ct.Cl. 627, 452 F.2d 1016, 1021 (1971) (citing *Keco Indus., Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233, 1240 (1970)). *Keco Industries* identified four factors used in determining whether a government official acted arbitrarily and abused his discretion. *See Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974).

1. Is there evidence indicating the official's subjective bad faith? *Keco Industries*, a case in which an unsuccessful bidder sought recovery of bid preparation costs, limited this element to subjective bad faith on the part of procuring officials in depriving a bidder of full and honest consideration of its bid. *Id.*, 492 F.2d at 1203. Warranted damages were recovery of bid preparation costs. *Id.* (citing *Heyer Prods. Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409 (1956)).

2. Was there any reasonable basis for the decision to terminate? Normally "no reasonable basis" for the administrative decision will suffice for a showing of capriciousness. *Id.* at 1203–04 (citing *Continental Business Enters. Inc. v. United States*, 196 Ct.Cl. 627, 452 F.2d 1016, 1021 (1971)).

3. What amount of discretion was granted to the government's agent? "[T]he degree of proof of error necessary

for recovery is ordinarily related to the amount of discretion entrusted to the procurement officials by applicable statutes and regulations. *Id.* at 1204 (citing *Continental Business*, 452 F.2d at 1021; *Keco Indus.*, 428 F.2d at 1240).

4. Was there a proven violation of an applicable statute or regulation? A "proven violation of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery." *Id.* (*cf. Keco Indus.*, 428 F.2d at 1240).

Bad faith is distinguishable from abuse of discretion; the standard is high but does not reach the higher "well-nigh irrefragable proof" standard. *Embrey*, 17 Cl.Ct. at 626. The Court of Claims

> ... pointed out that the standard of proof to be applied in cases where arbitrary and capricious action is charged should be a high one. Final decisions should be based on the particular circumstances of each case. It will remain for [the] plaintiff to meet this high standard by proving to the [court] that such arbitrary and capricious action as alleged did in fact exist.

*Keco Indus., Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233, 1240 (1970).

Weighed against these factors plaintiff has not met its burden of proof. The court has found that there was no persuasive evidence of any malice or bad faith by the contracting officer or any of defendant's agents. "Subjective bad faith" did not cause the termination. Rather, in response to his duty to provide a post office building, the contracting officer acted to protect defendant's interests. Defendant has proved that plaintiff failed to respond to proper directives it was bound to follow, and that the slab and other items were defective and not in compliance with the terms of the contract. Plaintiff simply cannot show that there is no reasonable basis for the adverse administrative decision. The contracting officer acted reasonably, not in bad faith, when he terminated the contract for default, and did not abuse his broad discretion. Finally, try as it might, plaintiff did not prove violation of an applicable statute or regulation by defendant.

## IV. THE DELAY CLAIM

 Plaintiff claims entitlement to damages for a total of 272 days of delay on the project. As discussed above, every contract with the government contains an implied obligation that neither party will do anything to prevent, hinder, or delay performance. *Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 550 F.2d 26, 32 (1977); *Cedar Lumber, Inc. v. United States*, 5 Cl.Ct. 539, 549 (1984). The government is said to have violated the implied obligations where its action or inaction delays performance of the project thus increasing costs. *Lewis–Nicholson*, 550 F.2d 26. When this occurs the contractor may have a claim for damages. *See id.* at 26–27, 32.

### A. Suspension of Work

Plaintiff did not specify exactly under which clause of the contract its delay claims were predicated but, with a few exceptions, presented proof and argued entitlement consonant with government-caused project delay to the critical path. There are, of course, two possible routes to successful prosecution of a delay claim. *See Chaney & James Constr. Co. v. United States*, 190 Ct.Cl. 699, 421 F.2d 728 (1970). The *Suspension of Work* clause of the contract, General Provision 9, provides in paragraph (b) that:

> If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer ... an adjustment shall be made for any increase in the cost of performance of this contract ... necessarily caused by such unreasonable suspension, delay or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or (2) for which an equitable adjustment

is provided for or excluded under any other provision of this contract.

■ The Court of Federal Claims and the Court of Appeals for the Federal Circuit have held that under the *Suspension of Work* clause, the contractor may be awarded compensation for "government-caused delays of an unreasonable duration." *Beauchamp Construction Co. v. United States,* 14 Cl.Ct. 430, 436–37 (1988) (citing *John A. Johnson & Sons v. United States,* 180 Ct.Cl. 969, 1967 WL 8810 (1967)); *Chaney and James Construction Co.* 421 F.2d at 731–32. The clause makes an adjustment unavailable, however, "to the extent that other causes, attributable to said contractor, would have simultaneously suspended, delayed, or interrupted contract performance." *Beauchamp,* 14 Cl.Ct. at 437. The delay need not be a Government ordered work stoppage to be compensable. Any unreasonable delay attributable *solely* and *directly* to the Government will be considered a constructive suspension of work for purposes of the clause. *John A. Johnson & Sons,* 180 Ct.Cl. at 984–85; *see Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 351 F.2d 956, 967–68 (1965). Contract completion need not be delayed. Delay to part of the performance may result in compensation. *See Chaney and James Constr. Co.,* 421 F.2d at 733.

■ To recover, the contractor must show: (1) the delay is of an "unreasonable length of time," *Wunderlich,* 351 F.2d at 967 (citing *River Construction Corp. v. United States,* 159 Ct.Cl. 254, 270, 1962 WL 9302 (1962)); *F.H. McGraw & Co. v. United States,* 131 Ct.Cl. 501, 506–07, 130 F.Supp. 394 (1955); (2) the delay was proximately caused by the Governments actions, *id.* (citing *River Construction,* 159 Ct.Cl. at 270; *Laburnum Construction Corp. v. United States,* 163 Ct.Cl. 339, 325 F.2d 451 (1963); *J.A. Ross & Co. v. United States,*

126 Ct.Cl. 323, 331–34, 115 F.Supp. 187 (1953)); and (3) the delay resulted in some injury to the contractor, *see Wunderlich* at 968 (citing *River Construction,* 159 Ct.Cl. 254; *Addison Miller, Inc. v. United States,* 108 Ct.Cl. 513, 70 F.Supp. 893, *cert. denied,* 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408 (1947); *J.D. Hedin Construction Co. v. United States,* 171 Ct.Cl. 70, 347 F.2d 235, 246–47).[15] Plaintiff must show that defendant was the "sole proximate cause" of the delay, and that no concurrent cause would have equally delayed the contract regardless of the Government's action or inaction. *Merritt–Chapman & Scott Corp. v. United States,* 208 Ct.Cl. 639, 528 F.2d 1392, 1397 (1976). This is not to say that where there are concurrent delays, a contractor may not attempt to prove the effect of government caused delay as distinct from others. Rather, "[t]he general rule is that '[w]here both parties contribute to the delay, neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each.'" *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir. 1984) (quoting *Blinderman Construction Co. v. United States,* 695 F.2d 552, 559 (Fed.Cir.1982); *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944)). As a result, "[c]ourts will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government." *Id.*

## B. Delay to Critical Path

■ Not only must plaintiff disentangle its delays from those allegedly caused by the government, but the delays must have affected activities on the critical path. *See Wilner v. United States (Wilner II),* 26 Cl.Ct. 260 (1992), *rev'd on other grounds,* 994 F.2d 783 (Fed.Cir.1993). It is not enough that an activity is delayed: there

15. Even though the case is bifurcated and this opinion addresses only liability, plaintiff must show injury to recover for the claimed delay. The injury need not be quantified with precision—that will be the subject of negotiations or subsequent proceedings—but plaintiff bears the burden of proving some economic injury as a

condition of any recovery. Courts have held, "no matter how unreasonable the Government's delay, there can be no recovery without proof that th[e] delay caused material damage." *Commerce Int'l Co. v. United States,* 338 F.2d 81, 89 (Ct.Cl.1964) (citations omitted).

must be delay of an activity on the critical path for there to be project, or compensable, delay. *See id.* "An interruption in one phase of the work ... does not always result in an increase in the time necessary for total performance. In such a case, the absence of any delay would obviously preclude recovery...." *Paul Hardeman, Inc. v. United States,* 186 Ct.Cl. 743, 406 F.2d 1357, 1361 (1969).

The Court of Claims described critical path method analysis as "an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects." *Haney v. United States,* 230 Ct.Cl. 148, 676 F.2d 584, 595 (1982). Critical path analysis is utilized to prove delay solely attributable to defendant. *Wilner II,* 26 Cl.Ct. at 274 (citing *Wilner v. United States (Wilner I),* 23 Cl.Ct. 241, 245 (1991)). *Wilner I* discussed in detail the necessity for, and value of, critical path analysis in order for plaintiff to prove a delay claim.

> Each subproject is identified and classified as to the duration and precedence of the work. (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

*Wilner v. United States (Wilner I),* 23 Cl.Ct. 241, 244–45 (1991) (quoting *Haney,* 676 F.2d at 595). This court has noted that

determining the critical path is essential to determining damages.

> The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path ha[s] an impact upon the time in which the project [i]s completed. If work on the critical path [i]s delayed, then the eventual completion date of the project [i]s delayed. Delay involving work not on the critical path generally ha[s] no impact on the eventual completion date of the project.

> \* \* \* \* \* \*

[The] critical path periods provide the court with the foundation necessary to reach delay damage conclusions.

*G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 728–30 (1984).

> A requisite for government liability for the consequences of a critical path delay is fault on the part of the Government. Courts will deny recovery where the delays [of the Government and the contractor] are concurrent and the contractor has not established its delay apart from that attributable to the government. Furthermore, the court is constrained ... to award delay damages only for the unreasonable portion of a government-caused delay. Not all delay that occurs along the critical path is unreasonable.

*Wilner II,* 26 Cl.Ct. at 263 (citations omitted); *Chaney & James Constr. Co. v. United States,* 190 Ct.Cl. 699, 421 F.2d 728, 737 (1970). Only delay on the critical path which affects a project's completion date is compensable.

C. PROOF OF CRITICAL PATH AND CRITICAL PATH DELAY [16]

"In order for the court to be able to award damages to plaintiff for government-caused project delay along the critical path, the court must have before it evidence that establishes the critical path of

---

**16.** As a preliminary matter, the court is constrained to note that plaintiff's presentation of its case, its briefing of the issues, and legal argument, confounded rather than clarified the court's understanding of its delay claims. Much of the evidence consisted of general comments recorded in unidentified, highly suspect, self-serving correspondence, much of which was prepared for litigation long after the events allegedly occurred. Plaintiff's already weak case foundered in the wake of defendant's evidence and testimony.

plaintiff's project." *Wilner II*, 26 Cl.Ct. at 263. However, the maximum number of delay days for which plaintiff may recover is the number of days that work continued on the contract beyond the original completion date of October 8, 1986, until the termination for default on July 22, 1987, i.e., 274 days, minus the 118 days the contract was extended by change order.[17] *See id.* at 263 n. 4. This amounts to 156 days, not 272 as claimed by plaintiff.

The contract did not dictate the preparation and updating of a Program Evaluation and Review Technique (PERT) chart, to provide critical path method (CPM) analysis, both of which are traditionally used by construction contractors. General Provision 65, the *Construction Project* clause of the contract, simply required plaintiff to provide a "practicable progress chart." [18] Rather than trying to integrate alleged government-caused delays into a critical path analysis pursuant to *Shupe* and *Haney*, plaintiff simply listed instances of delay allegedly attributable to defendant, in the form of a bar chart, and referred the court to the record to read anecdotal testimony about the delays. Plaintiff provided brief summaries of alleged government mismanagement kept intermittently by Mr. Hearn in his daily logs, but did not address the relevance or significance of those allegations in the context of the critical path method analysis. In fact, plaintiff failed to provide the court with any credible coher-

ent analysis of critical path delay, leaving to the court the well-nigh impossible task of identifying, quantifying, and assigning responsibility for critical path delay.

Plaintiff called Mr. Patrick Cumine as its expert construction delay witness to identify the delays and to establish the duration of, and responsibility for, the delays. Mr. Cumine did not expressly state as much, but before he could address the alleged project delays, he had to identify the critical path. It was clear to the court that plaintiff's principals understood the critical path method of construction planning by the date of trial, but there is ample evidence that plaintiff did not know what the critical path was during the contract period. Mr. Cumine testified that he reviewed most of the record and interviewed Messrs. Kaplan and Hearn at length in preparing his analysis. Based on his investigations, Mr. Cumine prepared a "construction schedule" bar chart for trial, supposedly based on plaintiff's as-planned bar chart. However, Mr. Cumine did not know if plaintiff's chart, upon which he based his chart, was the original construction schedule bar chart or a version that had been revised at some unknown later date. The latter point is important because in order to establish delay to completion of the project, one must have a starting point and the contractor's original intent in order to show

17. Counsel for defendant, in his opening remarks at trial, admitted liability for the 118-day delay previously allowed administratively by the contracting officer. The court has concluded that it cannot find from the record that plaintiff would be entitled to the 118 days however, "a contracting officer's findings of fact and conclusions of law ... favorable to the contractor have been held to constitute an 'evidentiary admission' of liability. *Wilner v. United States*, 994 F.2d 783 (Fed.Cir.1993) (citations omitted). Counsel's repeat of the admission, on the record, added weight to the contracting officer's admission. Defendant did *not* assert that the contracting officers administrative allowance of the 118 days of delay was improper. *See id.* It is for these reasons that the court declines to "disallow" the 118 days.

18. General Provision 65 continued:
The chart shall show the principal categories of work corresponding with those used in the breakdown on which progress payments are

based; the order in which the Contractor proposes to carry on the work, the date on which he will start each of the categories of work, and the contemplated dates for completing the same. The chart shall be in suitable scale to indicate graphically the total percentage of work scheduled to be in place at any time. At the end of each progress payment period, or at such intervals as directed by the Contracting Officer, the Contractor shall (1) adjust the chart to reflect any changes in the contract work, completion time, or both as approved by the Contracting Officer, (2) enter on the chart the total percentage of work actually in place, and (3) submit three copies of the adjusted chart to the Contracting Officer.

Defendant explained that the principal purpose of the charts was to provide a check on progress payments by permitting defendant to compare actual progress with claimed progress.

how and when the contractor intended to perform each phase of the work.

If the base bar chart Mr. Cumine used was actually a revised version, it did not accurately depict plaintiff's original intended construction schedule. Just how it differed was not explained. Mr. Cumine could not state whether his chart was based either on plaintiff's original chart, or on an amended version; none of plaintiff's witnesses offered any clarification on this point of confusion. Neither did plaintiff offer any evidence that its as-planned bar chart was reasonable. Compounding this problem was that the base bar chart that Mr. Cumine prepared for trial was, in his words, in a "different format" than plaintiff's. In the interests of judicial economy, the court permitted use of Mr. Cumine's bar chart with the caveat that at some point during trial plaintiff would lay a foundation showing that the alleged as-planned bar chart prepared by Mr. Cumine was the same as the original chart prepared by Mr. Kaplan. Plaintiff never did so, and the court does not know to this day whether the two charts are the same. The best Mr. Kaplan could do was state he "believed" the two charts were identical.

Mr. Cumine's bar chart had three clear plastic overlays. The first overlay depicted what he identified as the as-built bar chart and the "duration as-planned/as-built" comparison. His second overlay was a "pure graphical representation of the date of a document which relate[d] to a delay or impact on the specific work activity...." Not all of the documents to which he referred were specifically identified and there was no way for the court to confirm the accuracy of the information shown on the overlay. Nor was there any proffer of proof that the underlying documentation was factually accurate. The third overlay was Mr. Cumine's "simplified critical path ... and the critical path logic." He explained that his "simplified critical path" showed only critical path delays but not non-critical path delays, which should not

have been shown in any event. Mr. Cumine admitted that he assumed all time extensions allowed by defendant were on the critical path, but logic and credible evidence revealed that no to be the case.

Mr. Cumine also "identified" several instances where there were two concurrent delays on the critical path thereby invalidating much of his analysis. The suggestion of two concurrent delays on the critical path flies in the face of the critical path concept. Logically there cannot be two concurrent delays on the critical path because there is but one critical path at any one point in time, running in sequence from one critical activity to another.[19] *See Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 75 (1992). There is a sequence of work to be done through the project, and on that sequence work must be followed every day. The critical path may change during performance, but still remains the only critical path at any one time. *Id.*

Mr. Cumine admitted that neither the base bar chart he prepared, nor plaintiff's as-planned bar chart, actually constituted a critical path schedule; they did not "indicate the interrelationship between a preceding and succeeding activity ... [with] an interdependency link." *See Wilner II*, 26 Cl.Ct. at 264. Nevertheless he argued that "[t]he delays are identified by the comparison of the activity for the duration of the activities in comparing the 'as planned' and the 'as built' critical path activities." The court agrees that plaintiff's diagram is not a critical path analysis, but it does not agree that critical path delays are identifiable in the manner Mr. Cumine suggested. "Essential to a determination that an activity belongs on the critical path of a project is an understanding of how that activity affects the other activities." *Wilner II* at 263. The critical path method is an efficient way of organizing and scheduling a project which consists of numerous interrelated separate work

---

**19.** For instance, Mr. Cumine suggested the existence of a critical path delay of 177 days for installation of drywall but asserted that because defendant allowed time extensions for other "concurrent" delays, the drywall delay was only 119 days, even though drywall at the time allegedly was the critical path item.

items. Each work item is identified and classified as to the duration and precedence of the work. Plaintiff's bar chart depicted its version of numerous work items. However, it failed to prove that the claimed delays occurred along the critical path, because it does not indicate the interdependence of any one or more of the work items with any other work items. Plaintiff proffered documents prepared solely for use at trial as its estimate of work items that were on the critical path while the project was on-going, but offered no credible evidence of the interdependence of the project's activities. *Id.* (citing *WRB Corp. v. United States*, 183 Ct.Cl. 409, 426, 1968 WL 9146 (1968)). Plaintiff admitted into evidence much data reflecting alleged days of delay, dollars lost, and expenses incurred, but offered no credible proof of how the data related to delay or causation of delay. Without being able to allocate expenses to delay claims, this court cannot award a judgment in favor of plaintiff. *Westerhold v. United States*, 28 Fed.Cl. 172 (1993). Plaintiff appears to be seeking a total cost claim for which it did not make an adequate showing. The total cost approach to damages may be used only in rare cases where it is proved that

> (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.

*WRB Corp. v. United States*, 183 Ct.Cl. 409, 426 (1968) (citations omitted); *accord Servidone Construction Corp. v. United States*, 931 F.2d 860, 861 (Fed.Cir.1991).

Based on his analysis, Mr. Cumine alleged that he identified fifteen separate quantifiable "items of critical delay." Mr. Cumine may have used the phrase "critical delay" as a shorthand term to mean "critical path delay," but even if he did so, the court does not know whether the "critical delays" he allegedly identified were found using his concept of "concurrent" critical delays or by some other method. If the latter, the "critical delays" axiomatically may or may not have been on the critical path. A discussion and analysis of specific delay claims follows.

### 1. *Site Preparation Work*

Mr. Cumine alleged that the first critical delay occurred at the very outset of the contract. Plaintiff was prepared to begin work on September 23, 1985, but found that the job-site was "not ready" and that "[t]he Post Office required Mega to do considerable additional work in order to get the site prepared to the state that it should have been in on September 23rd." [20] Defendant allowed a thirty-two day extension of time in Modification No. 2 for plaintiff to complete this site-work. Mr. Cumine's analysis showed that it took plaintiff an additional thirty-nine days to prepare the site to begin construction, seven days more than allowed, thereby allegedly causing a delay of seven days to the critical path. The court finds fault with this analysis. The additional work at the outset of the contract was not on Mr. Cumine's as-planned bar chart, and may or may not have been on plaintiff's original, or amended, as-planned schedule. In fact, at the conclusion of his testimony, Mr. Cumine stated that the very same site-work was *not* on the critical path; "the critical path lies in the building itself." Mr. William Irwin, defendant's expert construction delay witness, agreed that site-work was not on the critical path.[21] Mr. Kaplan confirmed on cross-examination that site prep-

---

**20.** It should be borne in mind that Mr. Kaplan previously testified that work began on September 17, 1985. Because this portion of the discussion of the delay claim addresses Mr. Cumine's analysis, the court will consider that work began on September 23, 1985, a week later.

**21.** Mr. Irwin's charts and testimony suffered from the same problems as did Mr. Cumine's and for that reason are equally faulty. For example, using exactly the same data as did Mr. Cumine, Mr. Irwin concluded that it took plaintiff twenty-one days to clear the site at the outset of the contract as compared to Mr. Cumine's thirty-nine days. By studying the data the court cannot find support for either supposition.

aration work was not on the critical path and that he could not say that the claimed site-work delayed the project, even though he requested and received thirty-two additional days.

The fact that the pre-construction site-work was not on the critical path, and that defendant's allowance of thirty-two additional days for performance at the outset of the contract thus did not affect the critical path, further confused the entire delay issue. While the thirty-two days in practical terms would have been reflected at the end of the contract, for analysis of any delay, they had to be counted at the beginning of the contract. Mr. Cumine's delay analysis was flawed because the impact of that initial "lost" time was not calculated from when it occurred, and thus not considered a factor in the later periods of alleged delay. The thirty-two day period may have constituted a non-critical path delay at the beginning the contract, but Mr. Cumine did not take that into account in his calculations of "the delay" that he alleged occurred during the actual construction phase. By not counting the initial delay at the beginning of the contract, Mr. Cumine added thirty-two days of project delay to the as-planned construction phase.[22]

### 2. Earthwork and Footing Excavation

Plaintiff's base bar chart identified "Earthwork" and "Footing Excavation" as the third and fourth tasks to be performed on the project. "Earthwork" was apparently to have begun September 23, 1985, and be completed October 18 of the same year. "Footing Excavation" was not scheduled to begin until ten days later, on October 28, and be completed November 8, 1985. The only activity running during that ten-day gap in the as-planned schedule was "Mobilization," that was to begin September 23 and be completed November 1, 1985. Mr. Cumine surmised that the "Earthwork" did not actually begin until the second week of October and was not

completed until the last week of October, approximately the same time "Footing Excavation" was to begin. Mr. Cumine attempted to justify the as-built dates for "Earthwork" by adding an unexplained week of "impact" delay at the *beginning* of the period during which plaintiff was ostensibly to have performed "Earthwork." Without understanding the basis or reason for the alleged "impact" delay week at the very outset of the contract—before any work on the project began—the court cannot find that the "Earthwork" actually delayed "Footing Excavation" by a week, thereby adding seven days delay to the alleged critical path. In addition, the three week period between the apparent end of "Earthwork" and the start of "Footing Excavation," as shown on Mr. Cumine's version of the base chart and overlays, indicated that plaintiff intended only to continue the six week mobilization of its work force, and had no intention of working on site preparation, or on the building during that time.

### 3. Rain Delays

Other factors also bring into question the validity of Mr. Cumine's delay analysis. For example, his chart and narrative testimony indicated that he included days of rain in the alleged delay claims. Special Provision 13, entitled *Time Extensions*, provides that "[t]ime extensions will be considered only for climatic conditions that are more severe than the average seasonal conditions recorded by the U.S. National Weather Service." Early in his testimony, Mr. Cumine stated that rain was included in his base as-planned chart even though his analysis of the number of rain days that occurred over the "last five or six years" was average. On redirect, Mr. Cumine testified that he showed rain days on the chart and included them in his narrative of the delays but did not add days of delay to the alleged critical path, even though the charts allegedly showed only the critical path delays. He affirmed plaintiff's counsel's suggested answer that the

---

**22.** The court can only *infer* that Mr. Cumine added 32 days, though it cannot be confirmed. As the court attempted to read the charts from left to right and top to bottom, the data became increasingly incomprehensible and ultimately meaningless.

rain days were shown on the charts, and had been discussed earlier in his testimony, for "informational purposes only." *Cf. Wilner II*, 26 Cl.Ct. 260, 272. In light of all of Mr. Cumine's testimony, the court's study of his charts and overlays, and observation of the witness on direct and cross-examination, the court believes that the rain days were included in the alleged "critical path" delay claims, in contravention of clause SP–13 of the contract.

### 4. *Plaintiff's Claimed Completion of Work Items*

Mr. Cumine included days of delay attributable to defendant on which plaintiff was not working, but could have been. On February 3, 1986, defendant wrote to plaintiff, stating that, according to the project schedule, plaintiff was to have completed thirty-five percent of the project by the time it submitted its third request for progress payment. Yet, plaintiff's third request for progress payment showed that only thirteen percent of the project had been completed. Defendant's calculations included "no-work" time within the claimed delay period, further discrediting plaintiff's assertions that defendant was liable for 272 days of delay to the project. Defendant wrote, "[i]n accordance with clause 65(b) of the General Provisions, we request that you submit a revised schedule and plan to make up the lag in scheduled progress . . . ." Plaintiff's "response" was that the project was arguably twenty-three to twenty-five percent complete *vice* the thirteen percent shown in the record. There was sufficient evidence in the record to establish that defendant was faced with a serious discrepancy between actual project accomplishment and plaintiff's claimed degree of completion. Defendant was well justified in not blindly making progress payments without inquiring into the discrepancy. The time taken to compare claimed completion with actual completion was not unreasonably long, and there was no evidence that any delayed progress payments actually hindered plaintiff's work, or that any delay was not the result of plaintiff's submissions of questionable claims of accomplishment in support of its requests for progress payments.

### 5. *Job-site Abandonment During Construction Period*

The record revealed a number of instances when the job-site was vacant, or no work was being accomplished, even though there was work to be done that could have been done. One example was the delay caused by plaintiff when it ran out of rebar on April 3, 1986 in the midst of construction of the slab, and was forced to idle its workers for nearly a week until it could purchase more rebar and have it delivered to the site. The same was true for concrete that was rejected as substandard by defendant. Plaintiff did not explain the impact of the shortage of rebar or rejection of concrete but did include those periods as part of the alleged government-caused delay. The record reflects many days, even weeks, when the job-site was vacant but for plaintiff's project superintendent, when work could have been performed.[23] Another document included in the record reported that plaintiff had done almost "zero" work on the project between June 23, 1986 and January 6, 1987. A December 20, 1985 letter from Mr. Larry Reynolds, a U.S.P.S. Construction Inspector, to Mr. Harman, plaintiff's construction manager, four months after award, asked if plaintiff had abandoned the project because no workmen had been at the site for the "last 6 consecutive working days." The letter continued

[t]he gates are all locked so that even your sub-contractors [sic] cannot access the site. I don't see why your electri-

---

**23.** Although present at the job-site on days when other workers were absent, Mr. Hearn, plaintiff's project superintendent was not always at the job-site when other workers were present, even though the contract required that plaintiff maintain superintendence at all times. *See* General Provision 15, the *Superintendence by Contractor* clause of the contract. Mr. Hearn, it appears, split his time between the Canoga Park project and another Mega construction project. It was for this reason, and because of Mr. Hearn's refusal to cooperate with defendant's officers and agents, that the contracting officer directed his removal from the project pursuant to contract General Provision 16(b), *supra*.

cians and plumbers are not doing their ground work. Also, you could have framed and poured the dock wall, formed for the slab and finished pouring the remaining spread footings.

It is beyond my comprehension as to the way you are running this project. The weather has been some of the best of the year for the past two weeks.... We would like a meeting with you in our office at your earliest convenience, so that we may know what your intentions are.

Mr. Kaplan testified on cross-examination that there were periods when the project was "effectively" shut down because defendant had not provided needed guidance. "We literally ran out of work to do or any kind of consequential work to do." There was, however, no persuasive evidence that the alleged lack of guidance caused critical path delay or constituted delay to any work item. The record does reveal that the job-site was closed for seventeen days between August 8 and 25, 1986. Plaintiff argued that defendant was liable for this seventeen-day delay because it failed to provide crucial instructions to plaintiff on the fire sprinkler system, impact doors, and approximately thirty other items that allegedly required written instructions or directives from defendant. Again, plaintiff totally failed to analyze the alleged delay in light of its burden under *Shupe* and *Haney*. Consequently, the court cannot find defendant liable for the alleged seventeen-day shutdown.

In its post-trial brief, plaintiff asserted that a design problem with the fire sprinkler system arose on December 20, 1985, and that defendant failed to solve the problem until June 19, 1986. Yet, in the Appendix to its post-trial brief, plaintiff only referred to the fire sprinkler problem obliquely in construction log entries of May 1, 1986, and October 8, 1986, when the

installation of the fire sprinklers began. The court has no idea when, or even if, plaintiff submitted shop drawings to resolve the fire sprinkler design problem; whether the delay from June 19 to October 8, 1986 was attributable to defendant, plaintiff, or both; or why installation did not begin until October 1986 if the problem had been resolved in June 1986. Nor was there credible proof of when plaintiff planned to begin installation of the fire sprinkler system, whether the alleged delay was on the critical path, or if the alleged delay was concurrent with other activities on or off the critical path. Such disarray of proof was typical of dozens of similarly incomprehensible delay claims for which plaintiff seeks recovery.

The longest single delay to the project, according to Messrs. Kaplan and Cumine, was the installation and finishing of drywall, which allegedly delayed completion of the project by 119 days. Plaintiff contended that defendant was responsible for this delay because it failed to provide timely resolution of design defects in impact doors, fire sprinkler systems, heating and ventilation controls, electrical outlets, and screen walls, all of which allegedly required resolution before drywall activities could commence. However, plaintiff admitted that it did not want to install the drywall in a piecemeal fashion because to do so would be "inconvenient" and "not cost-effective." As a result, plaintiff asserted, the installation and finishing of drywall was delayed from approximately October 30, 1986, until January 7, 1987.[24]

Mr. Irwin, defendant's delay expert, testified, apart from his highly complex and discredited delay chart, that the impact door design problem was resolved in September 1986, and that installation of the fire sprinklers was completed by November 14, 1986.[25] Moreover, plaintiff's stolid re-

---

**24.** From October 30, 1986, to January 7, 1987, is 69 days. Plaintiff never explained how it calculated 119 days of delay to drywall installation.

**25.** Mr. Irwin's chart, and related testimony, were ordered stricken from the record at trial. As introduced, the chart was virtually unreadable. The court asked Mr. Irwin if the "weeks"

shown at the top of the chart were five-day work-weeks or seven-day weeks. He first testified that they were seven-day weeks, but the next day after consulting with the person who prepared the chart, informed the court that they were five-day work-weeks. At the close of his testimony the court called for a closer look at

fusal to install even one side of the drywall while awaiting changes to the temperature control units is totally without merit. Only seven units had to be installed and it is amply clear from the record that the units could easily have been installed with one side of the drywall in place. Even Mr. Cumine admitted on cross-examination that the temperature control units could have been installed with one side of the drywall installed. Based on this evidence, the court finds that plaintiff caused delay to the project, at the very least, between November 14, 1986, the day on which the installation of the fire sprinklers was completed, and January 7, 1987, the day on which drywall activities commenced, a total of fifty-four days.

It is also painfully obvious that plaintiff could not have continued work on the drywall through completion during the claim period because not all of the metal studs to which the drywall was to be attached had been installed. Even if plaintiff could have installed the drywall during the claim period there was no evidence of the amount of time plaintiff could have saved by installing all of the drywall at one time. Nor was there evidence of the allegedly additional time incurred because plaintiff insisted on delaying drywall installation until it could all be installed. Moreover, notwithstanding plaintiff's assertions that it could not have effectively installed the drywall in stages, it did partially install sections of the drywall before it was terminated for default. In fact, once plaintiff did begin to install drywall it did so on a piece-meal basis.

A further complicating factor facing the court was that plaintiff's pay requests for the drywall were grossly inaccurate. The record shows that in its May 1986 pay request, plaintiff stated that it had completed sixty-five percent of the value of the drywall installation. The amount of drywall installation remained at sixty-five percent until December 1986 when plaintiff claimed seventy-five percent completion. In January 1987, plaintiff claimed eighty-one percent completion of the drywall. Plaintiff raised the percentage of completion to ninety-five percent in its February 1987 pay request, and to ninety-nine percent in its April 1987 pay request. Plaintiff later claimed 100 percent of the drywall had been completed. Mr. Irwin, defendant's delay expert, whose testimony bears close watch, did state that when he visited the site in January 1987, the drywall was approximately twenty-five percent complete, not eighty-one percent complete as claimed in plaintiff's pay request for that month. The record also shows that between August or September 1986 through December 1986 when plaintiff claimed to have installed ten percent of the drywall, the job-site for all practical purposes had been abandoned. Mr. Ruffalo, defendant's on-site project manager, testified that by December 1986, no drywall had been installed, and that there was no reason why plaintiff could not have commenced installation by then. Only a few of plaintiff's employees were on-site on those days, and plaintiff provided no credible proof that the drywall subcontractor was on-site at all during the claim period.

Plaintiff consistently claimed that defendant was slow in giving necessary guidance, approving shop drawings, and answering its requests for clarifications. The claim has some basis; however, after careful examination of the record, the court finds that plaintiff has not proved that any such delay was on the critical path. The court is not unmindful that the contracting officer administratively allowed plaintiff

the chart and discovered that the entries were in fact for seven-day weeks. The following day, defendant's counsel further confused the matter by asserting that indeed a mistake had been made; the base as-planned schedule was shown as a five-day work-week whereas the as-built overlay was a seven-day week, making the entries even more useless. The difference between evaluating and comparing the delay claims over a five-day work week and a seven-day week would be significant over the course of the 719 days of the contract, especially as the modifications allowed by defendant, and plaintiff's claims, were based on a seven-day period. The court found Mr. Irwin's chart and expert testimony that was related to the chart grossly incompetent and ordered it stricken from the record. His fact testimony not related to the chart was not stricken from the record but was given little weight.

additional time for delay. While the contracting officer may have been willing to provide plaintiff with additional time and delay costs the court cannot do so in the absence of proof of causation or apportionment of causation for the delay. *Wilner II*, 26 Cl.Ct. at 276. The evidence relating to alleged changed work is insufficient for this court to attribute work item or critical path delay to defendant. In the absence of proof of critical path analysis, it is impossible to determine if some activities could have been scheduled earlier, but for delay attributable to defendant. The significance of this finding is that if the activities could have been scheduled earlier and conducted earlier they would have been completed prior to the original contract completion date. The absence of a critical path analysis for the project prevents the court from determining that critical path delay, attributable to defendant, actually occurred with respect to the claimed changes or other work. *Id.* Nor was there credible proof that plaintiff suffered material damage as the result of alleged government-caused delay. *See Wunderlich*, 351 F.2d at 967 (citing *River Construction Corp. v. United States*, 159 Ct.Cl. 254, 270, 1962 WL 9302 (1962)).

### 6. *Delay Occurring "After" Default Termination*

Mr. Cumine defined his fifteenth delay period as "indeterminate" because it was for delays that allegedly occurred after plaintiff's contract had been terminated for default. One such claim was for government-furnished equipment that was not delivered to the job-site until after the default. Mr. Cumine measured the duration of this element of the delay claim from the time plaintiff first requested the equipment, even though it was a clear that plaintiff was not ready to install the equipment at that time, or at any time in the reasonably near future. The problem with making a delay claim for the period of time after the termination for default is that plaintiff had no legal interest in the con-

tract, and defendant was under no duty to deliver the equipment until it was needed by the reprocurement contractor.[26] That Mr. Cumine, a professed expert on delay claims, would attempt to justify a delay claim beyond the date of a termination for default in total disregard of the contract and the law further diluted his credibility. *See also* section IV.D. of this opinion, *infra*.

### 7. *Unsubstantiated and Incomplete Analysis of Claims*

Mr. Cumine gathered the information he used in his analysis from documents and discussions he had with plaintiff's officers. Many of the documents used were not identified nor in the record, did not state what he alleged they reported, or were successfully refuted by defendant. The fact that Mr. Cumine discussed contract documents with plaintiff only and did not solicit comments from any of defendant's inspectors, managers, or contracting officers raises a strong presumption that his analysis was biased in favor of plaintiff. At one point during Mr. Cumine's testimony, plaintiff's counsel Mr. Greenberg, responding to an objection of hearsay, confirmed that portions of Mr. Cumine's analysis were based on bare self-serving statements made by plaintiff's officers, which Mr. Cumine opined were true, but to have them admitted into the record over defendant's hearsay objections, stated they were not offered for the truth of the matters contained therein. A good portion of Mr. Cumine's analysis was based upon plaintiff's construction logs, which are also highly suspect. Finally, Mr. Cumine included work in his delay analysis performed by plaintiff that was defective and had to be repaired or replaced by the reprocurement contractor.

### 8. *Credibility of Expert Witness*

The court was initially impressed with Mr. Cumine's demeanor at trial, but as his

---

**26.** The government-furnished equipment was timely delivered to B.G. Construction on the reprocurement.

testimony continued, and upon reflection and study of the record, discerned a strong partisan position by Mr. Cumine in favor of plaintiff, in conflict with one of his duties as an expert witness to objectively assist the court to understand the facts and issues.[27] Based upon the partisan nature of Mr. Cumine's testimony, his suspect version of plaintiff's bar chart with its incomprehensible overlays, his failure to consider defendant's position, and the totality of the evidence in the record, the court finds that Mr. Cumine's analysis was based upon unsupported or inaccurate information, ignorance of critical facts, misinterpretation of the terms of the contract, and misapplication or misunderstanding of the law and the contract. His testimony was thus flawed, and like Mr. Irwin's, given little or no weight. *See* Fed.R.Evid. 702 (1993), and Notes of the Advisory Committee thereto. "When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time." *Id.* (citing 7 Wigmore § 1918). *See Universal Camera Corp. v. N.L.R.B.* which held that the trier of fact's determination of the credibility of witnesses based on the trier's observation of their demeanor or conduct at the hearing is to be given great deference. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 495–96, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951); *Inwood Labs., Inc. v. Ives Labs, Inc.,* 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982); *Del Mar Avionics, Inc. v. Quinton Instrument Co.,* 836 F.2d 1320, 1325 (Fed.Cir.1987); *Krapf v. United States,* 17 Cl.Ct. 750, 764 (1989). See also *Publix Supermarkets v. United States,* 26 Cl.Ct. 161, 169 (1992), where the court concluded that the government's expert witnesses were not credible and their testimony was entitled to little or no deference.

### 9. *Credibility of Lay Witness*

Mr. Kaplan's testimony was no more helpful. He stated simply that plaintiff had worked on the project from the bottom upwards, but gave no specific description of the critical path or specifics of work item delays. Instead, he testified generally that plaintiff planned, *seriatim,* to prepare the soil, pour concrete, put up the framing and roof, install mechanical and electric items, drywall, and finish the project. Mr. Kaplan referred to his bar graph as a "Gantt Chart," a bar chart that shows actual completion dates and can be used to compare an as-planned schedule with actual performance. It does not permit logical CPM analysis because it does not depict a "critical path schedule;" the bars did not "indicate the interrelationship between a preceding and succeeding activity" with the all-important "interdependency link." *Wilner II,* 26 Cl.Ct. at 264. A PERT Chart permits identification of the critical path by the means of links between the activities. While the path will often change during construction the links reflect the changes and allow for subsequent analysis of the critical path activities, and where needed, an analysis of claimed delays against the known critical path. The bar charts lack objectivity in the analysis of claimed delays and required the trier of fact to subjectively guess at the path. The failure of the bar chart system is exemplified here where expert witnesses gave conflicting testimony on what each opined was the critical path, leaving to the court the task of considering claimed delays against an unknown critical path. *Id.* Mr. Kaplan's discussion of his undated bar chart was as unfathomable as Mr. Cumine's chart, and of no value to the court in dissecting the delay claims. Rather than presenting a theory of suspension of work or critical path delays in its briefs, plaintiff simply paraphrased the testimony of its witnesses and referred the court to ineffective, unpersuasive charts. The court has reviewed the evidence extensively, yet cannot make plaintiff's case for it. The testimony was equally unenlightening.

---

**27.** Rule 702 of the Federal Rules of Evidence, entitled *Testimony by Experts,* provides "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702 (1993).

In sum, plaintiff did not demonstrate what the critical path was; nor did it demonstrate that the delays allegedly attributable to defendant were work item or critical path delays or that it suffered material damage as the result of any government-caused delay. "Where both parties contribute to the delay, neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each." *William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed.Cir.1984) (quoting *Blinderman Construction Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir.1982); *Coath & Goss, Inc. v. United States*, 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944)). The testimony and bar charts prepared by Mr. Kaplan, and his "expert" delay witnesses, were of no help and were given no weight. *See Wilner II*, 26 Cl.Ct. at 264, 275 (citing *Wilner I*, 23 Cl.Ct. at 255–56); *Krapf v. United States*, 17 Cl.Ct. 750, 754 (1989) (citations omitted). "Determining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). When asked to indicate how specific activities on the progress schedule related to each other, plaintiff could not elucidate how the schedule exhibited interdependence of activities. It might have been possible for plaintiff to have developed some detail from its progress schedules—to develop the interdependence of activities from the start date, finish date, and duration given for the activities—but plaintiff offered no credible detail of that nature. The court does not view plaintiff's incomprehensible and suspect bar charts as demonstrating the critical path of the project, and no other evidence revealed the interdependence of the various activities of the project. The bar charts do not show the critical path, and thus do not permit a critical path analysis. *See Wilner II*, 26 Cl.Ct. at 263–64. At best, there may have been concurrent delay by both parties, but plaintiff made no attempt to apportion such delay.

Specifically, plaintiff failed to prove that any claimed delay was of an "unreasonable length of time," *Wunderlich*, 351 F.2d at 967 (citations omitted), defendant was the sole proximate cause of the delay, *id.*; *Merritt–Chapman & Scott Corp. v. United States*, 208 Ct.Cl. 639, 528 F.2d 1392, 1397 (1976), and the delay resulted in some injury, *Wunderlich* at 968 (citations omitted). Without a critical path analysis the court cannot exclude the possibility that the contractor caused concurrent delay on the project. *See Wilner I*, 23 Cl.Ct. at 245. Plaintiff's charts are not sufficient to prove allocation between the parties or attribution to defendant. The court cannot rely on assertions of a contractor, not supported by a critical path analysis of the project, to award critical path delay costs. *Wilner I*, 23 Cl.Ct. at 255–56. Neither did plaintiff show by a preponderance of the evidence that the claimed delays were of an unreasonable length and that any of the claimed work item delays caused material damage. *See Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 967–68 (1965) (citations omitted); *Commerce Int'l Co. v. United States*, 167 Ct.Cl. 529, 338 F.2d 81, 89 (1964) (citations omitted). This was insufficient to sustain plaintiff's contention that defendant's actions delayed the completion of the project by 272 days, or for any other quantifiable period of time. Plaintiff failed to prove entitlement to an equitable adjustment for delay to any work item, or project delay.

D. PERIODS INCLUDED IN THE DELAY CLAIMS

Plaintiff divided its delay claims into three separate time periods. The first spanned commencement of the work on September 23, 1985, two weeks after receipt of the Notice to Proceed, until July 22, 1987, the date of the termination for default (first period). The second period of delay claims lasted from July 23, 1987, until October 20, 1987, during which time plaintiff alleged that it was still "actively involved in the Project" (second period). The third time period spanned October 21, 1987 "to on or about December 31, 1988 [when plaintiff] was still actively involved in the project on a day-to-day basis as to,

among other things, its home office...." (third period). Plaintiff pled in the alternative, as to the latter two time periods, that if the court could not find entitlement to an equitable adjustment for delay after default termination, that plaintiff, "at the very least, ... is entitled to [compensation for] a reasonable time period for the winding down of its involvement in this Project."

Plaintiff claimed that support for its first-period delay claims arises from admissions of fault contained in the testimony of various government officers, and from the charts and testimony of its delay claims expert witness, Mr. Cumine. As noted, Mr. Cumine concluded from his analysis of fifteen items in the construction record that defendant was responsible for 272 days of delay, and plaintiff for five days of delay during the first period.[28] The 272 days of alleged government-caused delay include 118 days administratively allowed by the contracting officer by modifications to the contract. The actual number of days of delay included in the first claim period is therefore 154 days. Plaintiff asked that the court find defendant responsible for the full 272 days of alleged delay, but that the dollar value of the delay claim be reserved for subsequent proceedings.

Plaintiff's second-period delay claim was for ninety days, and began the day following the termination for default, until October 20, 1987, the date its superintendent and a round-the-clock watchmen left the job-site and "the site was fully turned over to the USPS [sic]." Plaintiff alleged that its home office remained active during this period, dealing with subcontractors and general "winding down" of the project. According to Mr. Cumine, defendant was the sole cause of the entire ninety-day delay and plaintiff was entitled to delay, impact, "and other" unidentified costs for the entire second period. Plaintiff referred the court to contract General Provision 10, The *Termination for the Convenience of the Government* clause, as the *sole* basis of its contention that damages incurred during the second period entitled plaintiff to an equitable adjustment.

The third period encompassed a total of 437 days. The delays claimed are the same as those claimed in the second period, i.e., home office involvement with subcontractors and "winding down." Mr. Kaplan testified about the scope of the claim:

A. ... It takes [in] any project—even if it is completed—it takes time to wind the project down. This, of course, went well beyond that because of problems that had arisen with it. We had lots of problems with sub[contractor]s, for example.... [D]uring that period, I had Mr. Harman working as a consultant for us. He had elected to leave the company. And I employed him to continue at least for a while to work as a consultant. He was off the payroll.

\* \* \* \* \* \*

Q. Was [Mr. Harman] responding to subcontractor claims and things like that at the time?

A. Well, I was really dealing more directly with the sub[contractor]s on that, but certainly, I had to utilize him for the very detailed knowledge that he had on certain issues.

Q. What else was being done by Mega during this time frame with regard to this job that Mega is claiming?

A. Our Accounts Payable Department was certainly very active in trying to hold our sub[contractor]s at bay. We had been threatened with many lawsuits, some of which came to fruition. I had a lot of explaining to do to a lot of people. I spent a lot of time trying to [mollify] people and that's never stopped.

As it did for its second-period delay claim, plaintiff relied upon the *Termi-*

---

**28.** Plaintiff admitted but to five days of fault for delay out of the total of 272 claimed, and sought ineffectively to lay the blame for remaining 267 days of delay at defendant's doorstep. Plaintiff arrived at the total days of first-period delay for its claim simply by deducting the 400-day construction period in the contract from the approximately 690 days that elapsed between the time it began work on the project and the date of its termination for default, less the five days for which it admits fault.

nation *for Convenience of the Government* clause, as the sole basis for its third-period delay claim. However, this provision of the contract is inapplicable under the circumstances of this case, as the court has previously found that plaintiff was properly terminated for default. *See* section III of this opinion, *supra.*

Throughout the record plaintiff characterized the termination for default as "alleged" and cited to the termination for convenience clause to justify entitlement to an equitable adjustment for costs incurred following its termination for default. However, once plaintiff's contract was terminated for default, its only responsibility, as it was instructed, was to vacate the job-site immediately. The default termination can be analogized to the final payment to a contractor in that it marks the end of the contract. No doubt plaintiff did incur costs in dealing with its subcontractors and attempting to put its books in order in anticipation of litigation. However, post-termination for default costs are not recoverable in the absence of extraordinary circumstances, *see, e.g., J.D. Hedin Constr. Co. v. United States*, 197 Ct.Cl. 782, 456 F.2d 1315 (1972) *(per curiam)*; *Preload Corp. v. United States*, 115 Ct.Cl. 596, 1950 WL 5017 (1950), or judicial conversion of the default termination to a termination for the convenience of the government, *Nolan Bros., Inc. v. United States*, 194 Ct.Cl. 1, 437 F.2d 1371 (1971); General Provision 10(e)(2), which will not occur here. *See Murdock Mach. & Eng'r Co. v. United States*, 873 F.2d 1410, 1413 (Fed.Cir.1989) (citing *Malone v. United States*, 849 F.2d 1441, 1446 (Fed.Cir.1988)), where the court held that the *Termination for Default* clause in the contract automatically converted a wrongful default termination into a termination for convenience. Because

the termination for default was not wrongful, the court will not consider any of plaintiff's claims of entitlement to an equitable adjustment for costs allegedly incurred after the date of the termination for default, including its claim, in the alternative, to costs for a reasonable period of time for "winding down." The court is not so naïve that it believes that once plaintiff's contract was terminated for default, plaintiff would not incur costs; however, that is a burden that every contractor must undertake with its own resources in the absence of proper contractual or other legal authority permitting or obligating the government to reimburse the contractor. The *Termination for Convenience* clause is not applicable in this case, plaintiff cited no other authority, and the court is aware of none that would require or permit reimbursement.

Without making a finding at this time, the court seriously questions whether plaintiff actually incurred "winding down" expenses for a total period of 527 days in addition to its other claims for all costs and expenses. 41 U.S.C. § 605(c)(1). The claimed second and third period delay claim costs appear to overlap, or duplicate those in the claim for litigation costs, discussed in section V.C. 17 of this opinion, *infra*, and, if that is the case, would constitute a violation of plaintiff's certification of costs submitted with its claim to the contracting officer as a condition of this court's jurisdiction to adjudicate the claim. *See W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1338–39 (Fed.Cir.1983).[29] The court agrees with defendant's characterization of the second and third period claims as nothing more than a crude attempt to pass on duplicative litigation expenses to the taxpayer.

---

**29.** The CDA certification requirement furthers an important congressional objective of discouraging the submission of unwarranted contractor claims. *Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. 11, 673 F.2d 352, 354 (1982). It is felt that enforcement of the requirement for certification on the basis of the circumstances presently before the court, properly implements this congressional objective. *See Ball, Ball & Brosamer v. United States*, 878 F.2d 1426 (Fed.Cir.

1989). The certification requirement is not an onerous one. It merely calls for a declaration of honesty and good faith on the part of the contractor in the submission of claims to the contracting officer and this court. It has been documented that certification serves a purpose. *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1383 (Fed.Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983).

## V. ADDITIONAL COST AND CHANGE ORDER CLAIMS

■ This portion of the opinion addresses additional issues of liability on numerous fact-intensive cost claims that allegedly occurred prior to the July 22, 1987 termination for default. Plaintiff requested separate findings of fact of liability on all additional cost and change order claims to which defendant had not admitted liability. Because defendant did not admit liability on any specific claims at trial, the court assumes that plaintiff meant to exclude from this case on liability those claims which the contracting officer allowed administratively in whole or in part.[30] In light of the contracting officer's allowance of the nine claims identified in note 29, and because defendant did not refute its liability for any of the claims administratively allowed by the contracting officer, the only remaining issue as to those claims may be the amount of the damages. Plaintiff also seeks additional—i.e., ripple or impact— damages stemming from many of its claims, but not included in the administrative adjustments previously allowed by the contracting officer, or if allowed, unpaid. Under the circumstances of this case, the contracting officer was not only entitled to offset funds owed plaintiff, and those remaining in the contract, but would have been derelict in his duty to protect defendant's rights had he not done so.[31] The burden is upon plaintiff to convince defendant of the value of those claims in negotiations following issuance of this opinion, or to convince the court to reopen the administrative changes allowed by the contracting officer to prove greater damages by a preponderance of the evidence in the quantum phase of this litigation.

---

**30.** In his final decision of November 25, 1988, the contracting officer admitted liability in whole or in part on the following claims: (1) HVAC Controls, (2) Relocation of Refrigeration Lines, (3) Relocation of Telephone Vault, (4) Additional Demolition & Field Office, (5) Perimeter Footing Removal, (6) Look-out Gallery Revision, (7) Electrical Vault, (8) Sink Hole, and (9) Catch Basin.

**31.** The government's right of offset is a claim. *Placeway Construction Corp. v. United States,* 18

### A. JURISDICTION OVER THE CLAIMS

#### 1. *Filing of Claims Under the Contract Disputes Act*

■ Because the claims were presented in such a disjointed illogical manner a question of jurisdiction has been presented which the court, *sua sponte,* must address. *Hambsch v. United States,* 857 F.2d 763, 764–65 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1054, 109 S.Ct. 1969, 104 L.Ed.2d 437 (1989). The Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988) (CDA), requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." *Id.* § 605(a). No particular magic language or format is required to create a claim over which this court has jurisdiction, *see Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed. Cir.1987), even though, as the Federal Circuit stated in *Spruill v. Merit Systems Protection Board,* " '[j]urisdiction' is a term that is one of the most·slippery in the legal lexicon." *Spruill v. Merit Systems Protection Board,* 978 F.2d 679, 686 (Fed. Cir.1992). The jurisdictional requirement for filing a claim under the CDA is that the contractor "submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning,* 811 F.2d at 592 (citing *Tecom, Inc. v. United States,* 732 F.2d 935, 936–37 (Fed.Cir.1984)); *Metric Constr. Co. v. United States,* 1 Cl.Ct. 383, 392 (1983).

This court has further articulated the prerequisites for jurisdiction as including the following additional elements: (1) a let-

---

Cl.Ct. 159 (1989) (citing *Dale Ingram, Inc. v. United States,* 201 Ct.Cl. 56, 475 F.2d 1177, 1188 (1973) and *Project Map, Inc. v. United States,* 203 Ct.Cl. 52, 486 F.2d 1375, 1376–77 (1973)). *Project Map* found that the government has the right to off set monies due it before paying its debt to its debtor and that the right is not restricted to a debt admitted by the debtor. *See also* 28 U.S.C. § 1503 granting this court jurisdiction to "render judgment upon any set-off or

ter to the contracting officer specifying the relief desired; (2) an assertion of specific rights; (3) a request for a final decision from the contracting officer; (4) a final decision of the contracting officer or the failure to issue such a decision within the statutory time periods; and (5) a clear indication of the amount of monetary compensation requested. *Cubic Corp. v. United States*, 20 Cl.Ct. 610, 616–17 (1990); *Mendenhall v. United States*, 20 Cl.Ct. 78, 82–83 (1990). Moreover, there is authority indicating that a claimant should state that the statutory basis for jurisdiction in this court is the Contract Disputes Act. *Hoffman Constr. Co. v. United States*, 7 Cl.Ct. 518, 526 (1985).

It could be argued that plaintiff failed to present its claims to the contracting officer in a manner which would give this court jurisdiction, and that this jurisdictional defect has not been cured as was the case with plaintiff's initial complaint addressed by the court in its Order on defendant's motion to dismiss. *See Mega Constr. Co. v. United States*, 14 Cl.Ct. 555 (1988). Plaintiff presented its additional cost and change order claims to the contracting officer in a letter dated August 30, 1988. That letter read as follows:

> Mega Construction Co., Inc. submits the following Claim pursuant to the Contract Dispute [sic] Act of 1978 [P.L. 95–563, 41 U.S.C. §§ 601–613] and Section 4 of the General Provisions for the above-referenced contract.[32]

> The undersigned certifies that the claims set forth herein are made in good faith; that the supporting data is accurate and complete to the best of my knowledge and belief; and that the amounts requested accurately reflect the contract adjustment for which Mega Construction Co., Inc. believes that the United States Postal Service is liable.

The letter was signed by Marvin N. Kaplan, President. In the introduction to the August 30, 1988 claim, plaintiff stated:

> demand by the United States against any plaintiff...."

As to the claims on the contract amounts due Mega, purported monies claimed by the U.S.P.S. and as to the challenge by Mega of the purported termination for default, Mega takes the position that there has already been a final decision [of the contracting officer] with regard to the aforementioned pursuant to the U.S.P.S.'s letters dated July 22, 1987 [the termination for default] and December 9, 1987 [the assessment of reprocurement costs] to Mega and therefore, Mega is merely reasserting same to make certain that if in fact there is a determination made that the prior letters were not sufficient for such determination for purported termination for default in terms of the appeals process herein, or as the U.S.P.S. may assert in the U.S. Court of Claims [sic] action involving this matter, that same is at least asserted pursuant to this claim. However, Mega does reserve its rights to contend that the prior aforementioned letters in fact are final decisions on the aforementioned issues perfecting Mega's right to appeal pursuant to the Contract Disputes Act, including, but not limited to the U.S. Court of Claims [sic]. Mega does not waive that right by asserting such claims herein.

The language is unwieldy, but it is clear that the August 30, 1988 letter constituted plaintiff's additional cost and change order claims. The contracting officer believed that to be the case because he responded to the letter with a final decision on November 25, 1988. The final decision of the contracting officer ended with the mandatory standard language advising plaintiff of its rights of appeal. *See* 41 U.S.C. §§ 605(b), 607(d), 609(a).

 Plaintiff might also argue that numerous of its letters prior to the August 30, 1988 letter submitting cost items to the contracting officer should be considered claims. There are two categories of such letters. One group begins with the statement, "[a]ttached are our claims for costs

32. General Provision 4 of the contract parrots the certification language of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988).

for the following." The other group begins, "[a]ttached is our proposal to do the following work." Following each introductory statement, plaintiff then identified the claim or proposal. The letters were form letters and each contained the same "reservation" language in the final paragraph. An example is the letter claiming costs for protective barricades and the screen wall. That "claim" letter, addressed to the attention of the contracting officer, reads as follows:

Attached are our claims for costs for the following:

Provide protective barricades for building due to delays in glass and hardware selection by USPS:

Total Amount: $14,551.50

Provide connection to wall (screen wall tube) per revised sketch SK–32:

Total Amount: $6,657.68

Please note that our claims are limited to the direct costs of the above work. Other costs incurred since discovery of the condition and to be incurred at a later date, (including but not limited to additional home and field office overhead resulting from overrun of the contract time, wage and fringe benefits escalations, increase of taxes, added weather protection, effects on work not modified by these changes, impact costs by subcontractors, ripple effect costs, etc., as well as liquidated damages are not included and are hereby specifically reserved. The extent of such additional costs will be evaluated only when fully known, but no later than the end of the project, and will be submitted at that time for equitable compensation. We do not recognize the granting of an appropriate time extension to be a waiver of any claim for costs.

Each so-called "claim" was accompanied by a completed standard form entitled "request for proposal" identifying plaintiff's direct and indirect costs for performing the claimed extra work, and in some instances, a voucher or bill from a subcontractor or supplier.[33] When asked what the last paragraph quoted above meant, Mr. Kaplan professed that he did not know, even though the paragraph was one he had developed "many years ago" for use in all of plaintiff's contracts to assert claims for contract modifications.

The court finds that the letters enclosing the request for proposals did not constitute claims under the CDA. Many did not give the contracting officer "adequate notice of the basis" of the claim, and none gave adequate notice of the amount claimed. *Contract Cleaning*, 811 F.2d at 592 (citing *Tecom*, 732 F.2d at 936–37); *Metric Constr.*, 1 Cl.Ct. at 392. Therefore, under the law of *Cubic Corp.* and *Mendenhall*, the contracting officer did not possess the authority to issue a final decision on those "claims." *Paragon Energy Corp. v. United States* and *Straga v. United States* denied the contracting officer the authority to issue a final decision under the CDA unless the claim had been properly submitted. *Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 645 F.2d 966, 971 (1981); *Straga v. United States*, 8 Cl.Ct. 61, 66–68 (1985). In *Straga*, the contracting officer rendered a purported final decision, but because the claim had not been properly submitted, the Claims Court found that it had no jurisdiction to address the claims. *Straga*, 8 Cl.Ct. at 66–68. If the claim does not satisfy the requirements of the CDA, even if the contracting officer inferred, or boldly stated, that the jurisdictional requirements were satisfied, jurisdiction does not vest. *RSH Constructors, Inc. v. United States*, 14 Cl.Ct. 655, 659 (1988) (citing *Paragon*, 227 Ct.Cl. 176, 645 F.2d 966). The jurisdictional prerequisites established by statute may never be waived by either party. *See W.M. Schlosser Co. v.*

---

**33.** Compare *Dawco Construction, Inc. v. United States,* where the Federal Circuit held that a "request for cost proposal" did not constitute a claim. *Dawco Constr., Inc. v. United States,* 930 F.2d 872, 878 (Fed.Cir.1991). The court noted that there was no evidence that plaintiff's letter, submitted to the government in response to its directive for a cost proposal, was "anything more than a cost proposal," or that the letter "even anticipate[d]" that a dispute might arise therefrom. *Id.* Here, it is clear from plaintiff's requests for proposals that plaintiff always anticipated filing a later, formal claim with the contracting officer.

*United States*, 705 F.2d 1336, 1338 (Fed. Cir.1983) and *Gardner Mach. Corp. v. United States*, 14 Cl.Ct. 286, 290 n. 1 (1988) holding that the contracting officer's "final decision" rendered on an uncertified claim was invalid, as the contracting officer had no authority to waive a requirement that Congress had imposed, and that the reviewing tribunal likewise could not waive the certification requirement in order to review the contracting officer's decision. Although *W.M. Schlosser* dealt with plaintiff's failure to certify a claim greater than $50,000, the absence of authority to waive a jurisdictional requirement under the CDA applies equally to the instant situation. In *Skelly & Loy v. United States*, the court, also addressing a certification deficiency, indicated that failure to satisfy the jurisdictional prerequisites "taint[s] every 'decision' that follows." *Skelly & Loy v. United States*, 231 Ct.Cl. 370, 685 F.2d 414, 419 (1982).

▪ One element of a properly submitted claim which the request for proposal letters and the August 30, 1988 claim specifically lack is a request that the contracting officer render a final decision on the "claim." In *Transamerica Insurance Corp. ex rel. Stroup Sheet Metal Works v. United States,* Senior Circuit Judge Marion T. Bennett, writing for a three judge panel, reversed an opinion of the United States Claims Court holding that the court lacked jurisdiction to adjudicate the claims before it because the contractor had not expressly requested a final decision from the contracting officer. *See Transamerica Ins. Corp. ex rel. Stroup Sheet Metal Works v. United States,* 973 F.2d 1572 (Fed.Cir. 1992).

This court's bench opinion in *Transamerica* was based upon an interpretation of a lengthy series of opinions of the United States Court of Appeals for the Federal Circuit, our common predecessor court the United States Court of Claims, and persuasive opinions of this court applying the law of the Federal Circuit, that a request for a final decision from the contracting officer is a jurisdictional prerequisite to an appeal in this court. The Transamerica Insurance

Corporation, surety to a contractor that had been terminated for default, took over the project through another contractor. The claims had first been submitted by the defaulted contractor on behalf of an unpaid subcontractor, Stroup Sheet Metal Works (Stroup). The record in *Transamerica* reflected that Stroup had written and spoken to the contracting officer, asking that he expedite his final decision. *Id.* at 1575. In the process of preparing the final decision, the contracting officer requested additional information of Stroup, which Stroup provided. *Id.* The contracting officer ultimately denied the claims in part, and Stroup accepted the allowed portions in a unilateral modification to the contract "as partial payment." *Id.* at 1576. The lawsuit filed in this court in *Transamerica* was for the difference between the amount awarded in the unilateral modification and the amount sought as equitable adjustment. The Federal Circuit stated that the main question before it was whether the Claims Court erred in holding that the original contractor's letter requesting an equitable adjustment on behalf of its subcontractor did not include "a request for a final decision, either express or implied." *Id.*

> Section 605(a) [of the Contract Disputes Act] by requiring submittal of a written claim 'for decision' does not of itself add any authority to the argument that there must be an explicit request for a contracting officer's final decision. The statute's broad language demonstrates that as long as what the contractor desires by its submissions is a final decision, that prong of the CDA claim test is met.

*Id.* The Federal Circuit in *Transamerica* distinguished the cases cited by defendant in support of its position that a request for a final decision is a jurisdictional prerequisite. One such case, *Hoffman Construction Co. v. United States*, 7 Cl.Ct. 518 (1985), relied extensively on *Paragon*. *Transamerica* however stated that reliance upon *Paragon* was "off the mark," *id.* at 1577, because the Court of Claims had not established a requirement for a request for a final decision under section

605(a) but had simply stated that "the particular factual showing in its case met the articulated statutory standard ... all that need be shown is an 'expression of interest' [for a final decision] which may be made implicitly." *Id.* *Transamerica* held that the original contractor's letter made clear that the contractor considered the letter to serve as a CDA claim and intended that the contracting officer either allow or deny the claims in a final decision. *Id.* at 1578. It is also clear that the contracting officer was on notice that the contractor intended the letter to serve as a request for a final decision. *Id.*

This court will not require contractors to do more than to comply as

> fully and reasonably as possible with the statutory requirements of the CDA when this court has definitively stated that certain 'magic words' need not be used and that the intent of the 'claim' governs. *See Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d [586,] 592 [ (Fed.Cir.1987).]
>
> The [claim] letter was in writing, was submitted to the contracting officer for a decision, requested payment of a sum certain, and gave the contracting officer adequate notice of the basis and the amount of the claim. This court is loathe to believe that in this case a reasonable contractor would submit to the contracting officer a letter containing a payment request after a dispute had arisen solely for the contracting officer's information and without at the very least an implied request that the contracting officer make a decision as to entitlement. Any other finding offends logic.

*Id.* Transamerica Insurance Corporation argued that the CDA requirements, as in-terpreted by the Federal Circuit, suggested applying *"a common sense analysis* to determine whether (1) the contractor asserted in writing and with sufficient specificity a right to additional compensation, (2) the government disputed that right, and (3) the contractor communicated his desire for a contracting officer decision." *Id.* at 1579 (emphasis in original). The court agreed,[34] stating "[a]pplying such a logical, common sense analysis in this case, [the original contractor's] submissions were sufficient to qualify as CDA claims." *Id.*

In its letter of August 30, 1988, plaintiff met all of the elements traditionally relied upon by the court to establish jurisdiction, *see Cubic Corp. v. United States,* 20 Cl.Ct. 610, 616–17 (1990); *Mendenhall v. United States,* 20 Cl.Ct. 78, 82–83 (1990), save one. The August 30 letter was a written document, submitted to the contracting officer, which specified the relief desired and the justification therefor, including the amount requested. However, plaintiff never expressly requested a final decision of the contracting officer in any of its correspondence with defendant. The issue thus presented is whether the court must dismiss plaintiff's claims with the exception of the termination for default and reprocurement cost claims. The court thinks not. The *Transamerica* court limited its holding to a specific factual setting, i.e., where there is virtually no question but that the contractor asked for and received a contracting officer's final decision. *See Transamerica,* 973 F.2d at 1581. As in *Transamerica,* Mr. Kaplan's letter of August 30, 1988, and his other writings and conversations with the contracting officer and the latter's representatives, at the very least *impliedly* expressed plaintiff's desire for a

---

**34.** The *Transamerica* court used a similar approach in ruling on the alternate basis for the Claims Court's dismissal, the alleged defective certification.

> This court has previously found that even when a proposed claim certification lacks certain elements specified in the statutory standard of 41 U.S.C. § 605(c)(1), the certification can still be valid if in substantial compliance with the statute and its purposes. In *United States v. General Electric Corp.,* 727 F.2d 1567 (Fed.Cir.1984), this court ruled that although

the certification failed to state the amount of the claim and did not include language to the effect "that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, it contained the critical information required by the statute and was therefore in substantial compliance with it."

*Transamerica Ins. Corp. ex rel. Stroup Sheet Metal Works v. United States,* 973 F.2d 1572, 1580 (Fed.Cir.1992).

final decision of the contracting officer on those claims, and thus satisfied the statutory requirements of 41 U.S.C. § 605(a). Moreover, the contracting officer in his correspondence with plaintiff specifically referred to the submission as a claim, and asked for additional supporting documents for several of the items contained therein in order that he might address them fully in his final decision, just as the contracting officer in *Transamerica* had done. *See id.* at 1575. Plaintiff's compliance with the contracting officer's request for additional documents to support the claims laid to rest any doubt that the August 30, 1988 letter was not a proper claim.

■ Based upon an analysis of the opinions of this court and of the Federal Circuit, the court finds that a request for a final decision of a contracting officer need not be in any particular format, or even expressly made. As long as the basic requirements of the CDA are met, and the contracting officer knows the bases of the claims and the final amounts sought, the "request" for a final decision may be inferred from the circumstances of the case. With the information available to the contracting officer defendant could not argue persuasively that the contracting officer was surprised at or lacked sufficient information to properly address plaintiff's claims. Accordingly, the court finds that plaintiff's additional cost item claims are properly before the court. Other claims, not included in the August 30, 1988 letter, are not properly before the court.

## 2. *Untimely Filing of Claims*

■ Under General Provision 6, the *Changes* clause, for any change which causes an increase or decrease in the contractor's cost of or time for performance, an equitable adjustment shall be made, provided that the contractor gives written notice of the date, circumstances, and source of the order and that the contractor regards the order as a change order. Although no starting point need be specified, notice must be given within twenty days from incurring costs as a result of a change order. Costs incurred more than

twenty days prior to this notification cannot be recovered, except in the case of defective specifications. Under the same clause, any claim for equitable adjustment must be provided by the contractor within thirty days from receipt of any written change order or written notice of a constructive change. The contractor must set forth, in writing, the general nature and monetary extent of the claim. The government has discretion to receive any claim asserted under this clause prior to final payment. The consequences of a contractor's failure to follow the notice provisions of the clause may result in its claim being disallowed. In any event, a claim must be submitted no later than the date of final payment. The filing of a claim within the administration period of a contract is plainly a prerequisite to relief. *Jo–Bar Mfg. Corp. v. United States*, 210 Ct.Cl. 149, 535 F.2d 62, 66 (1976) (citing *Eggers & Higgins v. United States*, 185 Ct.Cl. 765, 403 F.2d 225, 236 (1968)). Pursuant to the terms of the contract the government has discretion to receive and consider, prior to final payment, any claim that was not filed within appropriate time limits. However, in the absence of special circumstances not present in the case at bar, final payment to a contractor bars consideration of any subsequent claims for damages under the contract. *See G.M. Shupe, Inc. v. United States*, 230 Ct.Cl. 947, 1982 WL 25285 (1982); *Gulf & W. Indus., Inc. v. United States*, 6 Cl.Ct. 742, 751 (1984).

■ Defendant argued that plaintiff's proposal for the extra costs was untimely because it was not presented to the contracting officer until weeks after plaintiff's contract was terminated for default and well after the thirty-day notice requirement in the *Changes* clause of the contract, and that a default termination was analogous to final payment to a contractor marking the end of the contract. This is not the law. *See G.M. Shupe, Inc. v. United States*, 230 Ct.Cl. 947 (1982); *Gulf & W. Indus., Inc. v. United States*, 6 Cl.Ct. 742 (1984). Defendant argued that all claims submitted (1) after the termination, and (2) after the thirty days specified in the

*Changes* clause were out of time and should be dismissed, because the untimely filing of claims prejudiced defendant's right to take corrective action, which it might have taken had it been given timely notice. As to the purpose of the notice requirement generally, *see Roberts v. United States*, 174 Ct.Cl. 940, 357 F.2d 938, 946 (1966) and *Mingus Constructors, Inc. v. United States*, 10 Cl.Ct. 173 (1986), *aff'd*, 812 F.2d 1387 (Fed.Cir.1987).

Plaintiff does not deny that formal notice of its claims was not presented to the contracting officer until after the contract was terminated for default, but rather that the contracting officer had actual notice of the events and circumstances underlying its claims, and that this notice was sufficient to meet the notice requirements of the various contract clauses. The question thus is whether the notice requirements of the contract clauses in question can be subordinated to the actual or constructive knowledge by the contracting officer of the facts and events underscoring the claim. Plaintiff relied on the argument that the notice provisions should "not be applied too technically and illiberally where the government is quite aware of the operative facts," citing *Martin J. Simko Constr., Inc. v. United States*, 11 Cl.Ct. 257 (1986), *vacated and remanded on other grounds*, 852 F.2d 540 (Fed.Cir.1988); *Hoel–Steffen Constr. Co. v. United States*, 197 Ct.Cl. 561, 456 F.2d 760, 768 (1972); *Copco Steel & Eng'g Co. v. United States*, 169 Ct.Cl. 601, 341 F.2d 590, 598 (1965). It is clear that the contracting officer knew prior to the termination that plaintiff would assert formal claims for additional compensation, and he addressed all claims presented to him in the August 30, 1988 claim letter as timely. *See Jo–Bar Mfg.*, 535 F.2d at 66. Based on these facts, the court cannot find that defendant was in any way prejudiced by the late date of the filing of many of plaintiff's claims. With *Hoel–Steffen*'s admonition to apply the rules liberally in favor of plaintiff the court finds that the claims, except as noted hereinafter, were properly before the contracting officer and are properly before this court. *Hoel–Steffen*, 456 F.2d at 768. The court, in fact, in *H.H.O. Co. v. United*

*States* went as far as to find that because the contracting officer considered the claim on the merits there was no prejudice to defendant and that any argument of untimeliness had been waived. *H.H.O. Co. v. United States*, 12 Cl.Ct. 147, 160 (1987) (citing *Copco Steel & Eng'g Co. v. United States*, 169 Ct.Cl. 601, 341 F.2d 590, 598–600 (1965)).

**B. BURDEN OF PROOF**

■ The burden of proving its claims is solely upon plaintiff. It has long been held that the contractor bears the burden of proving the amount of its damages "with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed.Cir.1987) (quoting *Willems Indus., Inc. v. United States*, 155 Ct.Cl. 360, 295 F.2d 822, 831 (1961), *cert. denied*, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962)). The burden is measurable. Since plaintiff has the burden of establishing entitlement to an equitable adjustment under the terms of the contract, *Nager Elec. Co. v. United States*, 194 Ct.Cl. 835, 442 F.2d 936, 946 (1971), it must present proof sufficient to convince the court by a preponderance of the evidence that it is in fact entitled to an equitable adjustment. Even though this phase of the litigation is limited to liability, the court is constrained to point out, and consider where necessary, that this standard of proof also applies to proof of the amount of plaintiff's increased costs. 4 McBride & Wachtel, *Government Contracts* § 28.240, at 28–428 (1963 & Supp. 1993). In adjudicating plaintiff's additional cost and change order claims the court must consider, and apply where proper, its findings made on the delay claim discussed in section IV. of this opinion, because a determination of liability for delay is intertwined with many of these claims.

**C. OFFSETS**

■ Defendant administratively allowed costs and time extensions on nine claims, *see* note 30, *supra*, but the costs allowed were withheld by defendant to be

offset against its counterclaims. Plaintiff challenged defendant's right to offset funds it had agreed to pay under previous modifications to the contract, but withheld. Even when no contract clause permits the withholding of payments defendant has the implied right to protect its interests by this means. Setoff "is a common law right available to any creditor." *Southeastern Airways Corp. v. United States*, 230 Ct.Cl. 47, 673 F.2d 368, 379 (1982) (citations omitted). *United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) recognized the common law right of every creditor, including the government, to collect debts that are or later become due. *Cascade Pacific International v. United States* found that any procurement contract entered into subsequent to the 1979 containing the CDA "all-disputes" clause, reserved to defendant the common law right to offset money owed by the defaulted contractor. *Cascade Pac. Int'l v. United States*, 773 F.2d 287, 295–96 (Fed.Cir.1985), *see also Project Map, Inc. v. United States*, 203 Ct.Cl. 52, 486 F.2d 1375 (1973). For defendant to exercise its common law right of offset, the claim need not be reduced to judgment; the offset may be effected pending resolution of the controversy. *Mazama Timber Prods., Inc. v. United States*, 6 Cl.Ct. 87, 88–89 (1984) (citations omitted); *Americold Corp. v. United States*, 28 Fed.Cl. 747 (1993).

1. *HVAC Controls and Permanent Power for Testing*

■ The HVAC Controls claim is primarily a delay claim that was administratively allowed in part by the contracting officer. However, because it includes elements of additional costs, it will be addressed in this section of the opinion. Defendant changed the HVAC Control design and allowed plaintiff an equitable adjustment in the amount of $1,061.05. Plaintiff contends that additional costs and time for delay were incurred by reason of a change that was not included in the equitable adjustment, some of which costs were allegedly unknown at the time of the change. Defendant conceded that the administrative adjustment only reimbursed plaintiff for a "portion" of its extra expenses on this item and that its full damages, including overhead and general and administrative costs, should be addressed and proven during the quantum stage of this litigation. Plaintiff also alleged entitlement to additional time for performance, and defendant admitted to a delay of seven days after drywall installation had been completed, from June 12 through June 19, 1987. Following a thorough review of the record, the court is unable to find that plaintiff proved entitlement by a preponderance of the evidence to additional time. Moreover, it appears that plaintiff's claim was for the total cost of installing the HVAC Controls with no reliable evidence of its original allocated cost. In the absence of such proof, the court cannot find defendant liable for any extra costs for installation of the HVAC system. *See, however,* the discussion of the Condensing Unit counterclaim in section VI. B.9. of this opinion.

■ Plaintiff also claims delay for the failure of defendant to "turn on permanent power to the project which resulted in the inability of Mega to be able to test certain equipment, ... [including HVAC]." Temporary power was provided in accordance with clause SP–8 of the Special Provisions. Mr. Whalen testified that temporary electric power was available on-site. He saw a temporary power pole that had been on-site throughout the whole period of performance. In fact, following completion of the project by the reprocurement contractor, defendant encountered difficulty getting the electrical subcontractor to remove the pole and power lines.

According to the electrical subcontractor, it needed three-phase power to complete electric testing of equipment such as the HVAC, the lighting system controlled by the "Lutron" panel, and three phase motors. The original electrical subcontractor claimed that the temporary electric power was only single phase power. The subcontractor testified that the reason the building did not have the correct type of power was because defendant had to apply for a meter permit, yet had not done so. "The contractor cannot do it ... [and] the Post

Office would not apply for it," according to the electrical subcontractor. However, section 16100 of the Scope of Work, at paragraph 1.02 A 3., placed the duty to provide the proper electrical service squarely on plaintiff. Section 16100 stated, "[w]ork includes ... the following: Complete 120/208 volt, three[-]phase, four[-]wire lighting and power service, including meter facilities as required by serving utility company." Plaintiff provided no legal or other support for the subcontractor's statement that it was defendant's responsibility to apply to the local electric company for the meter permit, and that defendant "refused" do so. Furthermore, not all electrical systems were even ready for testing by the date of the termination for default.

Inasmuch as the claim is for delay damages which the court denied in section IV of this opinion, *supra*, the claim is denied. Moreover, in the complete absence of any support for the bare allegation that defendant needed to apply for three-phase power and refused to do so and because plaintiff was not ready for testing before the termination for default, the court finds that plaintiff has not proved by a preponderance of the evidence that it is entitled to an equitable adjustment to compensate it for any alleged extra costs caused by the government's refusal to provide three-phase electric power. The HVAC claim is dismissed.

### 2. *Price Escalation (General)*

■ Plaintiff made a price escalation delay claim disguised as a change order claim. Plaintiff claimed entitlement to an equitable adjustment for increased subcontractor billings due to delay caused by defendant. In support of its claim, plaintiff inserted into the record several letters from subcontractors claiming that because of government-caused delay, their costs were increased. This may or may not have been the case, but is certainly not dispositive of the issue. A recitation of second- and third-hand, non-contemporaneous facts is insufficient to prove injury. *See, e.g., Commerce Int'l Co. v. United States,* 167 Ct.Cl. 529, 338 F.2d 81, 86, 89 (1964), which

held that once a claimant establishes violation of a contract provision, it must show that the violation caused injury. Plaintiff failed to show any delay caused by the government and failed to apportion delay such as to support this price escalation claim. *See id.* at 89; section IV of this opinion, *supra.* While it might be possible to arrive at an approximation of the subcontractors' original costs, the proof offered is insufficient to meet plaintiff's burden of showing by a preponderance of the evidence that increased costs arose out of any alleged government-caused delay, or that the costs were not caused by some other factor. Moreover, as an self-professed experienced government contractor, plaintiff should have anticipated such costs. The court has reviewed the entire record and cannot find support for plaintiff's price escalation claim. The claim is denied and dismissed.

### 3. *Site Meeting Costs*

■ Plaintiff sought an equitable adjustment to the contract for extra costs it incurred because defendant allegedly failed to attend one meeting at the job-site. The most meaningful evidence of the missed meeting was found in the deposition of Mr. James Hearn, plaintiff's on-site project superintendent. Mr. Hearn stated that Marvin Nelson, a representative of Lane Architectural Group, requested a meeting at 9:00 a.m. on May 30, 1985 with representatives of plaintiff and two subcontractors "to settle out the problems we had with the electrical part of the heating, air conditioning and fire sprinklers." Mr. Greenberg, counsel for plaintiff, led Mr. Hearn through his deposition testimony, as follows:

Q. So you went out to the site that day, the date set for the meeting by Mr. Nelson?

A. Right.

Q. And no one showed up from the Postal Service?

A. No one showed up from the Postal Service.

Q. And Mr. Nelson didn't show up?

A. Mr. Nelson was at the job.

Mr. Hearn went on to explain that he knew defendant was aware of the meeting because "Mr. Nelson said" he had called defendant and told "them" of the meeting.

In its post-trial brief, plaintiff cited to "Number 3, Index Item 37, on page 11" as support for the claim. The court has reviewed two identical Index Items 37, as it did all Indices, and there is no page eleven. Nor, for that matter is there any document identified as "Number 3." Both Index Item No.'s 37 contain letters dated June 4, and June 18, 1986, a year after the alleged meeting, from two subcontractors purporting to bill plaintiff for four hours "wasted" waiting for representatives to attend the meeting. There is no proof, other than double hearsay, that defendant was even told of the meeting. Nor is there proof that defendant's representatives agreed to attend any meeting. Plaintiff completely failed to meet its burden to show that it was damaged by defendant's alleged derelictions. *See Commerce Int'l*, 338 F.2d at 86, 89. The court agrees with Mr. Kaplan's admission that this sort of expense, if indeed it was incurred, is typically a part of a contractor's overhead expenses, and included in plaintiff's bid. For the record, the court notes that in late-March or early-April 1987, Mr. Ruffalo, defendant's on-site project manager, telephoned Mr. Harman, plaintiff's construction manager, to set a meeting at the job-site, and Mr. Harman failed to appear.

Plaintiff's failure to demonstrate that the meeting of which it complains was nothing more than a typical on-site meeting, or that plaintiff incurred any unexpected expenses beyond the scope of its contract bid negates any entitlement to an equitable adjustment. Plaintiff failed to meet its burden of proof, and the claim is denied and dismissed. Because of the nature of the evidence, coupled with a total lack of substance, the claim is frivolous.

#### 4. *Additional Demolition and Moving of Field Office*

In support of this claim plaintiff provided the usual jumbled accumulation of documents and citations to the transcript, leaving the relevance of the material to the court to guess. Plaintiff claimed entitlement to an equitable adjustment for removal of existing pavement at the outer perimeter of the site, demolition, earthwork, and repaving. Plaintiff also sought an equitable adjustment for relocation of its on-site temporary field office trailer resulting from defendant's decision to demolish the existing pavement and to fill, grade, and repave the area. The area was approximately thirty-five by eighty-five feet. The contract called for the existing pavement at issue to remain in place and for plaintiff to fill, grade, and pave "the entire parking area." Thereafter, defendant determined that the existing pavement should be removed. Plaintiff was directed to remove the old pavement and to fill, grade, and repave the area to the proper level. Because plaintiff had placed its temporary field office trailer at this location, the trailer had to be moved. Defendant admitted responsibility for that portion of the claim associated with demolition of the pre-existing pavement, but argued that plaintiff was not entitled to an equitable adjustment for filling, grading, and repaving the area because that effort was within the scope of the contract for work on the entire parking area. Defendant also denied plaintiff's request for reimbursement of the cost of moving its field office.

Plaintiff claimed it had granted a credit to defendant in the second modification to the contract that deleted the demolition and paving work pursuant to defendant's decision to permit the old pavement to remain in place. The second modification referred to "construction services (import and compact fill)," but the court found no reference to or any evidence of plaintiff's claimed "credit" to defendant. From the evidence in the record, the court finds that plaintiff failed to meet its burden of proof to show that it had granted a credit for paving work to defendant.

Defendant modified the contract to require removal of the old pavement in a relatively small area of the job-site, entitling plaintiff to an equitable adjustment for the reasonable costs incurred in comply-

ing with the change. If the old pavement was to have been left in place, the fill, grade, and repaving work at that portion of the site cannot reasonably be considered to have been a part of the contract. Plaintiff is therefore entitled to an equitable adjustment for the extra work it performed at that area of the job-site in addition to the adjustment allowed by the contracting officer for the demolition of the old pavement. The claim for additional fill, grade, and paving at that area of the job-site is allowed.

 Special Provision 32 of the contract, entitled *Temporary Facilities*, paragraph (f), required the contractor to maintain a temporary field office on the worksite at a site to be approved by the contracting officer. What actually happened is difficult to discern. Defendant claimed that the contract had "always" required new paving at the site where plaintiff first placed its trailer. Plaintiff appears to argue, though it is far from clear, that the trailer was situated on the pavement described above, that the situs was not to be disturbed, and that had defendant not modified the contract, plaintiff would not have incurred "substantial" trailer relocation expenses. There is evidence that plaintiff sought approval of defendant before originally situating its field office as required by the contract, and was assured that the site selected would not be disturbed. In weighing the proof, the court finds that plaintiff had a reasonable expectation at the time it first brought the field office on-site that it would not have to move the trailer during performance of the contract. Plaintiff would not reasonably have put a contingency for relocating the field office into its bid if it had known that there were areas within the construction site where the field office would not be disturbed, and upon which it could place its field office with defendant's approval. The court therefore finds that plaintiff is entitled to an equitable adjustment for the cost of relocating its field office. The field office claim is allowed.

### 5. *Subsurface Removal and Site–Work*

Plaintiff sought an equitable adjustment for the removal of sub-surface debris from the job-site and extra site clearance of organic plant growth, including grading and compacting. The site had been cleared, graded, and compacted by a previous site preparation contractor. Plaintiff argued that all subsurface material was to have been removed under the site preparation contract, but that it had not been removed, and plaintiff had to remove the subsurface debris before it could grade and compact the site. Plaintiff also claimed it could not have paved the area in early 1986 as allegedly planned because of organic plant growth. Mr. Kaplan testified that plaintiff wanted to pave the area at the beginning of the project because paving at that time would have made the remaining performance easier. Site paving was not on the critical path. Plaintiff did not make a differing site condition claim pursuant to General Provision 7 of the contract.

Plaintiff presented the court with its typical series of disjointed conclusory statements and an accumulation of over fifty unreconciled documents, again leaving to the court the task of discovering and making plaintiff's argument. The only coherent statement of the claim, such as it was, was presented by Mr. Hearn in his deposition. Mr. Hearn stated that this claim consisted of site clearance work and subsurface removals, other than perimeter footings for which defendant administratively allowed an additional thirty-two days, and that there was organic growth which plaintiff had to remove and haul away from the site. According to Mr. Hearn, "because of government-caused delay," organic material, e.g., "weeds and debris, etc.," had overgrown the site and had to be removed by plaintiff. Because of rain over the prior eighteen to twenty-four months, the soil had loosened and the organic growth had reappeared. Mr. Hearn testified that after removing the subsurface material and organic growth, he "rolled" the site with a water truck to compact the soil. The subsurface material removed consisted of at least two six-feet-by-eight-feet concrete

footings, and pavement some three or four inches beneath the surface. There is no indication of the actual number of subsurface building footings and the amount of pavement removed, or where on the job-site the work actually occurred. There may have been other subsurface material that had to be removed, but the record is so unclear that the court cannot elucidate further in its discussion of the issue. Defendant contended that plaintiff's claim was unsupported and accordingly fell far short of the evidence needed to prove entitlement.

■ Defendant recognized that the prior site clearance contractor had not removed all subsurface material, and the contracting officer did administratively allow an equitable adjustment to compensate plaintiff for the extra costs of removing subsurface building footings at the perimeter of the site. A review of the record reveals that the extra work in this claim was coupled with other claims, including another building footing removal claim. It is true that there was no specific identification of the location of the subsurface material, or even the quantity encountered. There was, however, proof that additional subsurface material was encountered and removed by plaintiff. The nature of the claim precluded identification of the specific location of each and every item of material, but plaintiff did submit a proposed change for the work to the contracting officer on August 7, 1987, for the removal of "remaining subsurface foundations, ... paving, ... slabs & misc. debris encountered during excav[ation]...." The building footings, for which defendant allowed additional time, appears to have been part of this claim. The claim was stated with sufficient particularity to be addressed and in the absence of any evidence to the contrary the court finds that plaintiff has proven by a preponderance of the evidence entitlement to an equitable adjustment for the removal of the subsurface items included in this claim. The amount of the equitable adjustment will depend upon more accurate proof of the quantity of material removed, and costs incurred.

■ Plaintiff is not entitled to an equitable adjustment for its organic material removal claim. It is an elementary principle of government contract law that a fixed-price contract confers all risk of performance, including increased costs, on the contractor. *McNamara Constr., Ltd. v. United States*, 206 Ct.Cl. 1, 509 F.2d 1166, 1169 (1975) (citing cases). Plaintiff's claim for an equitable adjustment for removing organic material from the site stems in part from its delay claim that was addressed and denied in section IV, above. It cannot be a differing site condition claim because that contract clause pertains only to unforeseen or subsurface material. If plainly visible organic material existed at the site at the time of bidding, or upon notice to proceed, plaintiff was or should have been aware of its existence and was under a duty to bring it to the attention of the contracting officer before proceeding. Mr. Kaplan testified that he personally "passed by" the site on a weekend prior to bidding on the contract in accordance with plaintiff's policy of "[u]sually" investigating the site before preparing a bid. He also thought it *possible* that some other officer or employee of plaintiff might have conducted a pre-bid site investigation. This testimony was elicited in an attempt to show satisfaction of the directive contained in Section 02050 of the Scope of Work, Article 1.03 A.2. of the contract, to wit:

> Prior to submitting Bid [sic] examine the site and the conditions pertaining thereto and determine the extent of work to be done. All existing conditions are not necessarily shown on the drawings or noted herein and can be determined only by examination of the premises by the Contractor.

*See also* Paragraphs 1 & 2 of the Instructions To Bidders and contract General Provision 3. General Provision 3, the *Conditions Affecting Work* clause, provides, in part, that:

> The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the

cost thereof. Any failure by the Contractor to do so will not relieve him of responsibility for successfully performing the work without additional expense to the Postal Service.

The court cannot accept that Mr. Kaplan's "drive-by" of the job-site without more reasonably constituted a site visit as required by Section 02050 and the other cited contract provisions, and finds that plaintiff waived any claim it might have had for removing organic growth. *See Vann v. United States*, 190 Ct.Cl. 546, 420 F.2d 968, 982 (1970); *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 857–59 (1987), *aff'd*, 834 F.2d 1576 (Fed.Cir.1987). A similar contract clause at issue in *P.J. Maffei Building Wrecking Corp. v. United States* cautioned bidders that information contained in the contract documents may not accurately depict encountered conditions. *P.J. Maffei Building Wrecking Corp. v. United States*, 732 F.2d 913, 917 n. 7 (Fed.Cir.1984). *P.J. Maffei* interpreted such exculpatory language to mean that if a contractor relied on the information, it did so at its own risk and to its own detriment. *Id.* at 917–18. Plaintiff's contract contained almost identical language, and the holding of *P.J. Maffei* is equally applicable here, especially where the organic growth must have been clearly visible, even to a passerby. In *Vann v. United States* the court held:

> It is the rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove ... that he was misled by the contract.

*Vann*, 420 F.2d at 982; *accord Stuyvesant*, 11 Cl.Ct. at 857–59. As a competent experienced government contractor, familiar with the area, and the plans and specifications, plaintiff knew that a large building with a parking lot had previously been on the site and that the soil could be other than as it appeared from the road. Plaintiff could not reasonably have relied upon the prior site clearance contractor to have removed all of the organic material from the soil. Plaintiff also knew that documentation of the site clearance contract, and photographs, existed, but failed to look at either, thereby waiving any claim it might have had. *Cf. Stuyvesant* 11 Cl.Ct. at 859. "This is not the proficiency one would expect from the reasonable and prudent contractor." *McCormick Const. Co., Inc. v. United States*, 18 Cl.Ct. 259, 265 (1989).

Moreover, even if the conditions encountered were unexpected or materially peculiar, plaintiff was required by its contract to clear the site, and keep it clear throughout performance of the contract. Sections 02050 and 02200 of the Scope of Work required plaintiff to "[c]lear and grub [the] site of existing vegetation." Sec. 02050, Art. 1.03 A.1.; Scope of Work, Sec. 02200, Art. 1.02 A. Other provisions of the contract required plaintiff to maintain the site free from debris and waste material during progress of the construction. *See* Scope of Work, Sec. 02200, Art. 1.03 E. *See also* General Provision 3, the *Conditions Affecting the Work* clause of the contract, *supra*. Section 02200, article 1.05, entitled *Investigation of Site*, also required plaintiff to "inspect [the] existing site," and to "[r]eport in writing, to the Architect, any unfavorable conditions requiring attention. Commencing any work will be considered as acceptance of the site for purpose [sic] of performing this work."

■ The court finds that removal of organic plant material, as identified by Mr. Hearn, did not constitute a change to the contract. As part of its contractual obligation, plaintiff was to grade, fill, and compact the site in accordance with the specifications and drawings of the contract, and remove incompatible debris, such as organic plant material. Plaintiff's simple, unsupported assertions failed to demonstrate defendant's liability for the delay.

■ If it is plaintiff's argument that the site was clear of organic material when it received the notice to proceed, but had to perform extra site preparation work because the organic material grew back during a period when the contract was stalled, the claim must fail because plaintiff has not proven that the delay was government-

caused, or that the extent of any extra-contractual work it performed was greater than the cleaning and grubbing work required under the contract. If, on the other hand, it is plaintiff's argument that it had to clear the site at the outset of the contract because the organic material had grown back in the period between the time the site preparation contractor cleared the site and the time plaintiff took possession of the job-site, its claim must likewise fail, for the same reasons. There was no evidence—and plaintiff did not argue—that it ever reported any unfavorable organic growth condition prior to accepting the site. Moreover, by commencing work plaintiff accepted the site as it was. *See* Section 02200, Article 1.05, *supra*.

The court reiterates that plaintiff has proven no delay solely attributable to defendant, and has made no attempt to apportion delay between the parties. Plaintiff may not recover in the absence of proof of government-caused delay. *See Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir.1982) (quoting *Coath & Goss, Inc. v. United States*, 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944)) (other citations omitted). Plaintiff has not proven by a preponderance of the evidence that it is entitled to an equitable adjustment for any alleged "extra" removal of organic plant material. The organic plant material removal claim is denied and dismissed.

### 6. *Temporary Fence*

Plaintiff initially claimed entitlement to an equitable adjustment for the cost of leasing and maintaining a temporary fence around the job-site from the date of the notice to proceed until the termination for default. Plaintiff sought additional compensation because the period of time was longer than it reasonably expected. Subsequently, plaintiff supplemented its claim to include costs incurred from the original contract completion date of October 20, 1986, until well *after* the termination for default.

The viability of the temporary fence cost claim hinges in great part on the causation of delay issue, which the court has already addressed. While plaintiff did allege delay in the temporary fence claim—both to the contracting officer and the court—Mr. Kaplan testified that the extended period of time during which plaintiff was required to maintain the temporary fence did not cause a delay to the project. The temporary fence was clearly not on the critical path of the project.

Special Provision 24(e) of the contract, entitled *Protection & Restoration of Public & Private Property*, stated that plaintiff was responsible for protecting the job-site.

> Sole responsibility for protection of existing facilities, new work, the public, etc., lies with the Contractor. He shall carefully plan all work and erect all temporary shoring, barriers, barricades, closures, etc., as required to protect existing facilities, new work, and the public, and maintain such protective devices in proper condition *for the duration of the Contract*. (emphasis added).

This provision must also be read in conjunction with clause 31 of the General Provisions of the contract, the *Permits and Responsibilities* clause, that provided

> The Contractor shall, without additional expense to the Postal Service, be responsible for ... all damages to persons or property that occur as a result of his fault or negligence. He shall take proper safety and health precautions to protect the work, the workers, the public, and the property of others. He shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire construction work.

Neither clause limits the time period of responsibility to any period earlier than completion of the contract, or as here, termination for default, at which time all of plaintiff's responsibilities for the work ceased. Thus, defendant argued, the cost of the fence from the original date of the contract through the date of termination for default was the sole responsibility of plaintiff.

Plaintiff's claim to the contracting officer, submitted August 7, 1987, a month after the termination for default, was presented as follows:

Temporary fence rental from 10/10/86 thru [sic] 10/9/87 (projected); additional labor and equipment charges for removal and re-installation during added site operations and on 15 separate occasions where fence was knocked down by vandals; continuous maintenance 10/10/86 thru [sic] 10/9/87 (projected).

■ Plaintiff presented one additional aspect of the claim to the court. Mr. Hearn testified that plaintiff incurred relatively minor non-delay damages for having to "[move the temporary fence] out and back to get it out of the way and putting it back away for grading, for removing of the paving up in the other area." Defendant did not address this issue, and in the absence of proof to the contrary, the court finds that the fence was moved as described by Mr. Hearn. If plaintiff initially erected the temporary fence in the proper place but had to move it to perform extra earthwork for which it administratively received an equitable adjustment, the relocation constituted a change to the contract for which plaintiff is entitled to reimbursement. Plaintiff clearly had a duty to protect the job-site, but once reasonable efforts were taken, defendant could not increase plaintiff's costs with impunity by requiring it to move the temporary fence in order to effect an unrelated change to the contract.

■ Plaintiff is not entitled to costs incurred after the termination for default as discussed in section IV of this opinion, *supra*. Upon receipt of the notice of termination, the contractual relationship between plaintiff and defendant ended and plaintiff's sole responsibility was to quit the site immediately. Mr. Kaplan even testified that "[a]t termination we were basically told to clear out everything ... the fence was mentioned specifically." As a result, plaintiff removed the temporary security fence. However, shortly thereafter, plaintiff's surety instructed it to reinstall the temporary fence for security purposes.

Plaintiff argued that it is entitled to damages for costs incurred following the termination for default because "General Provision 10, paragraph (e)(2) states *in cases even for termination for convenience* that a contractor is entitled to reasonable costs incurred with regard to items such as these in protecting the site." (emphasis added). This argument is frivolous. The contract did not provide that in cases "even for termination for convenience" that plaintiff was entitled to post-termination costs. General Provision 10, the *Termination for Convenience* clause, provides squarely that only in the case of a termination for convenience is a contractor allowed the "reasonable cost of the preservation and protection of the property incurred pursuant to termination of work under this contract." Had plaintiff been terminated for convenience, it would have been entitled to reimbursement of costs to protect the work, but that is not the case in a termination *for* default.

Plaintiff also argued that it was entitled to delay and impact costs for the fence until the entry on-site of the reprocurement contractor because it incurred the costs, and cannot sue its own surety, which may or may not be the case. The answer to that question depends upon facts which are not in evidence. *See Transamerica Ins. Corp. ex rel. Stroup Sheet Metal Works v. United States*, 973 F.2d 1572, 1580 (Fed. Cir.1992). Defendant responded that the claim was ludicrous because defendant looked to plaintiff's surety under its performance bond to protect the site, and it was the surety who directed plaintiff to maintain the fence, not defendant. Mr. Kaplan confirmed, in his testimony, that it was the surety that directed plaintiff to maintain the fence.

In a letter to the contracting officer, dated August 20, 1987 F & D stated in part

It is my understanding that the U.S. Post Office is of the position that it is the contractual responsibility of Mega Construction and Fidelity and Deposit Company, as it's [sic] surety, to the safety and integrity of the project, even though

Mega Construction was defaulted on this project.

This company is not in agreement with this position and believes such responsibility may rest with the Post Office. Nonetheless, the Fidelity and Deposit Company is arranging for the security for the protection of the facility.

It is amply clear that defendant never instructed plaintiff to maintain site protection following termination and was under no notice by plaintiff or F & D that site security was provided by plaintiff. No contract ever existed between plaintiff and defendant upon which such a claim could be predicated. Accordingly, the temporary fence cost claim for all expenses incurred by plaintiff in providing protection to the job-site in accordance with Special Provision 24(e) and General Provision 31, and all costs allegedly incurred by plaintiff during the contract period and following the termination for default, with the exception of the claim for the costs of moving the temporary fence at defendant's direction to effect the unrelated claim, is denied and dismissed. The claim for moving the temporary fence in the circumstances described is allowed.

### 7. Screen Wall Support

Plaintiff seeks an equitable adjustment for an alleged design deficiency in the plans for the screen wall.[35] The plans for the screen wall are contained in drawings A–3, and A–9 at detail No. 14. Detail No. 14 depicts three-inch-by-three-inch square steel tubes, 3⅝″ metal wall studs, and other non-pertinent items. The plan required two screen walls, partially under the "lookout" gallery. Three-inch square steel screen tubes extend the length of the top of both screen walls. In that the screen walls do not extend to the ceiling they are supported and strengthened by identical horizontal steel tube "braces" running at right angles from the steel tubes atop the screen walls to steel studs in an adjacent solid wall. Detail No. 14 also indicated the presence of additional three-inch-by-three-inch steel tube vertical supports in the screen walls, "Where Required—See Plans."

According to plaintiff, pertinent information not shown on the drawings is the gauge of the three-inch-by-three-inch steel tubing, how the steel tubes were to be connected to the steel wall studs in the adjacent solid walls, where the steel tubes were required to be placed, and the number of vertical steel tubes that were required. Mr. Kaplan testified that the number of structural steel vertical supports shown on drawing A–9 was "insufficient" and that the dimensions of the wall supports indicated that the plans were incorrect. As a result, plaintiff alleged it incurred extra labor and material costs and delay on the project by virtue of the defective plans.

Neither party identified the specifications governing steel work in the screen walls, but Sections 05100 and 05500 of Division 5 of the Scope of Work addressed steel work in general. Those sections, as well as General Provision 62, the *Shop Drawing, Coordination, and Scheduling* clause of the contract, required the submission and approval of shop drawings prior to commencing steel work, and forewarned plaintiff that to work ahead of shop drawing approval was at its peril. Division 5 identifies the type of fasteners used to join steel parts, specifically to what industry standard plaintiff was to weld the steel, and the industry standards governing connectors. Article 1.03E. of Section 05100, read in conjunction with the rest of the contract, required plaintiff to provide shop drawings, and furnish detail "required for the attachment of [steelwork] to the structural steel framing for ... anchors ... and similar work." Article 3.03 of Section 05500 instructed plaintiff to

[f]urnish, fabricate, and install all miscellaneous angles, channels, bent plate, clips, *anchors*, and other *miscellaneous metal work* required for the complete job as indicated on the drawings. Form

---

**35.** Plaintiff did not make the design versus performance specification argument that might have invoked the *Spearin* doctrine. *See United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918) (citations omitted).

such as detailed[,] or if not detailed, as required for the location and purposes served, and in accordance with the applicable provisions specified herein. Furnish and install all miscellaneous metal items not specifically mentioned herein, or in other sections, but which are customarily considered as part of the work, the same as if fully specified herein and detailed on the drawings.

 \* \* \* \* \* \*

Furnish and install *anchors, brackets,* and *plates* of suitable steel where required in connection with steel, iron, and concrete construction. (emphasis added).

Other provisions of Division 5 specified that "pipe columns," "tube steel," "steel pipe other than structural steel," and "[a]rchitectural and miscellaneous steel" utilized were to be in accordance with identified specific industry standards.

The minutes of site meeting No. 6 held on May 2, 1986, under "new business," revealed that Lane Architectural Group agreed to "provide wall thicknesses for the steel tubes [in the screen wall]." Two months later, Mr. Hearn, plaintiff's on-site project superintendent, in a letter to defendant, stated:

> Our subcontractor has advised us that they [sic] have 68 L[inear] F[eet] × 20 Gage [sic] tubing and three cross braces included in their estimate.
>
> As the drawings do not adequately detail points of connection, welding or nominal tube thickness, we require additional information.
>
> Please issue clarification drawings and change instructions where applicable as soon as possible to minimize delay to framing and drywall operations.

A hand-written note discovered by the court in its review of plaintiff's evidence, written by Mr. Kaplan or Mr. Hearn, stated that the contract drawings showed incomplete information, and that the "sub[contractor] figured min[imum]!"

Lane provided plaintiff with sketch SK–32, dated December 18, 1986, showing column base and wall connections for the three-inch-by-three-inch square steel tubes. Plaintiff waited a full three months, until March 10, 1987, before instructing its subcontractor to "immediately proceed with fabrication and erection of the screen wall supports as detailed in the clarification drawing [SK–32] issued by [Lane]." [36] The same day, plaintiff wrote to defendant stating that it would proceed under SK–32 and that a claim would be submitted once actual costs could be determined. The next document in plaintiff's "Index" of the claim was the subcontractor's voucher for $647, which included overhead and profit at ten percent each. The last document in the claim "Index" was plaintiff's December 16, 1987 claim for $6,657.68, less impact, ripple, and flow-through costs.

Mr. Hearn stated in his deposition that the claim arose because drawing A–9 did not show the thickness of the walls of the steel tubes or how to connect the steel tubes to the adjacent solid walls. He further stated that sketch SK–32 provided that information. According to Mr. Hearn, sketch SK–32 identified the kind of metal to use and how to connect it to the steel wall studs. This was not the case. Sketch SK–32 did indicate how plaintiff was to connect the horizontal steel braces to the steel wall studs and the vertical steel tubes to the floor, but gave no information about the steel tubes; it made no reference to the "type" of steel tubing, gauge of the steel tube walls, tube steel vertical supports, or tube steel horizontal braces. What sketch SK–32 simply depicted was how the vertical steel tubes were to be connected to the floor, and the horizontal steel tube "braces" to the steel wall studs, even though plaintiff had not asked for clarification of the former. Mr. Kaplan professed "sur-

---

**36.** This period of time is included in plaintiff's delay claim, was alleged to be on the critical path, and causation attributable to defendant. Proof that the screen wall was on the critical path was lacking. Moreover, plaintiff gave no reason why it waited a full three months after receiving SK–32 before instructing its subcontractor to proceed and how much of the delay was caused by this three month delay, or how, in the circumstances, causation could be attributed to defendant.

prise" that the bolt and steel connectors depicted in sketch SK–32 were so heavy: "heavier than he would have reasonably expected." [37]

To recapitulate, plaintiff at various times and through several witnesses claimed the design was defective because the plans and specifications did not depict (1) the "type" of tubular steel to use, (2) the thickness (gauge) of the walls of the tubular steel, (3) the number of steel tube braces, (4) how to connect the steel tubes to the steel wall studs in the adjacent solid walls, (5) the requirements for "some" structural support,[38] and (6) detailed "points" of connection and welding of the steel tubes. Plaintiff also claimed that the steel tube dimensions indicated in the plans were "incorrect." Plaintiff's August 30, 1988 claim letter to the contracting officer defined the claim as

> involv[ing] a change from the reasonable interpretation of the drawings and plans thus increasing costs. It involves additional and/or more expensive structural supports for screen walls.
>
> \* \* \* \* \* \*
>
> Relevant documents with regard to the above is as follows [sic]:
> 5/2/86 minutes "Lane Architectural Group to provide wall thickness for steel tubes at 14/A9."
> Mega's 7/3/86 letter "please issue clarifications."
> SK–32 dated 12/18/86 received 1/19/87. See Mega letter and Request for Proposal dated 12/16/87, with attachments, Exhibit "9a" hereto.

The only screen wall claim actually submitted to the contracting officer was for a "connection to wall (screen wall tube) per revised sketch SK–32" [the claim designated (4), *supra*]. That is how plaintiff phrased the claim in its December 16, 1987 request for a change order and how the contracting officer understood the claim.[39] The only claim implicitly submitted involved Lane's promise to identify the gauge of the steel tubes, [designated (2), *supra*] but there is no evidence that Lane, or defendant, ever told plaintiff what gauge steel to use. Plaintiff never submitted the issue of the "type" of steel, the number of vertical steel tube supports, the number of horizontal steel tube braces to be used, or welding details to the contracting officer. If plaintiff intended all six allegations enumerated above to be claims instead of examples of how the design was deficient, it did so carelessly. Those "claims" were not submitted to the contracting officer. Moreover, there is no proof that the "type" of steel was ever in issue, or that plaintiff actually used extra vertical steel tube bracing.

■ The court has no doubt that the contracting officer was on notice of the two identified claims, and the amount of money demanded. However, such is not the case with the other four claims presented for the first time to the court. The four claims were not included in the August 30 claim letter, or any other valid claim, and it is obvious that the contracting officer had no notice of the reasons or bases for the claims, or the amounts requested, either explicitly or implicitly. Because those "claims" were not made prior to trial, they were not submitted in writing as required by the CDA and General Provision 4 of the contract, and do not otherwise satisfy the statutory prerequisites for jurisdiction. *See* 41 U.S.C. §§ 605, 609(a); Section V.A.1.

---

**37.** A hand-written, undated note in plaintiff's Index File for this claim stated "[o]wner/arch[itect] added correction details and established ¼" nominal thickness (use 10 ga[uge] as min[imum]!" The ¼-inch steel was shown in sketch SK–32 as the thickness of the plates connecting the steel tubes to the metal studs in the adjacent walls.

**38.** The court assumes that this refers to Mr. Kaplan's claim that there were "insufficient" tube steel vertical supports in the walls.

**39.** In his final decision of November 25, 1988, the contracting officer stated that "[t]he additional information given on SK–32 is merely clarification of the column connection to the floor and the 3″ × 3″ tubular steel tie connection to the steel wall studs and involves no extra work."

of this opinion, *supra.* Under these circumstances, the court dismisses all claims arising out of the screen wall with the exception of the screen wall steel connections and gauge of the steel tubes, submitted in writing by plaintiff on August 30, 1988, and addressed by the contracting officer in his November 25, 1988 final decision. *See Transamerica Ins. Corp. ex rel. Stroup Sheet Metal Works v. United States,* 973 F.2d 1572, 1580 (Fed.Cir.1992).

As is evidenced by plaintiff's July 3, 1986 letter to defendant, plaintiff's subcontractor premised its bid on the use of twenty-gauge steel tubes, with three horizontal steel tube braces running from the top of the screen walls to an adjacent solid wall. The subcontractor allegedly had not included in its bid the costs of any connections, including welding, or extra vertical steel tube supports. Even though plaintiff complained in the July 3, 1986 letter that its subcontractor could not have known the tube wall thickness when it prepared its bid to plaintiff, the record shows that the subcontractor had determined it prudent, and presumably within the guidelines of the industry standards identified in Sections 05100 and 05500, Division 5, of the Scope of Work, to use twenty-gauge steel, "at the minimum," as noted by either Mr. Kaplan or Mr. Hearn.

 In the discussion of the main workroom defective slab claim, the court found that the slab design was more in the nature of a design specification than a performance specification. *See* section III.B.2. of this opinion, *supra.* This was not, however, the case for all of the specifications in the contract. "Contracts may have both design and performance characteristics." *Blake Constr. Co. v. United States,* 987 F.2d 743, 746 (Fed.Cir.1993) (citing *Utility Contractors, Inc. v. United States,* 8 Cl.Ct. 42, 50 n. 7 (1985); *Aleutian Constructors v. United States,* 24 Cl.Ct. 372, 379 (1991)). The court finds from its review of drawings A–3 and A–9 and the other plans and specifications included in the contract, that the screen wall specification, and in particular Detail No. 14 on drawing A–9, was more in the nature of a performance specification than a design specification. *See Aleutian Constructors v. United States,* 24 Cl.Ct. 372, 379 (1991). The screen wall plans were more than schematic drawings but fell far short of design drawings. Plaintiff was required to build the screen walls in the manner set forth in contract drawings A–3 and A–9 and the specifications, but was given latitude in how to accomplish the job. The plans and specifications were not a road map that plaintiff was to follow assiduously. A degree of ingenuity, thought, and originality was required of plaintiff. *See Sterling Millwrights, Inc. v. United States,* 26 Cl.Ct. 49, 114 (1992). The fact that the wall connections of the tubular steel to the steel wall studs were not shown in the detail did not render the plans incomplete or defective. Had plaintiff followed the contractually designated process, it would have prepared and submitted shop drawings showing all aspects of the steel tubing, including how it proposed to connect the steel tubes to the walls, just as it did for other items in the contract. Instead, plaintiff demanded and received clarification of the design from the architect as is evidenced by its letter of July 3, 1986 asking for "clarification" of drawing A–9. Plaintiff was keenly aware of the clarification process, and used it successfully in other design areas both formally and informally through the use of "clouds" on its shop drawings.[40] It is not known why plaintiff did not avail itself of the shop drawing process in this instance. In support of this finding the court noted that plaintiff referred to sketch SK–32 in several other instances as a "clarification," as did defendant and Lane.

 In the alternative, Mr. Kaplan testified that plaintiff's bid was prepared on

---

**40.** *See Sterling Millwrights v. United States,* 26 Cl.Ct. 49, 54–55 (1992), where the court discussed at length the process for clarifying construction drawings and the use of "clouds." Simply put, if the builder has a question about the design, it is the practice in the industry to pen a note to the drawings and surround the words with a cloud, not unlike how language is depicted in cartoons. The owner or the architect in turn writes the answer in an adjacent cloud.

what he described as the most "reasonable" design for the wall based, in part, on its assumptions about how the screen wall would be constructed, rather than on the plans and specifications provided by defendant. The proper response to this theory is that the lack of design specifications placed plaintiff on notice to inquire as to the design requirements of defendant. *See Stuyvesant*, 11 Cl.Ct. at 861. In short, plaintiff recklessly assumed how the screen wall should be constructed without inquiring of defendant further details. It was amply obvious that plaintiff knew of the potential "problem" before it submitted its bid, thereby placing itself under a duty to seek clarification. *S.O.G. of Ark. v. United States*, 212 Ct.Cl. 125, 546 F.2d 367, 370–71 (1976); *Stuyvesant*, 11 Cl.Ct. at 861. A contractor "does not bear the burden of interpreting [the] contract [documents] correctly, only of interpreting [them] reasonably." *Salem Eng'g & Constr. Corp. v. United States*, 2 Cl.Ct. 803, 807 (1983) (citing *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 427 F.2d 1233, 1245 (1970)). Under this theory of recovery the court finds that from the view of a reasonably prudent contractor, the design was patently ambiguous. It is not the actual knowledge of the contractor but rather the obviousness of the discrepancy which imposes the duty to inquire. *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 455 F.2d 1037, 1045 (1972); *J.A. Jones Constr. Co. v. United States*, 184 Ct.Cl. 1, 395 F.2d 783, 789–90 (1968). The contractor is bound to inquire into obvious omissions or inconsistencies in the contract documents, *see Salem*, 2 Cl.Ct. at 807, and a contractor's interpretation cannot be reasonable "if the ambiguity is obvious." *Jamsar, Inc. v. United States*, 194 Ct.Cl. 819, 442 F.2d 930, 934 (1971). *Emerald Isle Electric, Inc. v. United States* held that "[a] patent ambiguity is generally defined as an 'obvious omission, inconsistency or discrepancy of significance.'" *Emerald Isle Elec., Inc. v. United States*, 28 Fed.Cl. 71, 73 (1993) (quoting *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963)). Where a patent ambiguity exists in contract specifications, prospective contractors have a duty to clarify the ambiguity prior to bidding on the contract. *J.B. Steel, Inc. v. United States*, 810 F.2d 1139 (Fed.Cir.1987); *S.O.G.* 546 F.2d at 370. Plaintiff failed to submit its question in writing, failed to get a written clarification, and never contacted the contracting officer about the discrepancy prior to executing the contract. The purpose of placing the burden of inquiry on prospective contractors is to allow for correction of errors before award and ensure that all prospective contractors bid on the basis of identical specifications. *Monarch Painting Corp. v. United States*, 16 Cl.Ct. 280, 287 (1989) (citing *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963)). Without inquiring further of defendant, plaintiff assumed the risk of any error when it based its bid on an assumed design that it later admitted was incomplete. *See McNamara Constr., Ltd. v. United States*, 206 Ct.Cl. 1, 509 F.2d 1166, 1169 (1975) (citing cases), holding that a contractor working under a fixed-price contract assumes the risk of unexpected costs, and *Delcon Construction Corp. v. United States*, where the Court of Federal Claims concluded that "[h]ad [the contractor] inquired in writing or sought clarification from the contracting officer, this misunderstanding, and this litigation, could have been avoided." *Delcon Constr. Corp. v. United States*, 27 Fed.Cl. 634, 638 (1993). Because plaintiff never sought clarification prior to its bid for what it admits is a "material omission," it cannot recover costs for this claim. *See S.O.G.*, 546 F.2d at 370–71. The cost of this folly rests squarely with plaintiff.

Moreover, according to Mr. Hearn's letter of July 3, 1986 to defendant, quoted above, the steel subcontractor said it intended to use twenty-gauge steel for the steel tubes but gave no indication of what gauge steel it intended to use for the connection plates. Plaintiff's statement that its subcontractor prepared its bid on the use of twenty-gauge steel tubes, but changed it to ten-gauge based on plaintiff's interpretation of sketch SK–32, although SK–32 made no reference to the gauge of the steel tubes, engendered further confusion. The reference to ten-gauge steel pre-

sumably came inferentially from the sections of sketch SK–32 depicting the use of ¼ inch *connection plates*. As directed by plaintiff the subcontractor delivered ten-gauge steel tubes to the job-site, but then, for another unknown reason, was told by plaintiff to replace them with sixteen-gauge steel tubes. Plaintiff never told the court why it submitted its bid on the project premised on the use of twenty-gauge steel, as proposed by its subcontractor, then chose to substitute ten-gauge steel, and ultimately sixteen-gauge steel in lieu of the twenty-gauge steel. It must be borne in mind that even though the contract required plaintiff to size the steel tubes to identified industry standards, and the subcontractor ostensibly had done so, plaintiff would have the court believe that it had no idea about what gauge steel to use because the contract did not specifically say "use twenty-, or ten-, or sixteen-gauge steel tubes."

A careful analysis by the court of the subcontractor's voucher led to the discovery that the length of steel tubes it intended to use was, in fact, what it actually used, contrary to plaintiff's assertion that extra tubing was needed after receiving sketch SK–32. The court reiterates that sketch SK–32 was issued December 18, 1986, but it was not until March 10, 1987 that plaintiff directed its steel subcontractor to fabricate the screen wall steel tubes and connections based on SK–32. The subcontractor delivered the steel two days later, on March 12, 1987 as shown by the subcontractor's voucher for an "extra" charge of $780. The voucher revealed that the subcontractor delivered a quantity of steel tube ³⁄₁₆-inch thick for "screen wall support." There were no steel plates included in the delivery for connectors. Because ³⁄₁₆–inch steel is thinner than ¼–inch steel, and ¼–inch was determined by plaintiff to equate to ten-gauge steel, ³⁄₁₆–inch steel is thinner than ten-gauge. However, plaintiff directed the subcontractor to replace the steel tubes and to show a credit for the ten-gauge steel. The subcontractor's second voucher was identical in all respects to the first, including the delivery date, except that it showed a credit of a

$105 for the ten-gauge steel tubes, and replacement with *exactly the same dimension* steel tubes, as originally delivered, i.e., ³⁄₁₆-inch, and lengths. The steel subcontractor's vouchers show that it did not deliver more material after this ruckus than it had originally delivered, contrary to plaintiff's claim. Fabrication costs were shown on both vouchers as $180 and freight costs as $120. Mr. Hearn's hand-written note on the first voucher said "show credit for 10 ga[uge]? Don't credit original freight (would have come with other material)." The second voucher showed no credit or extra cost as compared to the first voucher for freight or fabrication. Nor was there any reference to sixteen- or twenty-gauge steel.

Plaintiff created the confusion surrounding these issues but proffered no clarification. In light of the state of the record, the court has no option but to deny the claim. There are, however, additional reasons why the claim must be denied. In its cost submittal, plaintiff included all of the costs for steel in the screen walls allegedly incurred by it and its subcontractor without providing a shred of evidence of the costs of the alleged changes. Another hand-written note included in the Index File for this claim indicated that plaintiff expended thirty-two hours welding and anchoring the steel tubes, eight hours drilling holes, twenty-four hours welding for "say:" a total of eighty hours. Also included were the statements "Mega's welding outfit, rods and tips $90} [apparently equals] $126" and "Supervision 40 h[ou]rs."

General Provision 6, the *Changes* clause of the contract, entitles a contractor to an adjustment to its contract price to compensate it for the increased costs of performing changed work. In order to prove the costs of the changed work, a contractor must prove by a preponderance of credible evidence the original, or unchanged, costs or, at the very least, quantify the cost of the changed work. Plaintiff did neither. Plaintiff's total cost request for equitable adjustment associated with this alleged change included total direct costs (such as welding, drilling holes, etc.)

and total indirect costs (overhead, profit, labor, insurance, equipment, and other commonly accepted overhead items) that it would have incurred in erecting the wall regardless of the material used. In short, plaintiff failed to offer proof that its costs were increased by a change in material. Even were the court to find the drawings or specifications faulty, or that sketch SK–32 constituted in any way a change to the contract, which it did not, plaintiff provided no evidence of incurrence of costs beyond the scope of the contract. Simply alleging entitlement to an equitable adjustment equal to the total cost of the steel work in the screen walls is at the very least disingenuous. In the absence of a preponderance of the evidence proving government fault and injury, the court cannot find entitlement to an equitable adjustment. The court finds that the contract drawings were not inadequate or defective; that plaintiff asked for and received clarification of the connections; that sketch SK–32 changed no requirement of the contract; and that plaintiff is not entitled to an equitable adjustment to compensate it for any costs it may have incurred in furnishing the screen walls.[41] The claim is denied and dismissed.

## 8. *Material for Building Security*

Plaintiff sought an equitable adjustment for materials and labor used to secure the building beyond the time it had anticipated. Special Provision 24(e) of the contract, the *Protection & Restoration of Public & Private Property* clause, states that sole responsibility for protection of the facility lies with the contractor, and that the contractor will erect and maintain at its own cost the temporary barriers and closures, etc. necessary to protect new work. General Provision 31, entitled *Permits and Responsibilities*, requires the contractor to take responsibility "for all materials delivered and work performed until completion and acceptance of the entire construction work...."[42]

Mr. Kaplan described the claim as for "plywood and plastic barricades or enclosures to protect building openings, security-wise and weather-wise." Plaintiff acknowledged that every contract anticipates a certain amount of temporary protection on the job-site but argued that long periods of government-caused delay forced it to take precautions not anticipated at the time of award to protect the building. The claim was poorly briefed, unsupported, not analyzed, and therefore difficult to understand. In his testimony, Mr. Kaplan alleged that the plans and specifications were deficient in that "somewhere" the contract specified two types of glass. Plaintiff submitted one type for approval but Lane directed plaintiff to use the other type, for what he Mr. Kaplan believed were "aesthetic" purposes.[43] This change necessitated a second shop drawing submittal. The government's in-house debate over which type of glass to use ran from January until October 1986. Because of the lead time involved in ordering the selected glass, it was not delivered to the job-site until January 1987. Mr. Kaplan continued in his testimony

We had a building—with the exterior walls, certainly by October was complete—that is the lathe and plaster cladding, but we had open windows. So here we are in October, we were not that far away from the rainy season and we had a major theft. A whole bunch of electronic dimmers had been stolen from the building and there was some minor theft as well. But, I remember that became a big issue with our electrician because he was looking to us [because] we had not properly secured the building. There-

41. The part of the claim dealing with the subcontractor's materials costs does not appear to be in accord with plaintiff's certification of costs as per the CDA, 41 U.S.C. § 605(c)(1), and will be addressed shortly with other similar issues identified in this opinion.

42. For further discussion of Special Provision 24(e) and General Provision 31, see the discussion of the Temporary Fence claim in section V.C.6. of this opinion, *supra.*

43. Plaintiff made mention in passing of problems with glazing the windows and window frames, but never explained or developed the issues as part of any claim.

460

fore, in October, we secured the building. We filled the building with plywood.

The contracting officer administratively allowed the "glass" change but denied plaintiff's "plywood" claim for three reasons: (1) the contract required plaintiff to provide temporary protection; (2) a change order executed October 9, 1986, covered all the changes compensable, and later costs should have been included then, not fourteen months later; and (3) the amount of plywood and two by four's shown delivered in a supplier's voucher was vastly less than plaintiff's claim stated it actually used.[44] Plaintiff submitted its request for a change order to defendant on August 13, 1986, in the amount of $8,509, but revised it on February 2, 1986 to $4,215. The request for a change order contained plaintiff's standard boiler-plate exclusionary language for later discovered ripple and impact costs. Plaintiff's claim filed with the contracting officer on December 16, 1987, was for $14,551.50. Actually, two change orders were issued for the same item; Nos. twelve and fifteen. Both change orders noted that "THIS SUPPLEMENTAL AGREEMENT CONSTITUTES THE COMPLETE AND FULL AGREEMENT OF THE PARTIES." However, each change order contained a notation at the bottom "Executed per Mega proposal(s)." Plaintiff's proposal for the change order stated that ripple and impact costs were "TBD," (To Be Determined). Defendant argued that the issue was closed because the change orders constituted an accord and satisfaction. The court finds this not to be the case.

■■■■ One of the five elements of accord and satisfaction is a "meeting of the minds." *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 343 F.2d 951, 955 (1965) (quoting *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.,*

176 F.2d 73, 76 (10th Cir.1949), *cert. denied*, 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581 (1950)); *accord Commercial Contractors, Inc. v. United States*, 25 Cl.Ct. 666, 669 (1992). It is not known who penned the notation to the change orders but it is clear under the circumstances that there was no meeting of the minds sufficient to constitute accord and satisfaction.

Plaintiff's claim is bottomed on a delay to the contract. The contracting officer's administrative allowance of the "glass" claim may have been reasonable in the circumstances because of the ten-month delay to the work item in selecting the type of glass, though the evidence presented to the court would not have satisfied the requisite degree of proof to have permitted the court to have allowed the claim. Defendant was correct when it argued that normally plaintiff would be responsible for providing building security, including boarding open windows and doors to prevent weather damage, vandalism, and theft, in accordance with SP–24(e) and General Provision 31. The cost of barricading the windows and doors would be incidental, but allowable, damages to be included in the administrative modification to the contract. To the extent, therefor, that plaintiff was not fully reimbursed for costs of the plywood and lumber in the modification, it is entitled to those costs if it can prove the costs by the preponderance of the evidence, and the claim can be justified against plaintiff's CDA certification. The court will make no findings or conclusion on this claim pending resolution of the CDA certification issue.

### 9. *Fuel Storage Facility*

Plaintiff requested an equitable adjustment for direct, impact, and delay costs stemming from alleged increased costs of

**44.** At one point in the presentation of its case, plaintiff claimed that fifty-eight four-foot-by eight-foot pieces of plywood were used. Defendant's review of the record showed that only twenty-three were needed. The supplier's voucher showed that it had delivered 1856 square feet of plywood (fifty-eight sheets), whereas plaintiff's claim was for 2176 square feet (sixty-eight sheets). The supplier's voucher showed that it delivered 608 board feet of two-inch-by-four-inch framing lumber, but plaintiff's claim is for 1356 board feet. It could be that plaintiff used the wood for other purposes, but failed to mention that fact. This discrepancy appears to constitute a violation of the CDA certification, 41 U.S.C. § 605(c)(1), and will be addressed following the filing of this opinion.

its subcontractor for the construction of a vehicle fueling station. The claim arises out of the numerous delay claims allegedly caused by the government that plaintiff has failed to prove. Plaintiff's claim to the contracting officer, and its second amended complaint, were further examples of its mastery of the terse claim form.

■ Mr. Kaplan testified that plaintiff intended to construct the "little fueling facility" towards the beginning of the contract but was unable to do its own site-work to prepare for the fueling facility construction for *two years*, until late February or early March 1987, because of extra site preparation work, as discussed in section IV.C.1. of this opinion, *supra*, even though Mr. Cumine only suggested a *thirty-two day* delay. Plaintiff never explained how it calculated the two-year period. Mr. Kaplan alleged that during the two-year period, the City of Los Angeles changed the fuel storage facility code, thereby increasing the subcontractor's, and thus plaintiff's, costs.

> To make a long story short our subcontractor suffered a major increase in cost. He also ... in the space of a year and a half, suffered—he stated escalation costs in his labor and his insurance. As a result, he submitted a claim which we then processed.

Plaintiff's counsel neatly marched Mr. Kaplan through the claim. He asked: "Mr. Kaplan, was there basically a law that came into effect after Mega started the job which required Mega to change its original intended performance pertaining to this item." Mr. Kaplan responded, "Yes."

> Q. Okay. And, that required additional work to be done that wasn't originally contemplated at the time of the bid, is that correct?
> A. That is correct.
> Q. And, did Mega, in your belief as a contractor and opinion, start the work with regard to the site and taking into light all of the prior delays pertaining to demolition, et cetera, within a reasonable period of time?
> A. Yes.

> Q. And at the time Mega started the work-excuse me. This particular new provision was in effect?
> A. Yes.
>
> * * * * * *
>
> Q. And made it comply—the subcontractor complied with the new ordinance that came into effect at the time of this, correct, Mr. Kaplan?
> A. Yes.
> Q. And that resulted in the additional charge?
> A. Yes.

Plaintiff entered into a subcontract for construction of the "Gasoline Fueling Island" on October 30, 1985. On March 3, 1987, the subcontractor wrote to plaintiff stating that

> Since [entering into] our original contract with you ... several factors have influenced the job costs:
>
> > Although the facility is a Federal project, we find that the Postal Department is following the local Los Angeles, City Fire Department recommendations in regards to underground fuel tanks and dispensing systems. The local code now requires....

The subcontractor explained that the equipment it originally intended to use could not be used, and that "the recommended" equipment would be more costly. The subcontractor informed plaintiff that its labor and equipment costs "escalated from our original bid of 1985 to 1987. Liability insurance ... has jumped a minimum of 600% during this time period and consequently increases the contractor's operating costs." As a result, the subcontractor stated that it would "accept the fueling facility project for an addition of $10,035.00 ... to the original contract agreement." The subcontract was a "standard form subcontract" and had no provision for price escalation. The subcontract did, however, incorporate all terms and conditions of plaintiff's contract with the Postal Service. It included the statement

> SUBCONTRACTOR agrees to be bound to CONTRACTOR in the same manner

and to the same extent as CONTRACTOR is bound to OWNER under the Contract Documents, to the extent of the work provided for in this Agreement. . . .

General Provision 31 of the contract, the *Permits and Responsibilities* clause, provides that the contractor, without cost to the government, is responsible for complying with "any applicable Federal, State, and municipal laws, codes, and regulations in connection with the prosecution of the work." General Provision 52, the *Building Codes, Fees and Charges* clause, provided that

(a) State and local building codes and regulations do not apply as a matter of law to work inside the property lines of Postal Service-owned properties. . . . In compliance with U.S. Postal Service policy the Contractor shall comply with all State and local building code requirements unless otherwise specifically provided.

Mr. Kaplan testified that plaintiff intended to begin construction of the fueling station ten weeks after starting work and to complete it in three weeks. The Notice to Proceed was issued September 9, 1985, which meant that the fueling station should have been completed by the first or second week of December 1985. Had plaintiff worked to its allegedly as-planned schedule, the work would have been completed before any city code allegedly changed.

The contracting officer administratively allowed plaintiff a thirty-two day time extension for pre-construction site clearance. That delay, plaintiff agrees, was not on the critical path, though it allegedly did postpone the start of construction until late-November 1985. Plaintiff did not provide an iota of proof of when the city code changed, if, in fact, it did. The only evidence of a city code change was the subcontractor's general references to the equipment it recommended be used to meet the new city code requirements. Had there been a code change, plaintiff certainly would have provided copies of both the old and new code, with an analysis of any differences between the two. This would also have answered the question of whether any construction changes were mandatory or merely recommended to meet the "new" code, and would have delineated the actual extent of the changes. If this had been done in 1985 it would also have permitted defendant to have evaluated its policy of city code compliance against the possibility of increased costs, or down-sized the facility. In the absence of any information about any allegedly new code and the changes it required, the court cannot find that the code changed between the time of award of the subcontract and the date of alleged actual construction of the fueling station, or that the construction changes, if any, were required. In the complete absence of this information, the court is unable to find that plaintiff proved by a preponderance of the evidence that it was in compliance with General Provisions 31 and 52 of the contract.

There was no credible evidence offered that the fueling station subcontractor incurred greater costs in completing its portion of the contract, or, if it did, whether plaintiff was actually liable to the subcontractor for the increased costs. If plaintiff has made payment to the subcontractor, of which there is some doubt, it may have been nothing more than a voluntary act on plaintiff's part, and not a contractually required payment in light of the original fixed-price subcontract plaintiff entered into with its subcontractor. Plaintiff provided no analysis of or details about the extra costs allegedly incurred other than a bare, unsupported letter from its subcontractor. Plaintiff's subcontractor simply stated that it would be only too happy to construct the fueling station for $10,035 over the amount for which it had previously contractually obligated itself to perform, and plaintiff agreed.

Plaintiff failed to prove that there was an actual change in Los Angeles' fuel storage code, that the requirements of any later code were more expensive, or that the government caused or directed a compensable change. For these reasons, the court finds that plaintiff has not proved entitlement by a preponderance of the evidence to an equitable adjustment for the claimed

extra costs arising out of construction of the fueling station. Plaintiff's claim for costs associated with the alleged changes to the fuel system is denied and dismissed.

### 10. *Storm Drain*

The contract originally contained no storm drainage requirement, but according to Mr. Kaplan, the City of Los Angeles would not accept water draining across the sidewalk from the site. Defendant modified the contract to require a storm drainage system but did not finally allow the claim until after the contract was terminated. There is conflicting evidence in the record as to who installed the storm drainage system, but the weight of the evidence indicates that plaintiff, rather than the reprocurement contractor, constructed the storm drain. Instead of paying plaintiff for the work, defendant offset the value of the work against its counterclaim. The issue before the court is of defendant's right to offset funds earned, or to become due, as discussed above in section V.C. of this opinion. Whether plaintiff is entitled to have all or a portion of the earned funds released depends upon the outcome of the quantum phase of this litigation. Defendant properly withheld some payments pending resolution of its claims against plaintiff. *See Mazama Timber Prods., Inc. v. United States*, 6 Cl.Ct. 87, 88–89 (1984) (citations omitted); *Americold Corp. v. United States*, 28 Fed.Cl. 747 (1993).

### 11. *Photocopying Logs*

 Plaintiff claimed entitlement to an equitable adjustment for photocopying its workmen's and supervisor's logs at the request of defendant. Mr. Ruffalo, defendant's on-site project manager, testified that around March 1987, he requested that plaintiff furnish him with a copy of plaintiff's daily reports. According to Mr. Ruffalo,

> [t]he daily job log is an entry by the superintendent and he gives the weather, exactly who and which [sub]contractors are on the job and what they are doing

and any major deliveries or problems that relate to the job for that day.

By all indications, Mr. Ruffalo's request was in writing, but his letter was not offered into evidence. There was no dispute, however, over the request or exactly what was requested. Mr. Ruffalo testified that "[a]t the time we requested the daily reports, there was little or no progress going on at the job and we were ... wondering what the superintendent was actually writing in his daily job log." The underlying reason for requesting the daily reports was defendant's suspicion that it had been billed for work not accomplished. Defendant wanted to compare the daily reports showing what occurred at the site each day with plaintiff's requests for progress payments. As was shown at trial, and discussed herein, plaintiff had, in fact, billed defendant for certain work not accomplished in violation of the CDA certification. *See* discussion of delay claims in section IV.C.4. of this opinion, *supra*, and the finding that the Canoga Park facility was between 60 and 70 percent complete at the time of plaintiff's default termination. Section V.C.15. of this opinion, *infra*. The percentage of the project completed was far less than plaintiff represented to defendant. *See id.* The situation had become so severe by the time defendant requested the daily reports that defendant believed it could not make progress payments solely on the basis of plaintiff's payment vouchers. Defendant was clearly entitled to additional documentation to verify claimed progress before making further progress payments.

On April 27, 1987, Mr. Kaplan forwarded plaintiff's "log of workmen and supervisory personnel," pursuant to contract Special Provision 10, the *Preconstruction Conference and Daily Reports* clause of the contract. Plaintiff pointedly stated that Special Provision 10 only required "this log" to be available for inspection in the job-site office and that there was no requirement in the contract that it must copy the log for defendant.[45] Plaintiff's April 27 letter ac-

---

**45.** The second paragraph Special Provision 10 stated:

companying the log claimed that it copied 1,530 pages of the "log" at seven cents each; that it took twenty-four hours at $15 an hour to complete the copying, plus two and a half hours of unidentified labor at $50 an hour, and a "markup" of $124.34. The claim totaled $716.44. On the premise that copying the "workman's log" was outside the scope of the contract, plaintiff filed this claim with the contracting officer in its August 30, 1988 claim letter. In its Second Amended Complaint, plaintiff adhered to the position that "the log" was always available to defendant and that it was entitled to compensation for the costs of copying.

In its opening post-trial brief, plaintiff began to move away from an identification of the "log" by describing the claim as one that "involved the preparation by Mega of additional information for the USPS [sic] ... together with copying of same." In its post-trial reply brief, plaintiff simply stated "[r]eference is made to [the opening post-trial brief] ... together with Mr. Hearn's deposition testimony [located in Index 67]. Index 67 sheds no light on the claim; it is simply a copy of Mr. Kaplan's letter of April 27, cited above, and a stack of forty-seven transmittal forms sending weekly *payroll* reports under Special Provision 10 to defendant "for [their] records."[46] Mr. Hearn may have understood what Mr. Ruffalo wanted; he referred to the documents as "workmen's logs." Mr. Kaplan testified he provided the "workmen's logs." That is not, however, what he gave defendant.

Mr. Ruffalo testified in response to defendant's counsel's question asking if he ever received the daily reports; "No. We never got them.... The package I received was a xerox [sic] copy of a certified payroll, which I already had." At no time did plaintiff supply defendant with a copy of the requested daily reports until the discovery phase of this litigation.

This claim raises serious issues which could affect the outcome of the entire litigation. Obviously, long before the time plaintiff submitted its claim to the contracting officer, plaintiff knew that it had copied and submitted the wrong documents. The court finds this claim, at the very least, to be blatantly irresponsible and perhaps false. The Rules of this court provide that

> [t]he signature of an attorney or party constitutes a certificate by the attorney or party that the attorney or party has read the pleading, motion, or other paper; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

RCFC 11 (1993); *see* 28 U.S.C. § 2514 (1988);[47] Fed.R.Civ.P. 11 (1992); *Tyger*

---

The Contractor shall maintain a daily log showing number of workmen and supervisory personnel by craft physically on the job-site each working day and a list of equipment other than small tools, on-site. This log shall be available for inspection at all times in the Contractor's temporary job office.

**46.** The payroll reports were submitted weekly to defendant pursuant to Labor Standard Provision 5(b)(1) of the contract.

**47.** Title 28 U.S.C. § 2514, entitled "Forfeiture of fraudulent claims" provides

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States [Court of Federal] Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

Constr. Co. v. United States, 28 Fed.Cl. 35 (1993); Versaggi Shrimp Corp. v. United States, 28 Fed.Cl. 20 (1993); Durable Metal Prods., Inc. v. United States, 21 Cl.Ct. 41, 47–48 (1990); SGW, Inc. v. United States, 20 Cl.Ct. 174 (1990). See Sterling Millwrights, 26 Cl.Ct. at 91–111, containing an indepth discussion of the False Claims Act, (31 U.S.C. §§ 3729–3733 (1988 & Supp. III 1991)), the Forfeiture Act (28 U.S.C. § 2514), the fraud provision of the CDA (41 U.S.C. § 604 (1988)), and 18 U.S.C. § 1001 (1988).[48]

This claim by plaintiff, repeated several times over the signature of its counsel, and presented at trial, tainted all of plaintiff's other claims and severely damaged plaintiff's credibility. It further raises a question of the "good faith" in plaintiff's claim certification signed by Mr. Kaplan and filed with the contracting officer in the August 30, 1988 claim letter, and its counsel's repeated assertion of the claim. See RCFC 11 and 41 U.S.C. § 605(c).[49] Defendant has not investigated or addressed this issue, nor have the parties briefed it satisfactorily or completely. Because of its serious nature, the court will refrain from making findings and conclusions, or issuing sanctions sua sponte at this time. However, the issue must be fully aired, and will be addressed by the court prior to formal proceedings on quantum in this litigation. Cf. Speck v. United States, 28 Fed.Cl. 254 (1993).

The court finds absolutely no merit to plaintiff's claim for the copying and furnishing of documents not requested by defendant. No findings will be made on this claim pending resolution of the possible false claim issue.

---

28 U.S.C. § 2514 (1988).

**48.** The cited portion of Sterling was vacated by the court at the request of the parties to that litigation in furtherance of settlement. The case is cited only as cogent statement of the law under discussion in this section of the opinion.

**49.** Section 6(c) of the CDA requires that all claims over $50,000 be properly certified before submission to the contracting officer. 41 U.S.C.

## 12. Change Order Proposals

Plaintiff claimed entitlement to an equitable adjustment in the amount of $2,000.00 for the cost of sixty hours of preparing "a few" unidentified change order proposals. As defendant explained to plaintiff at the outset of the contract, the process by which the U.S.P.S. initiated bilateral change orders required plaintiff to complete a request for proposal in which plaintiff stated its proposed direct and indirect costs for completing the work that was the subject of the proposal. The proposal was to identify the work to be performed and, where appropriate, included shop drawings. If the work required use of a subcontractor, its costs were to be stated. In some instances, subcontractors stated their direct and indirect costs, and in others simply the total cost. Some, but not all, proposals lead to change orders. See General Provision 8, Equitable Adjustments, of the contract, discussed infra.

At one point, seven months into the contract, plaintiff "directed" defendant to review and formally "execute modifications" to the contract "within 5 days after receipt of the quotation" in order to expedite approval of the costs stated in its requests for proposals. Later, plaintiff specifically limited the time its proposed costs would remain valid for only two or three days. The absurdity of plaintiff's position is reflected in a letter of June 30, 1987 from Mr. Ruffalo to Mr. Kaplan, stating, in part:

> Regarding Mega Transmittal of April 14, 1987: Your comments are noted. It is also noted that your transmittal was dated [April 14, 1987] and received in this office on [April 20, 1987] at 8:55am. You also say that you need an answer by [April 20, 1987] at 7:00am. This is insufficient time for proper notification to

---

§ 605(c). Mr. Kaplan stated in his letter of August 30, 1988:

> The undersigned certifies that the claims set forth herein are made in good faith; that the supporting data is accurate and complete to the best of his knowledge and belief; and that the amounts requested accurately reflect the contract adjustment for which Mega Construction Co., Inc. believes that the United States Postal Service is liable.

the Postal Service on a Change Request. (emphasis added).

The contract provided no specific time period for defendant to react to plaintiff's proposals unless the proposal contained a shop drawing. Special Provision 16, the *Contractor Submittal Schedule* clause, allowed defendant twenty days to review and approve shop drawings. General Provision 8, paragraph (e) stated:

> After receipt of a proposal with a detailed breakdown the Contracting Officer shall act promptly thereon, provided, however, that when the necessity to proceed with a change does not allow sufficient time to check a proposal, or in the event of failure to reach agreement on a proposal, the Postal Service may order the Contractor to proceed on the basis of a price to be determined at the earliest practicable date but not to be more than the increase or less than the decrease proposed.

The record showed that on several occasions defendant ordered plaintiff to proceed with the proposed changes pursuant to General Provision 8(e), but there was no evidence permitting the court to identify or quantify action on the other requests for proposals. There were times when defendant took a long period of time to respond to plaintiff's requests for proposals, but plaintiff presented no credible proof that the delay in responding to any specific request for proposals delayed any activity on the critical path, or that it suffered any material damage as a result of a slow response. Nor did plaintiff even attempt to show what a normal approval period would have been for a modification to a contract from the date of receipt of a proposal by defendant until negotiation and execution of a modification. The court is aware of no law, regulation, or contract provision that permits plaintiff to unilaterally direct the duration of time that defendant is allowed to accede to and execute a modification to a $2.5 million dollar construction contract, much less only two or three days.

Further complicating the change order approval process was the fact that plaintiff rarely included its overhead, and other cost items required in General Provision 8, paragraphs (a) and (b), in its proposals, thereby hampering defendant's ability to control, or even to estimate, the ultimate cost of the project. A further complicating factor was that plaintiff's claimed progress did not equate to its requests for progress payments thereby requiring defendant to carefully check all payments, including those made pursuant to requests for proposals to assure that it was not overbilled or billed twice for the same work.

In support of its claim, plaintiff referred the court to its claim Index No. 27. The Index includes a list of seventeen proposals submitted to defendant on August 14, 1986, plus one additional proposal submitted on May 18, 1987, as requests for equitable adjustments. However, the Index did not identify which proposals were the subject of the claim. Some of the proposals were allowed in whole or in part by defendant, while others were denied, including several of the claims addressed in this opinion. Plaintiff had submitted other proposals to defendant, but did not include or refer to them in the Index, or otherwise. Plaintiff did not state how many proposals were submitted in total. At trial, Mr. Kaplan conceded that costs associated with change orders were part of normal overhead expenses, but believed that the number of the proposals required was far greater than normal. Plaintiff argued that because of the unusually large number of proposals it was required to submit, defendant, in effect, used plaintiff to perform "the services of an estimating service and a field inspection service" which "should have been done by the USPS [sic] consultants on the project, including the architect." Plaintiff also argued that it "was required to be involved in redesign of portions of the project...."

There is a dearth of law addressing the issue of entitlement to additional compensation for the preparation of change order proposals. General Provision 8(g) stated that

> [u]pon written request by the Contracting Officer, the Contractor shall submit a proposal, in accordance [with this clause],

for work involving contemplated changes covered by the request, within the time indicated.... If, within a reasonable time after receipt of such proposal, the Contracting Officer orders the Contractor to proceed with the performance of the work contemplated, the proposal ... shall constitute the Contractor's statement of the monetary extent of claim [sic] for equitable adjustment.

The court found no guidance in the opinions of the Federal Circuit or this court on this issue. A few Boards of Contract Appeal have, however, addressed the issue and found such costs not allowable. *See Greenhut Constr. Co.*, ASBCA 14354, 70–1 BCA ¶ 8209, 1970 WL 1696 (1970); *Energy Eng'g Corp.*, PSBCA 319, 77–1 BCA ¶ 12,-422, 1977 WL 2613 (1977). The general reason given for denial of the costs is that the proposal preparation costs are included in the contractor's overhead. *See Blake Constr. Co.*, VACAB 1725, 83–1 BCA ¶ 16,-431, 1983 WL 7506 (1983); *CML–Macarr, Inc.*, ASBCA 21190, 78–2 BCA ¶ 13,240, 1978 WL 2100 (1978); *see also* R. Nash, *Changes and Claims*, in *Construction Contracting* 501, 526–27 (George Washington University 1991). The Boards have concluded that such "proposal costs ... are allowable as direct costs only when there is agreement to do so or if the contract so provides." *CML–Macarr, Inc.*, 21190, 78–2 BCA ¶ 13,240 at 64,766. There have been a few exceptions to the general rule. The Armed Services Board of Contract Appeals has allowed such costs in a few instances where the proposal corrected errors in government specifications, *see Acme Missiles & Constr. Corp.*, ASBCA 11786, 69–2 BCA ¶ 8057, 1969 WL 629 (1969), and where the contracting officer ordered preparation of the proposal specifically at government cost. *See Century Eng'g Corp.*, ASBCA 2932, 57–2 BCA ¶ 1419, 1957 WL 4619 (1957), 58–1 BCA ¶ 1625, 1958 WL 5579 (1958). *See also Mac–Well Co.* where, although the Board agreed that under the general "no recovery-overhead" rule the contractor would not be entitled to recover, an anomalous situation existed warranting allowance of the contractor's claim. *Mac–Well Co.* ASBCA 23097, 79–2 BCA ¶ 13,895

at 68,223, 1979 WL 2541 (1978). The *Mac–Well* claim was for costs expended in responding to a change order given *after* the contract had been performed and final payment made. *Id.* The Board found that the change order was beyond the scope of the contract, and that the contractor had been "misled into believing a change order would issue in which it could recapture all of its costs including the expense of preparing the proposal." *Id.* at 68,224. In response, the government argued that the cost of preparing a proposal is not recoverable unless the preparation effort is of great complexity or magnitude or the parties have made a prior agreement on compensation. The Board held:

[w]e are unable to find any great complexity or magnitude in the work done by [the contractor] in preparing the estimate to change the pumps. But the Government proposed the use of the change order procedure for work that was clearly beyond the scope of the contract and we think that when the Government does that it is requiring extra work. Further we think the Government officials knew or should have known that the work was beyond the scope of the contract but appellant, having installed the first set of pumps, seemed the best source to do the work in correcting the design error the Government had made [and for which the government had expressly assumed responsibility].

*Id.* As the Board stated, the equitable adjustment vehicle was the most efficient procedure by which it could compensate the contractor for an action it took after final payment; at the least, it was the most expedient. However, there is no evidence that a similarly anomalous situation existed in the case at bar, and, therefore, no reason why the court should not apply the general rule disallowing recovery.

Plaintiff was directed to prepare a number of proposals. However, plaintiff provided no evidence that the number of proposals was greater than that normally encountered on any comparable construction project. Even if there had been more changes to its contract than was normally to be expected, plaintiff provided the court with no information about when the proposals allegedly crossed the line separating

the range of typical from excessive. Plaintiff's only "evidence" consisted of conclusory statements made by Mr. Kaplan, far short of the preponderance of the evidence needed to prove a claim. There was no identification, dollar breakdown, or analysis of an allegedly "abnormally high" number of changes that would permit the court to identify any compensation for excess proposals, if in fact there were an excessive number. Certainly plaintiff must bear the costs of preparing shop drawings, deriving estimates of its own and its subcontractors' costs for changes, and the full panoply of work that accompanies any actual or proposed change under a government contract. The court agrees with Mr. Kaplan's admission at trial that the cost of preparing requests for proposals for submission to defendant, which might or might not lead to change orders is entirely chargeable to plaintiff's overhead. In the complete absence of any proof or analysis of what was to be expected in the way of proposal preparation and shop drawings, as compared with what actually occurred, the court cannot apportion compensation for an allegedly "abnormal" number of proposals prepared. Here, the court is asked to compensate plaintiff for sixty hours of unidentified work allegedly incurred in complying with General Provision 6, the *Changes* clause of the contract. If the claim is supported under any other clause of the contract or provision of law, plaintiff has not identified it, and the court is unaware of any provision entitling plaintiff, in the circumstances of this case, to an equitable adjustment for the preparation of requests for proposals, which might or might not have culminated in a change to the contract.

Plaintiff did not explain what it meant in its statement that it was required to be a "field inspector and assist in redesign," or how any such work went beyond what it was required to do under the terms of the contract. The project was not particularly or unusually difficult. In fact, Mr. Kaplan described the project as a "plain vanilla project ... of no particular degree of complexity." In the absence of any proof that the proposals were highly technical or complex in nature, that an undue amount of time went into proposal preparation, or that the proposals were in any way beyond the scope of its contract either in sheer number or subject matter, the court must apply the general rule that proposal preparation costs are part of the contractor's overhead.[50] Accordingly, the claim is denied and dismissed.

### 13. *Post–Termination Security*

██ Plaintiff alleged entitlement to an equitable adjustment for watchman services provided after the termination for default. Defendant demanded of the surety that security be maintained on the project following the termination for default, and the surety instructed plaintiff to provide round-the-clock watchmen. As a result, plaintiff allegedly provided a watchman at the site twenty-four hours a day until "around October 20, 1987." Because plaintiff bore the entire cost of the watchmen's services, including home office overhead, and defendant benefited from the services, plaintiff claims entitlement to relief. Plaintiff also claimed that the temporary fence, discussed above in section V.C.6. of this opinion, *supra,* was part of the post-termination security claim, and that plaintiff's superintendent, Mr. Hearn, stayed at the site to provide additional security. Plaintiff did not spell out how Mr. Hearn's presence provided any additional degree of security beyond that of watchmen, or how much of Mr. Hearn's time was spent providing security as opposed to assisting F & D perform tests on the slab. Plaintiff argued that Mr. Hearn was on-site for both purposes through October 20, 1987, notwithstanding the fact that F & D completed its tests through the Construction Consulting Group, Inc. and Smith–Emory prior to September 28, 1987. Mr. Kaplan testified that no representative of defendant ever objected to Mr. Hearn's presence on the site, even though plaintiff was forbid-

---

**50.** This is so even though Mr. Kaplan testified that plaintiff did not specifically include an overhead factor in its bid. Mr. Kaplan explained that plaintiff intended to recoup its non-change order overhead from profits.

den access. Defendant made no contemporaneous objection to Mr. Hearn's presence on the job-site because he was never seen at the site. Several of defendant's witnesses testified that they never saw Mr. Hearn on-site following the termination, and no witness from either side testified that they did see him there.

In its post-trial brief, plaintiff argued that:

... the bonding company and Mega, for purposes of this item of damages, in essence, had a unity of identity and that a demand upon the bonding company was a demand on Mega.... Further, certainly the relationship of Mega and its bonding company as principal and surety are such that Mega can directly bring this claim for these costs against the USPS [sic].

As the court has already noted, upon receiving notice of the termination for default, plaintiff's responsibility was to vacate the premises immediately. If F & D instructed plaintiff to provide watchmen at the site, that is a matter between F & D and plaintiff, or F & D and defendant. Plaintiff did not bring this claim on behalf of F & D and F & D has not joined in the suit as a party-plaintiff to recoup its costs for the fence. Following the default, F & D became responsible for plaintiff's unfinished responsibilities under the contract, including site security; how it chose to comply with its duties is a matter beyond plaintiff's extra cost and change order claims. F & D disagreed with defendant that it (or plaintiff) was responsible for site security following the termination and stated in a letter to the contracting officer of August 20, 1987, "such responsibility *may* rest with the Post Office. Nonetheless, [F & D] is arranging for the security for the protection of the facility." (emphasis added).

Plaintiff can point to no directive or act of a government official creating privity of contract between itself and defendant to provide watchmen's services or for the fence. Mr. Kaplan testified that he sent a letter to the contracting officer "generally regarding security at the site after the termination." Defendant's response was

curt but clear: "Get off the job." Later in his testimony, Mr. Kaplan confirmed defendant's position about plaintiff's presence at the job-site; he testified that he was instructed on more than one occasion that under no circumstances was plaintiff to go anywhere near the job-site. As a result, plaintiff kept its personnel away.

■ Without authorization, work performed after termination is not compensable. *See Semco, Inc. v. United States*, 6 Cl.Ct. 81 (1984). Plaintiff argued that *Semco* was distinguishable because the above principle "totally ignores General Provision 10(e)(2) which gives the contractor an ability to collect for such an item." This argument is frivolous because contract General Provision 10 is the *Termination for Convenience of the Government* clause. No matter how often or stridently plaintiff characterizes the termination for default as "alleged" or "purported," it cannot change the fact that it was terminated for default, and properly so. *See* section III.B. of this opinion, *supra*. Plaintiff cannot rely upon General Provision 10 for relief.

a. Contract implied-in-fact

■ Plaintiff may have stumbled upon an implied-in-fact contract argument in its allegation that it provided watchmen services and the government benefited. Implied-in-fact contracts require the same contractual elements as are required to establish an express contract: Mutuality of intent, offer and acceptance by an authorized person, consideration, and lack of ambiguity. *Pollack v. United States*, 15 Cl. Ct. 46, 48 (1988) (citing *Fincke v. United States*, 230 Ct.Cl. 233, 675 F.2d 289, 295 (1982)); *Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 338 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984). Only the nature of the evidence differs. *See, e.g., Fincke v. United States*, 230 Ct.Cl. 233, 675 F.2d 289, 295 (1982). *Algonac Manufacturing Co. v. United States* held that the court must look at the facts and circumstances surrounding the alleged implied-in-fact contract. *Algonac Mfg. Co. v. United States*,

192 Ct.Cl. 649, 428 F.2d 1241, 1255–56 (1970). In the arena of government contracts, an implied-in-fact contract can exist only if it is entered into with an agent of the government who has the direct authority to obligate funds of the United States. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Pollack*, 15 Cl.Ct. at 49; *Pacific Gas*, 3 Cl.Ct. 329, 339; *see City of Klawock v. United States*, 2 Cl.Ct. 580, 584–85 (1983), *aff'd*, 732 F.2d 168 (Fed.Cir.1984).

▆▆▆ An implied-in-fact contract may be created through the acceptance of benefits with the knowledge that the supplier expects to be compensated. *Pacific Maritime Ass'n v. United States*, 123 Ct.Cl. 667, 108 F.Supp. 603 (1952), *reh'g denied*, 125 Ct.Cl. 216, 117 F.Supp. 307 (1953). In *Pacific Maritime*, the government continually accepted the labor referral services of the plaintiff, with the knowledge that the plaintiff expected to be paid, and without ever disclaiming an intention to pay. *Id.* at 605–07. The government claimed that the plaintiff was at all times advised that any agreement with respect to compensation would have to be approved by higher officials and that approval was never actually obtained. *Id.* at 606. The *Pacific Maritime* court found that an implied-in-fact contract existed because of the government's continued use of such services subsequent to the demand for compensation. *Id.* at 607. The fact that one party conferred a benefit upon the other was not what created the contract implied-in-fact; rather, it was the tacit agreement to compensate the contractor for the benefit which it conferred. *Id.*

▆▆▆ Under the *Pacific Maritime* analysis, there was no implied-in-fact contract in the present case. The mere conferring of a benefit upon the government does not create an implied-in-fact contractual relationship. Implied-in-fact contracts require conduct of the parties manifesting assent. *Pacific Gas*, 3 Cl.Ct. at 338. Here, unlike in *Pacific Maritime*, the government never recognized the validity of the plaintiff's claim for payment of the services. There is no proof that defendant even knew that

the watchmen were employed by plaintiff instead of directly by the surety or a third-party. The contracting officer did not direct plaintiff to provide the services, thus the basic contract elements of offer and acceptance were absent. Moreover, there was no authority vested in the surety to contractually obligate the government, and implied-in-fact contracts must be based on the conduct of authorized government agents. *Federal Crop Ins. Corp.*, 332 U.S. at 384, 68 S.Ct. at 3; *Pollack*, 15 Cl.Ct. at 49; *Pacific Gas*, 3 Cl.Ct. at 339; *see City of Klawock*, 2 Cl.Ct. at 584–85. Thus, although plaintiff suggested this argument in support of its claim, it cannot meet the standards enunciated above.

### b. Contract implied-in-law

▆▆▆ Plaintiff might argue entitlement under a totally incompatible line of cases sometimes relied upon by the Federal Circuit to provide economic relief to a provider of services when the government has benefited from the services. *See United States v. Amdahl*, 786 F.2d 387, 393 (Fed. Cir.1986) (citations omitted). In a private transaction, the conferring of a benefit may allow recovery under a quasi-contract or implied-in-law contract. However, these claims are not cognizable under the Tucker Act. 28 U.S.C. § 1491(a)(1) (1988); *see Fincke*, 675 F.2d at 296; *Algonac Mfg.*, 428 F.2d at 1256. While the Tucker Act vests jurisdiction in this court over contracts implied-in-fact, it does not reach claims based on contracts implied-in-law. *United States v. Mitchell*, 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983); *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925) (citations omitted). A contract implied-in-law is one in which no actual agreement between the parties occurred but where equity imposes a duty in order to prevent injustice. *Algonac Mfg.*, 428 F.2d at 1255–56; *Hirschmann v. United States*, 11 Cl.Ct. 338, 342 (1986).

Despite the distinction between contracts implied-in-fact and contracts implied-in-law, the Federal Circuit has concluded that there are situations in which it will find

that a contract implied-in-fact exists even though the contract is unenforceable, or even illegal. *See Amdahl,* 786 F.2d at 392–93. In *Amdahl,* the court stated that recovery might be allowed under a contract "implied-in-fact" because the disallowance of recovery would violate the court's "good conscience to impose upon the contractor *all* economic loss from having entered [into] an illegal contract." *Id.* at 393 (emphasis in original). The Amdahl Corporation had protested the purchase of a computer mainframe by the Treasury Department from the Federal Home Loan Mortgage Corporation on the grounds that the purchase was contrary to the delegation of procurement authority from the General Services Administration. In ruling on the case, the court first stated the black letter law "that the failure of a contracting officer to comply with statutory requirements in making an award renders the contract a nullity.... [t]he courts are bound to strike down illegal contracts.... [t]hus, no damages can be awarded for 'breach' of a nullity." *Id.* at 392–93 (citations omitted). The court, in exercising its equitable jurisdiction, stated:

> Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity.

*Id.* at 393 (emphasis in original) (footnote omitted). The court held that the contractor was not to be compensated under the existing contract, but rather under a contract implied-in-fact. The *Amdahl* court quoted from *Prestex, Inc. v. United States* to emphasize that:

> Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it. In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature

when the Government elects to rescind an invalid contract. No one would deny that ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason. However, the basic fact of legal significance charging the Government with liability in these situations is its retention of benefits in the form of goods or services.

*Id.* at 393 (quoting *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367, 373 (1963)).

 This concept of "equity" embraced by the Federal Circuit runs counter to the long-established principle of government contract law that contracts must be awarded in accordance with the law and regulations, that only an agent expressly authorized to bind the United States contractually may do so, and that a person deals with the government at its peril. Nonetheless, it appears as if the "equitable" exception to the law as expressed in *Amdahl* and a handful of other decisions enables the Federal Circuit to grant relief to plaintiff under contracts implied-in-fact if the government received and kept a benefit from plaintiff's labor even though such contracts actually would be contracts implied-in-law. *Amdahl* might hold defendant liable under "ordinary principles of equity" for the fair value of the benefit. *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367, 373 (1963). It is clear that the theory of contract which *Amdahl* expounded more properly fits under the definition of a contract implied-in-law as opposed to a contract implied-in-fact. This is because a contract implied-in-fact may exist only when all the elements of an express contract are present, *Fincke,* 675 F.2d at 295; *Algonac Mfg.,* 428 F.2d at 1255, whereas under *Amdahl,* all the elements of a contract need not be present. *Amdahl,* 786 F.2d at 392. *Amdahl* referred to the contract as implied-in-fact, although the decision speaks of contracts being unenforceable if they

are "not authorized" *Id.* at 393 (quoting *Prestex*, 320 F.2d at 373). Thus, the recovery to which *Amdahl* refers would have to be under a contract implied-in-law, which is a remedy imposed by a court having the requisite jurisdiction when no express contract or contract implied-in-fact exists. The "measure of recovery" in an action on a contract implied-in-law is "the reasonable value of the goods or services furnished to the benefited defendant." *Campbell v. Tennessee Valley Auth.*, 421 F.2d 293, 296 (5th Cir.1969). Finally, the *Amdahl* court's reliance on *Prestex* speaks of a court's "grant[ing] relief of a quasi-contractual nature when the Government elects to rescind an invalid contract." *Id.* (quoting *Prestex*, 320 F.2d at 373). Quasi-contractual relief is afforded for a contract implied-in-law. *See Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474, 482 (1976).

▆ Because the Court of Appeals for the Federal Circuit is a court created under Article III of the Constitution of the United States, its exercise of equitable powers, such as in *Amdahl*, is within its jurisdictional mandate. However, this court is an Article I court with specific jurisdiction granted by the Congress ·that must be strictly construed. *See United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372–74 (Fed.Cir.1983). This court is statutorily devoid of equitable jurisdiction in this area of the law and, thus may not provide redress for contracts implied-in-law. *See* 28 U.S.C. § 1491(a)(1); *Mitchell*, 463 U.S. at 218, 103 S.Ct. at 2968; *Merritt*, 267 U.S. at 341, 45 S.Ct. at 279.

In the alternative, even if this court were to accept the characterization in *Amdahl* of a contract implied-in-fact, *Amdahl* is factually distinguishable. In *Amdahl*, a contract was entered into by authorized persons and it was only later, after the authorized persons acted beyond the scope of their authority, that the contract was rescinded as illegal. *Amdahl*, 786 F.2d at 391. In the instant case a contract for post-termination services with plaintiff was never executed by any government official, much less an authorized person. The difference is significant. The theory of contracts implied-in-fact espoused in *Amdahl* only applies in limited circumstances where the contract was, in fact, entered into by persons so authorized; even then the equitable "duty" placed upon defendant ceased when the contract was rescinded.

Because of the nature of the relationship of the parties at the time the events in question occurred, this court rejects any argument that defendant became obligated to plaintiff for watchman services. The court cannot infer that defendant, under the circumstances of this case, would have accepted the services had it known plaintiff intended to charge the incurred costs to the government. The Federal Circuit never intended *Amdahl* to apply to a contractor in a post-termination for default period, especially in the absence of any action by the contracting officer or any person reasonably acting in his stead.

It is also noteworthy that while defendant may have benefited from the services allegedly provided, the benefit was remote. The true beneficiary of the services was F & D which bore the responsibility for completing, or funding completion of the contract. Had the site or building been damaged during the period between plaintiff's termination for default and award of the reprocurement contract defendant would properly have looked to F & D for compensation for repairs or the cost of repairs; whether F & D would have then looked to plaintiff is a matter between F & D and plaintiff.

Plaintiff prepared no Index for this claim, but chose to rely upon unsubstantiated and conclusory statements spread throughout the record, and the equitable argument that simply because it incurred the post-termination costs it is entitled to an equitable adjustment. There was no dispositive proof that plaintiff incurred the costs, and no analysis or breakdown of the costs as required by the contract to prove entitlement. Plaintiff offered no proof that the contracting officer even knew that plaintiff provided watchmen's services at other than the surety's cost, or that Mr. Hearn ever provided any security services. There was no credible proof that Mr. Hearn

was on the job-site after the termination to either assist the surety conduct its tests and or assist the watchmen. At the very least, part of the claim appears to be made of whole cloth. Plaintiff has stated no well-founded claim against the government. This claim, based entirely on General Provision 10, the *Termination for Convenience of the Government* clause of the contract is denied and dismissed. The claim is frivolous.

### 14. *Loss of Future Income*

Plaintiff filed a claim for loss of future income and bonding capacity based solely on the termination for default. The claim is for lost income and profit for work *other* than on the Canoga Park Main Post Office contract. Plaintiff is a construction company, and performance and payment bonds are required on all levels of public work. Mr. Kaplan testified that prior to the termination for default, plaintiff's bonding capacity was seven to eight million dollars. Mr. Richard Yeazel, vice-president of the Los Angeles office of F & D, testified that plaintiff's bonding capacity was six and one-half to seven million dollars. Following the termination for default, plaintiff's bonding capacity was reduced to $4 million in the aggregate and $2 million for a single project. Plaintiff alleged that as a result of the decreased bonding capacity following the termination for default it was unable to secure a bond that it needed in order to bid on a single unidentified project. Plaintiff's bonding capacity was increased back to its pre-termination level in 1989.

Mr. Kaplan prepared two charts purporting to prove that plaintiff's profit was twelve to thirteen percent of earnings for the period 1983 through 1987. For eighteen months following the termination for default, plaintiff's profits were nine percent. When plaintiff's bonding capacity was raised in late 1989, its profits soared to eighteen percent of earnings. Based upon this bald "evidence," plaintiff requested that "culpability or liability be found with a determination of the amount of damages to be made at the trial on quantum." In its claim to the contracting officer, *see* Attachment D to the Second Amended Complaint, plaintiff described its claim as

[l]oss of income to Mega as a result of reduction of Mega's bonding capacity due to the alleged termination for default and therefor reduction in amount of revenues for an established 2 year period is $4,500,000.00 at 12% × 2 years which is $1,080,000.00. Said 12% is the figure based on Mega's financial statements averaged over the last few years.

 It is difficult to know where to begin to address this claim.[51] Plaintiff continues to believe that the termination for default did not really occur and that it is entitled to all expenses it incurred as if the termination were one for convenience. Under a termination for convenience of the government, a contractor may recover all reasonable, allowable, allocable costs, as well as profit on work it performed; but it may not so recover under a termination for default. *See J. Parr Constr. & Design, Inc. v. United States,* 24 Cl.Ct. 228, 232 n. 2 (1991), *aff'd,* 996 F.2d 319 (Fed.Cir.1993). Even under a termination for convenience, the contractor may only recover profit on work it actually performed. Anticipated but unearned profit is never recoverable. *Dairy Sales Corp. v. United States,* 219 Ct.Cl. 431, 593 F.2d 1002, 1005–06 (1979). Plaintiff identified no term of the contract or provision of law which would entitle it to

---

**51.** Mr. Kaplan's testimony on this claim is a fair example of the confusion running rampantly through plaintiff's claims. Mr. Kaplan identified this claim as for lost *income* for a two-year period when, in fact, it was for lost *profit* for an eighteen-month period. Plaintiff claimed it lost $4.5 million over a two-year period, and that its profit was twelve percent of revenue. Multiplying $4.5 million by twelve percent would give an alleged loss of profit of $540,000 for a *two*-year period—yet plaintiff more than doubled that

figure in its claim. Plaintiff certified in its Second Amended Complaint pursuant to the CDA that its lost future income was $840,000, not $1,080,000. *See* Second Am.Compl., Attach. D at 40, entitled *Summary of Claims.* The court cannot fathom how plaintiff reconciled its claim with its CDA certification, *See* 41 U.S.C. § 605(c); section V.C.11. of this opinion, or arrived at the figures it threw about in this claim.

recover allegedly lost income or profits that it may or may not have earned had it not been terminated. Its purported reliance upon "financial statements" is misleading in that the statements presented to the court were nothing more than self-serving unsupported documents prepared by Mr. Kaplan for trial. Plaintiff has provided no evidence in support of its claim other than that its bonding capacity was reduced for eighteen months following its termination for default, and that it could not purchase a bond from F & D in order to bid on one unidentified contract. Plaintiff has not proved by a preponderance of the evidence that its income and profits decreased following the termination for default solely as a result of the default. Plaintiff's unsupported claim raises many questions, i.e., what role did harsh construction market conditions play in its lost income; what other factors contributed to the decrease in profits; could plaintiff have received a bond from a different bonding company; did it even try to secure the bond it needed from F & D? None of these questions were answered.

In *Rhen v. United States* a contractor that had been terminated for default claimed that its lack of ability to obtain future bonding prevented it from obtaining other contracts that would have enabled it to have earned significant profits. The court stated:

> In substance, plaintiff's claim is one for general loss of business as a result of the default termination. Such a damage claim is too remote or consequential in nature to allow for a recovery thereon. Since the damages claimed are too remote, consequential and speculative, they are, as a matter of law, not recoverable in any event.

*Rhen v. United States*, 17 Cl.Ct. 140, 143–44 (1989) (citations omitted). Plaintiff's claim is identical to the claim in *Rhen* and is likewise too remote, consequential, and speculative. *Similarly, Olin Jones Sand Co. v. United States* held that a defaulted contractor may not recover for those damages which allegedly resulted when, because of defendant's actions, the bonding company or others refused to issue bonds on behalf of plaintiff on other contracts or work, thus crippling the contractor's ability to obtain new contracts or new work. *Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741, 741–44, 1980 WL 13211 (1980). "Even if proven, these damages would be too remote and speculative to be recoverable." *Id.*, 225 Ct.Cl. at 744. In the complete absence of any credible proof, and provision of the contract or law allowing the recovery of anticipated but lost income and profits, the claim is denied and dismissed.

15. *Lost Profits and Percentage of Completion of Work*

a. Lost profits

Plaintiff boldly claimed entitlement to lost profits on this contract for work which it did *not* perform because the contract was terminated for default. Plaintiff also asked the court to determine the percentage of the facility's completion in purported support for its claim for pre-termination delay damages. To put the claim into perspective, plaintiff's counsel led Mr. Kaplan through the following colloquy:

> Q. Mr. Kaplan, you previously indicated that Mega did not fully complete the job that there was some small percentage left to go, is that correct?
>
> A. Yes.
>
> Q. Okay. With regard to that, we are talking about monies that would have been earmarked for work that Mega had not completed to the day of termination would Mega have been entitled to had Mega completed profits within that sum of money?

Mr. Kaplan apparently understood the question, and responded, "Yes." He also answered "yes" to counsel's question, was plaintiff "making a claim for those profits in this claim." This claim, as best the court can determine, is that plaintiff believed the project was 97.92% complete on the day the contract was allegedly improperly terminated for default, and had the contract not been terminated, plaintiff would have completed the project quickly,

and thus earned additional profit.[52] Plaintiff cited no authority for the proposition that a contractor is ever entitled to profit on unperformed work.

 Termination, by definition, extinguishes a contractor's association with the project on which it was terminated. Anticipated but unearned profit is not recoverable, even under a termination for the convenience of the government. *Dairy Sales Corp. v. United States*, 593 F.2d 1002, 1005–06.[53] The holding in *Rhen v. United States* that loss of future income is not allowable is equally true *here*. *Rhen v. United States*, 17 Cl.Ct. at 143–44. Plaintiff is not, as a matter of law, entitled to anticipated but unearned profits. Any recovery of profits on a default terminated contract is limited to earned profit on work actually performed prior to the termination. It is undisputed that plaintiff performed no work on the terminated portion of the contract and thus it may not recover anticipated profits. Following its termination for default, plaintiff had no contractual, or other, right to remain on the jobsite, much less to complete the contract. The idea that plaintiff may be entitled to profit on work it did not perform, especially after a default termination, is frivolous. The law of government contracts is that a contractor may not be compensated, or receive a profit, "for work not performed, whether the non-performance results from termination or from deletion of a severable portion of the work." *J.F. Shea Co. v. United States*, 10 Cl.Ct. 620, 626 (1986). The claim is denied and is dismissed. Because of the nature of the evidence, cou-

pled with its total lack of substance, the claim is frivolous.

### b. Percentage of completion

In support of its claim that the contract was 97.92% complete on the day of termination, plaintiff referred to Invoice and Payment Authorization No. 17, dated May 1, 1987, prepared approximately fifty days before the termination, wherein plaintiff claimed that the project was 90.8% complete. Mr. Ruffalo recommended payment of Invoice and Voucher No. 17 on June 10, 1987. Plaintiff argued that Mr. Ruffalo's recommendation of payment constituted an admission by defendant that the project was 90.8% complete. Defendant challenged that conclusion. Mr. Ruffalo testified that in February 1987, the project was 80 to 85% complete. Mr. Cipriani, the contracting officer, testified that on June 10, 1987, the facility was only 85% complete and that, in any event, Invoice & Voucher No. 17 was not submitted to the government until after the termination, thereby raising an issue of whether plaintiff had other self-serving reasons for stating that the project was over 90% complete. The court can find no support for Mr. Cipriani's statement that the invoice was not submitted until after the termination for default. However, neither does the record support the various positions of Messrs. Kaplan, Cipriani, or Ruffalo on the percentage of contract completion because their statements were made in the period of time before defendant had identified the full amount of incomplete and deficient work to be corrected.

---

**52.** Plaintiff computed the loss of its profits following the termination for default by subtracting the alleged 97.92% completion from 100%, which is 2.08% and multiplying the latter by $350,000, plaintiff's anticipated gross profit on the project. The result was $7,280. It must be borne in mind that Mr. Kaplan testified that plaintiff did not include a specific factor for overhead in its bid and that overhead expenses were to be recovered from profit. That being the case, overhead and related factors would have to be deducted from anticipated gross profit to find the true, or net, anticipated profit. That was not done; Mr. Kaplan's formula is too self-serving, and thus, defective for this reason as well.

**53.** The Court of Claims, now the Court of Appeals for the Federal Circuit, has consistently upheld the validity of this principle. In *G.C. Casebolt Co. v. United States* the court held that if a contract contains a convenience-termination clause, anticipated, but unearned, profits are not allowable. *G.C. Casebolt Co. v. United States*, 190 Ct.Cl. 783, 421 F.2d 710 (1970). *See also Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *William Green Constr. Co. v. United States*, 201 Ct.Cl. 616, 477 F.2d 930 (1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974).

On May 15, 1987, two months before the termination for default, Lane Architectural Group, in response to a request by plaintiff for final inspection of the project pursuant to General Provision 51(f), the *Inspection and Acceptance* clause, gave Messrs. Ruffalo and Hunter "a quick summary" of the "many items remaining to be completed and submittals and procedures to be done prior to a final inspection which would indicate a final inspection as requested for May 28, 1987 could not be met." Lane did not indicate a percentage of incompletion but noted fifty-six items which were incomplete. The list was not intended to be all-inclusive, and did include some work usually considered punch list items. Other items would have required far more work to complete or repair than punch list items.[54]

Mr. Daniel Whalen, an architect from JS & A, defendant's architectural firm on the reprocurement, whom the court found to be a very credible witness, first visited the job-site with Mr. Sturm, also of JS & A, on October 19, 1987. Their purpose was to familiarize themselves with the work JS & A had undertaken, and to determine what was necessary to complete the facility. This information was to be incorporated into the reprocurement documents. Messrs. Whalen and Sturm prepared lists of incomplete and deficient work, and visually verified all items that could be seen. Mr. Whalen, alone and with Mr. Sturm, made three more site visits in the following two weeks. On his first visit he noted seven incomplete items of work. Following his second site visit, his list grew to twenty-seven incomplete or deficient items. The final list of incomplete and deficient items was extensive. In concluding this portion of his testimony, Mr. Whalen stated that after termination, based on plaintiff's uncompleted and deficient work, the project was "between 60 and 70 percent complete." Additional information discovered later by Mr. Whalen and the reprocurement contractor would have decreased the percentage of completion, perhaps significantly. The court cannot quantify the lower percentage of completion but in the circumstances it is not necessary to do so. Had there been no deficiencies, Mr. Whalen agreed that the project would have been 80 percent complete. There was no other credible testimony or documentary evidence addressing the issue of percentage of completion of the project. The court, having had the benefit of observing the witnesses, and after a thorough review of the record, is of the opinion that the testimony of Mr. Whalen is to be given great weight. The testimony of other witnesses as to the degree of completion of the work was not based upon the same amount of information available to Mr. Whalen, or was otherwise not credible.[55]

After weighing the documentary evidence and testimony, the court finds that the facility was between 60 and 70 percent

---

**54.** Some of the more work-extensive items included installation of paving, fencing and gates, landscaping and irrigation, electric power to the fuel island, flip ramps, dock levelers, the scale and scale indicator, downspouts, floor and base including asphalt plank and carpet, U.S.P.S. provided equipment, lobby desks, acoustical tile ceilings, fire sprinkler escutcheons and sleeves, and painting of the interior and exterior. Plaintiff had not provided final certifications, tests, and manuals for the plumbing, fire sprinkler, HVAC, and electrical systems. Mr. Whalen testified that, for example, he saw no landscaping in place, notwithstanding that plaintiff claimed in Invoice and Voucher No. 17 to have completed twenty-five percent of the landscaping. The project was far from complete when plaintiff requested that the final inspection be conducted May 28, 1987. Lane's list, completed before the termination for default, naturally did not include the numerous defective and incomplete items, or poor workmanship, discovered later.

**55.** "Determining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982).

The determination of the credibility of a witness is within the discretion of the presiding official. The presiding official in her [or his] role as the trier of fact can observe the demeanor of the witnesses and their reaction when confronted with the documents and evidence in the case[.]

*Hagmeyer v. Department of the Treasury,* 757 F.2d 1281, 1284 (Fed.Cir.1985) (citation omitted). *See also Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 495–96, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951).

complete at the time of the termination for default.

### 16. *Damage to Reputation*

Plaintiff divided this claim into two parts: damages due to certain unidentified subcontractors who refuse to do business with plaintiff, and loss of future unidentified clients.

#### a. Damaged relationship with subcontractors

■ Mr. Kaplan testified that he does not now receive bids on new projects from some unidentified subcontractors who worked for plaintiff on the Canoga Park Post Office project, or from other potential subcontractors. Furthermore, he testified, if subcontractors do submit bids, the bids are inflated, presumably because plaintiff has yet to pay its subcontractors who worked on the Canoga Park Main Post Office project. Plaintiff lays · fault for these occurrences at defendant's doorstep because the allegedly wrongful termination for default gave plaintiff a "negative reputation," in the "small construction industry." As Mr. Kaplan testified, "word does get around." The court finds it odd that plaintiff has not yet paid its subcontractors from the project in the light of its claim that it has earned a very healthy eighteen percent profit on earnings since at least 1987. Plaintiff offered only Mr. Kaplan's conclusory testimony in support of the claim. Plaintiff provided no proof that it no longer receives bids from subcontractors, that bids it receives are higher because of nonpayment or late payment as opposed to generally rising costs, or that bids contain a risk factor attributable to the termination for default. Not a single subcontractor was proffered to testify that it would not do business with plaintiff, or that it inflated its bids to plaintiff. The claim was based on sheer speculation and guess-work by Mr. Kaplan, with absolutely no credible proof.

#### b. Loss of future clients

Plaintiff's claim for damages for loss of future clients is equally speculative. In its post-trial brief, plaintiff stated that its claim is for "the loss of potentially one or more jobs by Mega as a result of the alleged default termination and the loss of reputation that necessarily follows from same." In its August 30, 1988 claim to the contracting officer, plaintiff offered a somewhat expanded view of the claim.

> On negotiated work or work where Mega is the low bidder, this project [i.e., the Canoga Park Post Office] may have some impact with regard to Mega not obtaining such jobs when the owner questions Mega as to whether Mega has been purportedly terminated for default on any other jobs. This situation and the loss of any job would result in a direct loss of profits plus bid expenses for the project. The amount would be estimated at $240,000. Based on 12% estimated profits × $2,000,000 of revenue.

Plaintiff provided the court with no evidence of actual jobs lost because of the termination for default, or how it derived the $2 million revenue figure.[56]

■ Moreover, this claim sounds in tort and the Tucker Act, 28 U.S.C. § 1491(a)(1), expressly excludes the consideration of tort claims against the government from the jurisdiction of this court.

> The United States [Court of Federal Claims] shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases *not sounding in tort.*

28 U.S.C. § 1491(a)(1) (1988) (emphasis added).

■ Defendant argued that plaintiff's claim for damage to reputation is for tortious misrepresentation, rather than for "breach" of contract. Defendant emphasized that plaintiff, in its presentation of the claim to the contracting officer and in its original pre-trial submission to this

---

**56.** See note 51, *supra,* on plaintiff's calculation of alleged lost profits.

court, identified the basis of the claim as the result of "[d]efamation of reputation." Plaintiff later alleged that its claim for damage to reputation was a tortious breach of contractual duties, rather than purely a tort. On this basis, plaintiff attempted to distinguish its claim from a simple tort action by arguing that the test of this court's jurisdiction is whether there has been a "tortious" breach of contract, rather than a tort independent of the contract. So long as there is some connection between the tortious conduct and the contractual obligations owed by the government to the plaintiff, plaintiff is correct that jurisdiction in this court is not prohibited by the Tucker Act. "[T]he Tucker Act has been interpreted to allow jurisdiction over claims which although somewhat 'tortious' in nature, are essentially based upon the breach of a contractual obligation." *C.B.C. Enters., Inc. v. United States*, 24 Cl.Ct. 1, 4 (1991) (citing *H.H.O., Inc. v. United States*, 7 Cl.Ct. 703, 706 (1985)). Plaintiff did not elaborate on its argument in its trial briefs.

 It is undisputed that this court has a specific statutory jurisdiction which does not extend to tort claims. *Transcountry Packing Co. v. United States*, 215 Ct.Cl. 390, 568 F.2d 1333, 1336 (1978) (citing *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 508 F.2d 817 (1974)). Nevertheless, the court has consistently interpreted the Tucker Act to allow jurisdiction over claims which, although somewhat "tortious" in nature, are essentially based upon the violation of a contractual obligation. *Chain Belt Co. v. United States*, 127 Ct.Cl. 38, 115 F.Supp. 701, 711–12 (1953) (citations omitted). Thus, a plaintiff may maintain an action in this court which arises primarily from a contractual undertaking. *Id.* The test for jurisdiction in this court, under the Tucker Act, is whether there has been a "tortious" breach of contract, rather than a tort independent of the contract. *L'Enfant Plaza Properties, Inc. v. United States*, 227 Ct.Cl. 1, 645 F.2d 886, 892 (1981). In order for this court to have jurisdiction over suits of this nature, there must be a direct connection between the government's contractual obligations and the alleged tortious conduct. *See Chain*

*Belt*, 115 F.Supp. at 712. It is not jurisdictionally sufficient if the alleged tortious conduct is merely "related" in some general sense to the contractual relationship between the parties. *Id.* "The fact that [the claimant] and the United States were in a contractual relationship does not convert an otherwise tortious claim into one in contract." *Aleutco Corp. v. United States*, 244 F.2d 674, 678 (3d Cir.1957).

In *Olin Jones Sand Co.*, the contractor sought damages for allegedly false statements made by representatives of the contracting officer to the contractor's bonding company about the contractor's performance. *Olin Jones*, 225 Ct.Cl. at 742. The contractor charged that the misrepresentations led the bonding company to withdraw from further issuance of bonds to the contractor, rendering the contractor unable to secure other similar contract work. *Id.* The government moved to dismiss the claim on the ground that the claim sounded in tort, rather than in contract. *Id.* at 744–45. In dealing with the issue the Court of Claims stated

> [w]here, as is the case here, a claim is based on breach of contract it is properly within the jurisdiction of this court even though it also alleges that defendant engaged in tortious conduct in breaching the contract. In *Fountain v. United States*, ... [192 Ct.Cl. 495] 427 F.2d 759 (1970), *cert. denied*, 404 U.S. 839 [92 S.Ct. 131, 30 L.Ed.2d 73] (1971), we specifically stated that "[i]f contractual relations exist, the fact that the alleged breach is also tortious does not foreclose Tucker Act jurisdiction." *Id.* at 761. Insofar as plaintiff's references to defendant's alleged misrepresentations are merely another way of asserting that a breach of contract occurred, the ... claim is not barred simply because it might also be stated as a tort. However, damages arising from defendant's alleged breach must still be limited to compensation for those injuries directly related to completion of the contract in question, as opposed to any remote or speculative effects the misrepresentations might have had on obtaining bonding for

other contracts. The damages must be proper contract damages.

*Id.* 225 Ct.Cl. at 745 (citations and footnote omitted). Under the reasoning of *Olin Jones*, plaintiff's claim for damage to reputation must be denied because it lacks the required direct nexus to the Tucker Act, 28 U.S.C. § 1491, granting this court jurisdiction. *Olin Jones* is also distinguishable in that here defendant's statements to F & D were not false, and F & D did not refuse, but perhaps once, to bond plaintiff.

 According to several persuasive opinions of this court, the claim is also "consequential" in nature and thus not recoverable under a contract theory. The determination of whether damages are consequential turns on whether the plaintiff's damages were the natural and probable consequences of an alleged breach of contract. *See Gardner Displays Co. v. United States*, 171 Ct.Cl. 497, 346 F.2d 585, 589 (1965); *Ramsey v. United States*, 121 Ct. Cl. 426, 101 F.Supp. 353, 357 (1951), *cert. denied*, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952). If plaintiff had offered a preponderance of credible proof that defendant tortiously breached its contract, it might have recovered the damages sought; but it did not. The failure to receive future contracts was consequential. Moreover, the court is not unmindful of plaintiff's assertions that it continued to receive contracts following the termination for default and that after its full bonding was reinstated in 1987 it did extremely well. There is no assurance that plaintiff would have been awarded any contracts in question had bonding been available to it. "Receipt or non-receipt of future contracts is both speculative in nature and dependent on many factors not related to bonding." *Olin Jones*, 225 Ct.Cl. at 744. Moreover, there is no suggestion that the parties could have contemplated such losses at the time they entered into the contract. *See Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707, 714 (1975), *cert. denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976). The court finds that the injury claimed is too remote, consequential, and speculative to permit recovery as a matter of law, *Rhen v. United States*, 17 Cl.Ct. at 143–44, and is denied. The damage to reputation claim is denied and dismissed.

### 17. Legal and Related Fees

Plaintiff made a claim for legal fees arising out of this dispute: For defending subcontractor and supplier lawsuits; for its surety's legal and consultant expenses; and for legal fees incurred in this litigation, and costs. Attorney's fees can be awarded to a plaintiff only in situations allowed by the Equal Access to Justice Act, 28 U.S.C. § 2412(d) (1985). Congress has limited such awards under § 2412(d)(1)(A) to situations where, after litigation is concluded, and plaintiff is the "prevailing party," the court can find that the litigation position of defendant "was not substantially justified." *See TGS Int'l, Inc. v. United States*, 983 F.2d 229 (Fed.Cir.1993). Without making findings or passing on the propriety of any of the claimed fees, the court notes that this claim is premature. Plaintiff's entitlement to legal fees and costs may be addressed another day. *See also Texas Instruments, Inc. v. United States*, 991 F.2d 760 (Fed.Cir.1993) for a discussion of legal fees arising from actions before administrative agencies pursuant to 5 U.S.C. § 504.

### 18. Consultants' Fees

Plaintiff requested an equitable adjustment for consultant's fees pursuant to General Provision 10 of the contract. It argued that reimbursement for "certain uses of consultants during construction [is] allowable." Plaintiff also claimed unidentified consulting costs for claim preparation and litigation based upon the alleged "grievous, willful acts of [the contracting officer,]" and the expense of paying Mr. Harman after he left plaintiff's employ, but remained as an "independent contractor to plaintiff, providing the same services." Mr. Kaplan was particularly terse in testifying on this claim. He merely responded "Yes" to his counsel's question "[D]id Mega incur some monies with regard to [consultant's fees]?"

As has been stated time and again General Provision 10 provides no authority for the payment of any claim under the circumstances of this litigation. General Provision 10, the *Termination for the Convenience of the Government* clause, has no applicability to this case. Plaintiff's continued reliance upon General Provision 10 is sheer folly, and is frivolous. Plaintiff referred the court to *Kame[n] Soap Prods. Co.*, 57-2 BCA [¶] 1366, 1957 WL 4906 (195[7]) and eighty-nine pages of McBride & Wachtel, 3 *Government Contracts.* The court was unable to find support for plaintiff's contentions from its review of either source.[57]

 It is fundamental contract law that a contractor is entitled to reimbursement of consultants' expenses in a cost reimbursement contract, or for the resolution of disputes arising out of a contract terminated for convenience, if the costs are allowable, allocable, and reasonable. *See* General Provision 11, the *Termination for Default* clause of the contract. General Provision 11(e) provides that if a contractor proves a termination for default to have been wrongfully issued, damages are measured pursuant to General Provision 10. It is fundamental that a contractor performing under a fixed-price contract that was terminated for default is not entitled to such reimbursement in the absence of proof of government liability. Plaintiff cannot claim entitlement to reimbursement pursuant to the *Termination for the Convenience of the Government* clause, with any success, until and unless it first proves the termination for default was wrongly issued. Plaintiff's bald claim that it is entitled to be reimbursed for "certain uses" of consultants during construction, claim preparation, and the instant litigation, and for Mr. Harman's compensation, without any proof or explanation of what particular services were performed, who performed the services, why the costs were not a part of plaintiff's contract and chargeable to

overhead, and how the government was at fault and therefore liable for those unquantified costs is hardly a claim, much less a claim proven by a preponderance of the evidence. The simple fact that plaintiff "incurred some costs under the contract" is axiomatic, but certainly—without much much more—does not support a claim for reimbursement of those expenses. The claim for consultants' fees brought under General Provision 10 of the contract is denied and dismissed. The claim is frivolous.

### 19. Escalation Costs

In addition to plaintiff's escalation cost claim for the fueling station, discussed in section V.C.9. of this opinion, *supra*, plaintiff also separately claimed escalation costs for the allegedly delayed work performed by its plumbing and paving subcontractors.

#### a. Plumbing

LeBaron Plumbing Company, Inc. (LeBaron) subcontracted to perform all or a portion of the plumbing work under the contract. The subcontract was not introduced into evidence. LeBaron's claim letter to Mr. Harman seems little more than a recital of plaintiff's overall claim. LeBaron's letter was undated but was obviously prepared after plaintiff's termination for default. It stated, in part

> In accordance with the specifications we are filing a job claim on the ... project. As you are aware, the completion date has been delayed for an unreasonable length of time.... Currently we are waiting for a cabinet to be installed by others, so that we can complete our work. All of the job phases have been started and finished late at no fault of ours. Original total job completion date was 9–15–86 and the estimated completion date is 7–1–87 which equals 288 days delayed.

> \* \* \* \* \* \*

---

57. *Kamen Soap Products. Co.,* ASBCA 2587, 57–2 BCA ¶ 1366, 1957 WL 4906 (1957) is of no assistance to plaintiff because it addressed a dispute over accounting in a contract that had been terminated for the convenience of the govern-

ment. McBride & Wachtel never stated in all eighty-nine cited pages of 3 *Government Contracts* that a contractor would be entitled to an equitable adjustment for the costs of unidentified consultants for unidentified claim prepara-

Listed below are our costs associated with the delays.

| | |
|---|---:|
| 1. Labor–Increase costs that occurred after 9-1-87, $2139.00 × 8.36% plus travel card dues, $1.71 × 288 days | 671.30 |
| 2. Material–Increase costs of finish materials, $7418.00 × 288 days | 415.41 |
| 3. Job site storage-Rental $2.33/day × 288 days | 671.04 |
| 4. Overhead–Home Office allocated overhead based on the original construction period, $15.07 × 288 days | 4340.16 |
| 5. Interest–Interest on retention held after completion date, $1.13 × 288 days | 325.44 |
| Subtotal | 6423.35 |
| Profit 10% | 642.34 |
| TOTAL | 7065.69 |

To this plaintiff added its ten percent profit on the claimed extra costs but not overhead. In denying the claim, the contracting officer indicated that LeBaron did not deduct from its claim the time extensions allowed by defendant that would have reduced plaintiff's claim by almost half. The court has no evidence before it that the time extensions allowed by the contracting officer did or did not halve the value of the claim, and makes no finding. However, if the time already allowed by defendant did reduce the delay, and LeBaron, or plaintiff, benefited from the time extension, this claim would be an attempt by plaintiff to recover twice on the same claim. *See* the court's discussion of the photocopying logs claim, section V.C.11. of this opinion, *supra*. There was no other pertinent information about the escalation claim in the record. The court has numerous problems with this claim and will address them in the order presented by plaintiff.

### 1. Labor

LeBaron presented its claim through plaintiff for a delay period beginning September 15, 1986, and ending approximately July 1, 1987. There is no credible information in the record that LeBaron was delayed 288 days (which, incredibly, was sixteen days longer than plaintiff's delay claim) other than its bald allegation. The $2,139 labor increase is unsupported as is the 8.36% multiplier. There is no informa-

tion about what the multiplier represents or how it was derived. Further, there is no justification or explanation for the $1.71 per day dues for a "travel card." [58]

### 2. Materials

There is no proof in the record that the "finish materials" increased in price by $7,418 during the alleged 288 day delay claim. Nor was the 5.6% multiplier explained, identified, or proven.

### 3. Job-site storage

There was no proof of the $2.33 per day storage rental claim. There was no evidence offered of what was stored, that storage was used throughout the contract and beyond, what was rented, why storage was necessary for such an extended period, or that storage extended over the full 288 days claimed.

### 4. Overhead

The record is devoid of any proof, other than LeBaron's unsupported assertion, that its overhead was $4,340.16, that such overhead was all chargeable to this contract, or that such overhead was incurred for the full 288 day delay period claimed at a calculated daily rate of $15.07.

### 5. Interest

Defendant retained five percent of the funds due plaintiff under the terms of the contract, and plaintiff may have withheld that same amount from LeBaron; there was no proof of retention by plaintiff and no witness, including Mr. Kaplan, knew with certainty. There was no credible evidence that plaintiff retained any funds owed LeBaron, that interest is owed on any such funds, or that the claim is properly based on 288 days of alleged government-caused delay.

### b. Paving

Plaintiff also claimed entitlement to an equitable adjustment in the amount of $3,661 over its subcontract price of $61,514 for costs allegedly incurred by Del Mar

tion and litigation costs that arose after a termination for default.

**58.** In the total absence of any proof the court finds it very difficult to believe that LeBaron Plumbing Company, Inc. pays $624.15 a year

for the privilege of owning a travel card, and that the full yearly amount is chargeable to this contract. If the claimed amount of $624.15 represents only the percentage of the annual charge that is allocable to plaintiff's contract the annual dues would be unbelievably higher.

Paving Company, Inc. (Del Mar), its asphalt paving subcontractor. Mr. Kaplan testified that plaintiff had intended to pave the parking lot in early 1986 but that Del Mar, during subcontract negotiations, anticipated escalated costs and insisted that plaintiff insert a clause in its subcontract to address that contingency. Had Del Mar performed the work on schedule, according to Mr. Kaplan, it would not have needed the escalation clause. Because of alleged government-caused delay, Del Mar's costs allegedly escalated and plaintiff believed itself obligated to increase the subcontract price. The subcontract was not included in the record so the terms and conditions, and the triggering dates or events of the price escalation clause, are unknown to the court.

On May 6, 1987, Del Mar submitted what it described as its "breakdown of additional costs due to delay of project past the contract expiration date." The claim identified a $273 deduction for asphalt, a ninety-four cent per ton increase in the cost of "base," a five cent per square foot increase for the slurry seal coat, an increase of two dollars an hour for labor, benefits, and equipment rental, a 100% increase in insurance, and a total increase of 210 hours. On May 14, 1987, plaintiff and Del Mar amended the subcontract to increase the price to the amounts stated above. Plaintiff added ten percent to its claim, presumably its profit on the increase, but again excluded its overhead costs. The claim submitted to the government, less overhead, was $4,027.10.

 Two factors dictate dismissal of the Del Mar escalation claim. While plaintiff might have included a price escalation clause in the subcontract at Del Mar's insistence, plaintiff's contract with the government had no such clause. If plaintiff is to recover from defendant on this claim it must do so under the terms of its contract with defendant. Plaintiff's entire claim on behalf of Del Mar is predicated upon government-caused delay. However, in the absence of proof that the government caused

such delay, plaintiff is not entitled to an equitable adjustment for its alleged increased costs, even though it may have been liable to Del Mar under the terms of the subcontract.[59]

Plaintiff's confusing and suspect as-planned progress chart, prepared for litigation, supported Mr. Kaplan's testimony that paving was planned for early 1986. The chart, which the court has not accepted as accurate, shows paving was planned from March 20 through April 9, 1986. However, the as-built overlay indicates that the parking lot was actually paved between late May and late June 1986, about six weeks after planned. While the overlay is almost impossible to read with the base chart, it does seem to indicate that by the time paving was completed other activities lagged behind the as-planned schedule. This information, suspect as it is, raises the possibility that there was no significant delay in the paving work, at least no delay of the magnitude claimed. It also raises a serious question as to the effect of the escalation clause in the subcontract. There is no evidence of when the Del Mar subcontract was executed, but the court finds it difficult to believe in light of a complete lack of evidence that plaintiff would obligate itself to increase the cost of a subcontract which was apparently delayed only six weeks. The court also questions Del Mar's alleged increase of 210 hours on the project. There was no evidence that Del Mar worked more than the normal eight-hour workday, and the work was completed in less than a month. The as-planned chart indicated that the work was to be accomplished in twenty days. Del Mar's claim for an additional 210 hours of work, at eight hours a day, subsumes twenty-six days. The claim is thus for the equivalent of two months work, but the only evidence available to the court is that it was completed in twenty days.

The court makes no findings or conclusions on the Del Mar and LeBaron cost escalation claims because of the need to

---

59. There was no limited "fault for delay" reimbursement clause in Del Mar's subcontract as there was in plaintiff's contract with the government.

inquire further into the issue of possible double billing by plaintiff.

## VI. DEFENDANT'S COUNTERCLAIMS

[84] Following a proper termination for default, defendant is entitled to reimbursement of the costs of completing the project from the defaulted contractor. Defendant is permitted to deduct unearned funds remaining in the contract for use to complete the project including reasonable costs occasioned by the termination for default, J. Richard Margulies, *Owner Remedies for Contractor Default, in Construction Contracting* 837, 866 (George Washington University 1991), and liquidated damages. *See* General Provision 11 and Special Provision 2 of the contract. The burden is on defendant to prove it acted reasonably in completing the contract and assessing such damages. *Datronics Eng'rs, Inc. v. United States*, 190 Ct.Cl. 196, 418 F.2d 1371, 1379 (1969). However, once defendant has met its obligation, the burden of proof falls squarely on plaintiff to show that any element of loss or damage is not recoverable by defendant.

Defendant's amended counterclaim is based upon General Provision 11 of the contract, the *Termination for Default* clause, and on Special Provision 2, the *Liquidated Damages* clause. These clauses provide, in pertinent part:

11. TERMINATION FOR DEFAULT— DAMAGES FOR CONTRACTOR DELAY—TIME EXTENSION

(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Postal Service may, by written notice to the Contractor, terminate his right to proceed with the work.... In such event the Postal Service may take over the work and prosecute the same to completion, by contract or otherwise.... Whether or not the Contractor's right to proceed with the work is terminated, he and his sureties shall be liable for any damage to the Postal Service resulting from his refusal or failure to complete the work within the time specified.

(b) If fixed and agreed liquidated damages are provided in the contract and if the Postal Service so terminates the Contractor's right to proceed, the resulting damage will consist of such liquidated damages until such reasonable time as may be required for final completion of the work together with any increased costs occasioned the Postal Service in completing the work.

\* \* \* \* \* \*

(f) The rights and remedies of the Postal Service provided in this clause are in addition to any other rights and remedies provided by law or under this contract.

SP–2 *LIQUIDATED DAMAGES*

(A) *GENERAL*

In case of failure on the part of the Contractor to complete the work within the time fixed in the contract or any extension thereof, the Contractor shall pay to the USPS [sic] as liquidated damages, pursuant to the clauses of the GENERAL PROVISIONS entitled TERMINATION FOR DELAY—DAMAGES FOR DELAY—TIME EXTENSION, the sum of $387.00 for each day of delay.

The figure "$387.00" was manually typed into the printed boiler-plate language of Special Provision 2.

Under recognized rules of contract interpretation, "words are to be given their plain and ordinary meanings." *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979) (citations omitted). In the circumstances of this case the plain and ordinary meaning of paragraphs (a) and (b) of General Provision 11 is clearly that if plaintiff defaulted in the performance of its contract, as it did, it would be liable for all damage to defendant resulting from the default, and any increased costs which defendant incurred in completing the work.

A. THE REPROCUREMENT PROCESS

1. *Duties of Contracting Officer*

 In reprocuring work on a defaulted contract, the contracting officer has broad discretionary powers, *United States v. Warsaw Elevator Co.*, 213 F.2d 517, 518 (2d Cir.1954), but may not abuse his discretion, and must act reasonably under the circumstances. *Astro–Space Labs., Inc. v. United States*, 200 Ct.Cl. 282, 470 F.2d 1003, 1017 (1972). Whether the contracting officer acted reasonably, under the circumstances of a particular reprocurement, is a question of fact. *Id.* at 1017–18. More precisely, a contracting officer is under a duty to (1) act within a reasonable time after default, (2) obtain a reasonable price, and (3) mitigate the default by contractor's damages. *Id.*, 470 F.2d at 1018; *see Cascade Pac. Int'l v. United States*, 773 F.2d 287, 291 (Fed.Cir.1985).

 Courts have often approved reprocurements on somewhat different terms than the defaulted contract. *See, e.g., Consolidated Airborne Sys., Inc. v. United States*, 172 Ct.Cl. 588, 348 F.2d 941, 946–48 (1965). A reprocurement contract need not be identical to the original contract if excess costs can be calculated and if the contract is capable of a reasonable adjustment to fulfill the purpose of the excess costs provision of the *Termination for Default* clause. *See Consolidated Airborne*, 348 F.2d at 949.

 This court has held on numerous occasions that what is a "reasonable time" depends on the facts and circumstances of a particular situation. The ultimate test is whether the defaulted contractor was charged a higher price due to the passage of time, i.e., was the passage of time *per se* a failure to mitigate damages against the defaulted contractor. *Astro–Space*, 470 F.2d at 1018. Moreover, a contractor who alleges that it has been prejudiced by a contracting officer's delay has the burden of proof, and the contractor must not have contributed to the delay. *See CCM v. United States*, 20 Cl.Ct. 649, 659 (1990). There is, however, no statutory, regulatory, or court-made rule defining a "reason-able" period of time. *See Standard Eng'g & Mfg. Co.*, ASBCA 3733, 57–2 BCA ¶ 1477, at 5063–64, 1957 WL 316 (1957) (citing cases).

> In the view of the court, defendant's obligation to mitigate damages is a balanced one. Defendant cannot be lackadaisical about selecting a reprocurement contractor while the clock is running on plaintiff, but neither does defendant have to rush in to a reprocurement. [Defendant] is entitled, at the least, to enough time to carefully select a new contractor to complete the project....

*Martin J. Simko Constr., Inc., v. United States*, 11 Cl.Ct. 257, 273 (1986), *vacated and remanded in part on other grounds*, 852 F.2d 540 (Fed.Cir.1988).

 Competitive reprocurement is not required after default although it is desirable since it offers firm evidence that the original contract price was reasonable. *Astro–Space*, 470 F.2d at 1018. Even if the reprocurement contract can be competed, it is "neither unreasonable nor illegal" to solicit bids only from those firms that bid on the original contract. *American Marine Upholstery Co. v. United States*, 170 Ct.Cl. 564, 345 F.2d 577, 582, *reh'g denied in part and granted in part*, 351 F.2d 657, 658 (Ct.Cl.1965). *See also Zoda v. United States*, where the court held that the government's solicitation of bids from all but one of the firms bidding on the original contract was proper, given that the government properly excluded the firm due to its concurrent difficulties on another government contract. *Zoda v. United States*, 148 Ct.Cl. 49, 180 F.Supp. 419, 424 (1960). However, where the original contract was first solicited at least three years prior to the reprocurement, the presumption of price reasonableness would be lacking, and the court must look to other indices of fairness. *See, e.g., Consolidated Airborne*, 348 F.2d at 949; *Rumley v. United States*, 152 Ct.Cl. 166, 285 F.2d 773, 777 (1961). Furthermore, if the contracting officer reasonably believes that the contract must be completed quickly, even though there may be several potential contractors capable of completing the contract, the contracting officer may negotiate with

a single source. *Astro–Space,* 470 F.2d at 1018 (citing *Consolidated Airborne Systems, Inc. v. United States,* 172 Ct.Cl. 588, 348 F.2d 941, 947 (1965); *H & H Mfg,* 168 Ct.Cl. at 884–85).

Mr. Ruffalo, defendant's on-site project manager, testified that the Canoga Park Main Post Office was urgently needed, and that in anticipation of completing the project he recommended early in November 1987 that the contracting officer negotiate a competitive contract with a minority-owned construction company to complete the project. He did so "because under [that] procurement procedure we could save a lot of time rather than procuring the completion through [the relatively lengthy process of] an open bid." The contracting officer accepted Mr. Ruffalo's recommendation.

On November 6, 1987, before the reprocurement contractor selection process formally began, defendant met with its architect, soils engineer, structural engineer, and others at its Inglewood Facility Service Office to discuss the anticipated scope of the reprocurement contract. Later that same day, the meeting reconvened at the job-site so that all attendees could view the slab and the building. The reason for the meeting was to attempt to gain consensus of what defendant needed of the reprocurement contractor in order to complete the project. The most important item was the slab: if the slab had to be removed, was it to be replaced using the same specifications as in the original contract, or were the specifications to be modified? At this meeting, defendant made the decision to remove the entire main workroom slab from a point anywhere between four to ten or twelve feet in from the surrounding walls, but not to remove the parts of the slab in adjoining rooms.[60] Defendant made no decision at the November 6, 1987 job-site meeting to change the design of the slab.

Defendant began the selection process for the reprocurement contractor in mid-November 1987 by mailing a "Request for Price Proposals" to four minority-owned construction firms with prior Postal Service construction experience who were known to have the necessary bonding capacity necessary to undertake this project. Two of the four firms solicited responded to the "Request for Price Proposals": B.G. Construction Company, Inc. and one other firm. Defendant's policy governing its "Requests for Price Proposals" permitted it to negotiate with the responsive firms, and did not require it to necessarily accept the lowest offer. B.G. Construction's initial price proposal of $298,000 was the lowest received, against defendant's estimate of approximately $500,000. The court has no solid information on the price proposed by the competing firm, but it was inferred at trial that it was similarly discrepant from defendant's estimate. Because of the significant difference between both offerors' proposed prices and defendant's estimate, defendant was concerned that neither offeror fully understood the scope of the reprocurement contract. Accordingly, the two responsive firms were required to meet separately with defendant to discuss the extent of the undertaking, and the their proposed costs. At the meetings defendant discussed each proposal and each item of work with both firms. Those discussions confirmed defendant's concern that neither offeror had understood and addressed the full scope of the reprocurement contract in their proposals. This negotiation process was repeated several times before defendant was confident that, at the least, B.G. Construction fully understood the scope of the reprocurement. During these discussions, B.G. Construction's price grew as it understood more and more fully the scope of the undertaking. Mr. Whalen testified that it was difficult to arrive at a firm price proposal for the reprocurement contract "because you had to field verify so many things. It's not like you can look at the

---

60. There was no consistent testimony on how far "in" from the walls of the main work room the slab was cut, but the evidence favors four feet. There was consensus that less than the total of 10,300 square feet was removed. The court calculated that approximately 7,600 square feet was removed; one-third of the entire 27,000 square foot slab.

drawings and know [completely] what the scope of work is." Defendant accepted B.G. Construction's final price proposal of $401,000 and awarded the reprocurement contract on December 11, 1987. Slab removal began January 4, 1988.

The reprocurement contract provided that the project was to be completed 100 days from the date of the Notice to Proceed, but because a number of deficiencies and incomplete items in plaintiff's work were discovered by JS & A and B.G. Construction after work began, and because defendant added work items to the reprocurement contract which were not included in the original contract, defendant issued several modifications extending the time for performance and increasing the contract price to $559,000.[61] Defendant took beneficial occupancy on June 6, 1988.

The total reprocurement contract price, less work items not charged against plaintiff in the counterclaim was twenty-four percent of plaintiff's contract price. Assuming that the project was seventy percent complete when the contract was terminated, the figures are remarkably close. B.G. Construction completed thirty percent of the work for twenty-four percent of the original contract price, thereby verifying that the original contract price was reasonable, *see Astro–Space*, 470 F.2d at 1018, as were the reprocurement costs. *See Cascade Pac. Int'l v. United States*, 773 F.2d 287, 291 (Fed.Cir.1985).

### 2. Availability of Common Law Damages; Excess Costs

Defendant, in this case, has a separate remedy under paragraph (f) of General Provision 11, the *Termination for Default* clause. This term of the contract reserves to defendant all remedies provided by law,

*i.e.* damages for breach of contract, in addition to its contractual remedies. Prior to the CDA, 41 U.S.C. § 605, the Court of Claims recognized that a contractor's default was a breach of contract. *Marley v. United States*, 191 Ct.Cl. 205, 423 F.2d 324, 335 (1970); *Rumley*, 285 F.2d at 776. The *Marley* court upheld the Armed Services Board of Contract Appeals' finding that plaintiff had defaulted on its contract without excuse and that the contract had been properly terminated for default. *Marley*, 423 F.2d at 329–31. The court concluded that "[i]t remains only to add the almost inevitable conclusion of law—that an unexcused default is a breach." *Id.* at 335. "The measure of damages is the reasonable reprocurement price less the original contract price." *Cascade Pac.*, 773 F.2d at 293 (citations omitted). However, the government may only recover excess reprocurement costs when it has satisfied the three conditions set out in sec. VI.A.1. of this opinion thereby demonstrating its reasonableness in completing the contract. *Id.* at 293–94.

As discussed in section VI.A.1. of this opinion, a reprocurement contract not identical to the original contract may provide a basis for computation of excess costs, if it is capable of a reasonable adjustment to fulfill the purpose of the excess costs subparagraph of the *Termination for Default* clause. The award of reasonably adjusted excess costs on reprocurement is allowable under *Consolidated Airborne*, 348 F.2d at 949. Or the award may be considered to be the amount of common law damages, the right to which is reserved by paragraph (f) of the *Termination for Default* clause. Because adjustments may be made in the actual excess costs of the

---

**61.** Mr. Kaplan testified that had plaintiff been permitted to complete the project, it could have done so "within six weeks" for "[f]ifty, sixty, seventy thousand [dollars]." It is probable that plaintiff could have completed the project, as it claimed, had it been permitted to do so in the same slip-shod manner that it began. However, it could not have completed the project as well as corrected the previously constructed and installed deficient work within that time period. The record shows that the cost to remove and

replace the slab alone would have exceeded seventy thousand dollars. Moreover, Mr. Kaplan's self-serving statement was predicated upon the false assumption that the project was 97.92% complete on the date of the termination for default; not less than 60 to 70% complete as found by the court in section V.C.15. of this opinion, *supra*. The additional work items were not charged back against plaintiff in the counterclaim.

reprocurement in order to determine what damages were incurred by the default, as demonstrated by the adjusted reprocurement, there is very little difference between an award grounded on one or the other of paragraphs (b) and (f) of General Provision 11. *See Cable Systems & Assembly Co.'s* analysis of several cases of awards of adjusted excess costs. *Cable Sys. & Assembly Co.*, ASBCA 17844, 73–2 BCA ¶ 10,172 at 47,883–88, 1973 WL 1691 (1973).

The excess cost language of the *Termination for Default* clause is designed to avoid the need to prove market price by calculating breach damages through a formula to derive market value at the time of breach, less the contract price. When the excess reprocurement costs paragraph is inapplicable by reason of a belated reprocurement or otherwise, breach damages may be computed from other available evidence, under the authority of the reservation-of-rights paragraph (f). *See Marley*, 423 F.2d at 334–35; *Rumley*, 285 F.2d at 777; *cf. Dynalectron Corp.*, 199 Ct.Cl. 996, 997–98, 1972 WL 5181 (1972) which held that the government may not recover any reprocurement costs under either the excess cost or breach of contract provisions of the contract when defendant has contributed to circumstances resulting in plaintiff's termination for default. As an alternative to finding that the repurchase was made at market value or costs, the court may make findings that the reprocurement prices and circumstances, including the method of reprocurement, were reasonable. *See Cascade Pacific*, 773 F.2d at 293–94; *Consolidated Airborne*, 348 F.2d at 948–49; *Rumley*, 285 F.2d at 777; *Cable Sys.*, 73–2 BCA ¶ 10,172, at 47,883–88 (citing cases). The resulting calculation is, therefore, a proper computation of breach damages, as was done in *Cascade Pacific*, 773 F.2d at 294; *Consolidated Airborne*, 348 F.2d at 948–49; and *Rumley*, 285 F.2d at 777.

On December 9, 1987, defendant issued unilateral Modification No. 16 to plaintiff's contract by which it deducted $338,917.38, the remaining balance, to apply to the reprocurement contract, and demanded payment of $62,082.62, the difference between the amount deducted from plaintiff's contract and the initial reprocurement contract price. *Cf. Speck v. United States*, 28 Fed. Cl. 254 (1993). The additional amount demanded was subject to increase in the event the reprocurement contract costs exceeded $401,000. Defendant claimed that it incurred reprocurement costs and expenses, and liquidated damages in the total amount of $559,460.08. This figure includes costs to correct plaintiff's deficient work, and work which plaintiff had performed other than in accordance with the terms of its contract, and as a consequence of plaintiff's failure to comply specifically with General Provision 34 of the contract, the *Buy American* provision. Both "corrective" excess cost items were discovered after the reprocurement contract was awarded. Defendant also alleged that it incurred costs "to investigate and consult with experts" as a consequence of plaintiff's deficient performance and failure to comply with "[its] contract requirements," and "in administrative costs" expended to reprocure the work. Liquidated damages were assessed for 435 days during which it was denied beneficial occupancy of the building. Defendant also requested interest on the counterclaim. Plaintiff challenged each element of the counterclaim and demanded payment of the sum deducted from its contract by Modification No. 16, plus interest. All counterclaims were the subject of final decisions of the contracting officer.

Plaintiff argued that defendant had no right under the contract or law to collect excess reprocurement costs because (1) it had unreasonably delayed awarding the reprocurement contract to B.G. Construction, (2) the reprocurement contract had not been awarded in the same manner as had plaintiff's, and (3) the contract price had been "forced" up by defendant during its negotiations with the responsive firms. Hovering over plaintiff's request that the court find it not liable for the counterclaim was its unsuccessful, but recurring, argument that defendant had delayed performance of plaintiff's contract beyond the completion date of the reprocurement con-

tract. As the court has found the contention of government-caused delay of plaintiff's contract to be without merit it need not further address plaintiff's request for denial of liability of that claim.

■ To determine if defendant fatally delayed the reprocurement, the court must look to the facts of the case to see if, under the circumstances, the delay was unreasonable. *See Astro–Space,* 470 F.2d at 1017–18; *Consolidated Airborne,* 348 F.2d at 946–47. Whether the contracting officer acted reasonably under the circumstances of this case is a question of fact. *Astro–Space,* 470 F.2d at 1017–18; *H & H Mfg.,* 168 Ct.Cl. at 885.

Plaintiff's contract was terminated for default on July 22, 1987, following plaintiff's refusal to comply with valid directives of the contracting officer. The subsequent discovery of defective workmanship further validated the termination for default. *See* section III.B.5. of this opinion, *supra.* The reprocurement process began in mid-November, four months after the default termination, and the reprocurement contract was awarded to B.G. Construction on December 11, 1987. The reprocurement contract was in evidence. *See Cascade Pac.,* 773 F.2d at 294. As discussed above, plaintiff did not appreciate the precarious position it found itself in, as exemplified by its counsel's letter of August 27, 1987. That letter *dictated* that defendant had until September 1, 1987, to allow plaintiff to complete the project, or defendant would "suffer the consequences." It could be argued that determination of the issue of defendant's delay in the reprocurement should begin on September 1, 1987. However, the court believes it more proper to begin the analysis on July 22, 1987, because there was no evidence that defendant ever gave serious thought to permitting plaintiff to complete the project following the default.

On July 22, 1987, the same day as the termination for default, defendant wrote to F & D informing the surety that plaintiff's "right to proceed with the work ha[d] been terminated for default" and that the surety was obligated to complete the work under the performance bond. The surety was asked to notify defendant as soon as possible of its plans for completing the work. *Cf. Int'l Fidelity Ins. Co. v. United States,* 25 Cl.Ct. 469 (1992).

Defendant attempted to quickly obtain agreement from the surety to complete the project following the termination for default. F & D never explained why it refused for several months to take a firm corporate position on whether it would or would not complete the project. Mr. Dennis Kelly, claims manager for the Los Angeles office of F & D, met with defendant on at least three occasions to discuss its obligations and intent under the performance bond. Mr. Kelly first met with defendant representatives on August 19, 1987, almost a month after the termination and receipt of the first letter inquiring whether F & D intended to take over the project. At that time, Mr. Kelly asserted that the surety was under no obligation to complete the project, and that under no circumstances would it do so. The record however, belied Mr. Kelly's statements and denigrated his credibility. Minutes of the August 19 meeting indicated that the attendees had a lengthy conversation about plaintiff's failure to comply with the terms of the contract, and the termination. Mr. Kelly was given a take-over agreement prepared by defendant that he agreed to "have his people review and present any changes they feel necessary," but that first he would have his consultant visit the site to confirm the conditions. Mr. Kelly made no firm commitment as to a date by which it would respond to defendant's inquiry but target dates were discussed for completion of the project. Specifically, the timing for the take-over agreement was left open.[62]

---

**62.** Mr. Kelly made several weak attempts to defend plaintiff, including the claim that plaintiff had not received progress payments since April 1987. Nothing more was said about the issue and the court must infer that Mr. Kelly

was satisfied with Mr. Ruffalo's explanation that the cause of the delay was plaintiff's failure to furnish defendant with the data required by the contract to support the progress payment claims, and that the problem had been resolved

If, as Mr. Kelly testified, the surety would not take over the project, the court can but wonder why he met with defendant's representatives on at least two more occasions to discuss the take-over agreement. A second meeting with the surety occurred on September 17, 1987. At subsequent meetings the issue was still under discussion with Mr. Kelly. A note written by Mr. Ruffalo at a meeting on September 24, 1987, iterated that "Dennis Kelly, F & D claims man [was] stonewalling U.S.P.S.," that the surety was guilty of "bad faith," that defendant had discussed filing suit against the surety, and that "U.S.P.S. [was] still waiting for 'F & D's' review of [the] takeover agreement." By mid-November 1987, defendant concluded that F & D was not acting quickly enough, or in good faith, and informed the Mr. Kelly that if F & D did not respond to defendant's inquiry about completing the project defendant would exercise its right to complete the project and charge the reprocurement costs to plaintiff. Mr. Cipriani testified that defendant always expected F & D to take over and complete the project. In the circumstances the court finds that defendant, at the very least, had a reasonable basis on which to believe that the surety had not refused to take over the contract until it became so apparent that it would not do so approximately three months after it began discussions with Mr. Kelly.[63] Mr. Cipriani testified that

> [Mr. Kelly] kept leading us to believe that they were reviewing the take[-]over agreement and that they would get back to us with the signed document or any revisions that they determined they wanted to have in the take over agreement. But, they never did.

Defendant did not stand idly by waiting for F & D to make its decision to take over the project. Following the termination of plaintiff's contract, defendant employed the architectural firm of Joncich, Sturm & Associates to assist in planning the reprocurement contract. At defendant's instruction, Smith–Emery Company undertook soil samples of the fill beneath the slab in August, and again in September 1987. Also in September 1987 F & D contracted with Construction Consulting Group, Inc. and Smith–Emery to conduct soils tests. The reasons why F & D wanted its own tests were never disclosed; nor were the results of the tests. In October 1987, defendant directed Smith–Emery to take additional soil samples from other areas under the slab. It was from the October 1987 soils test that Smith–Emery discovered the "low-to-medium potential for expansion" of the fill that was reported to defendant November 3, 1987. On October 19, 1987, Messrs. Whalen and Sturm made their first visit to the job-site. As discussed, Mr. Whalen made at least two more site visits over the next few weeks. On November 6, 1987, Mr. Cipriani met with defendant's consultants and advisors to discuss the scope of the reprocurement. Mr. Kelsen completed his redesign of the slab by November 13, 1987. It was on November 15, 1987 that defendant began its reprocurement process, and following several meetings with B.G. Construction, awarded it the reprocurement contract on December 11, 1987.

Plaintiff's argument that defendant took an unreasonably long time between the date of the termination for default and award of the reprocurement contract to permit it to recover excess costs could appear, at first glance, to have merit. However, upon analysis of the circumstances of the case, the court finds that the time was well-spent, and certainly justified. Defendant could have acted more quickly only if it had been able to ascertain more readily the scope of the project upon termination. Defendant must be allowed the necessary time to select a reprocurement contractor, so long as the time is reasonable. *Martin J. Simko*, 11 Cl.Ct. at 273. It is abundantly clear that the reprocurement contract was a difficult document to assemble.

---

and defendant paid months before. *See* General Provision 35, *Payments,* of the contract and section IV.C.4. of this opinion.

63. It should be noted that notwithstanding Mr. Kelly's waffling on the take-over decision, he never denied F & D's responsibility to defendant for the cost of completion under its bond.

Various witnesses testified that even the initial scope of the reprocurement contract could not have been completely known short of spending much time investigating what plaintiff had and had not accomplished. The effort was complicated by plaintiff's payment vouchers that inaccurately claimed work performed that was not, and by the need to identify what work had been done in such a slip-shod manner as to require replacement, what of plaintiff's work could be used even though it did not meet contract specifications, and pricing the completion and replacement work. As Mr. Whalen testified, every time he visited the job-site he discovered more work to be included in the reprocurement contract. Eventually more than 400 deficient and incomplete work items attributable to plaintiff were discovered.

The court does not consider the three months lost by defendant in dealing with F & D as unreasonable delay to the reprocurement. The surety was under contract to plaintiff even though defendant was the beneficiary of the performance bond. *See Washington Int'l Ins. Co. v. United States*, 16 Cl.Ct. 663, 666 (1989) (citing *Travelers Indem. Co. v. United States*, 16 Cl.Ct. 142, 152 (1988)), *aff'd*, 889 F.2d 1101 (Fed.Cir.1989). The court finds that the three months defendant spent trying to get comments on, and a final answer about, the take-over agreement from F & D was reasonable in the circumstances.

The time defendant spent selecting the reprocurement contractor was also reasonable in the circumstances. It was vital to defendant's needs that the Canoga Park Main Post Office be completed quickly with a minimum amount of lost time and extra costs. Defendant reasonably believed that if the reprocurement contractor did not have a sound grasp of the scope of the work necessary to complete the facility, that contractor would founder, as had plaintiff. The negotiations with B.G. Construction was time well spent. It was amply clear that B.G. Construction did not initially have a grasp of the scope of the work required, as evidenced by its low initial proposed price and testimony of witnesses who conducted the negotiations. The fact that B.G. Construction did not grasp all of the nuances of the reprocurement in one negotiation session was not surprising considering the circumstances of the project. There was no proof of, or merit, to plaintiff's charge that defendant negotiated the price of the reprocurement contract upwards to increase its counterclaim.

The court also finds that the reprocurement contractor selection process was reasonable under the circumstances. Defendant perceived an urgent need for the facility and legitimately wanted to award a contract more quickly than would have been possible had it used the formal sealed bid process. Competitive reprocurement is not required after a termination for default, *Astro–Space*, 470 F.2d at 1018, and as long as Mr. Cipriani reasonably believed that time was of the essence, he could even have negotiated with a single source. *Consolidated Airborne*, 348 F.2d at 947; *see H & H Mfg.*, 168 Ct.Cl. at 885. Defendant's decision to competitively negotiate the contract with four potential contractors known to have the capability to complete the project guaranteed a reasonable price. *See Astro–Space*, 470 F.2d at 1018. The court's analysis of the contract prices in section VI.A.1. proved the reasonableness of the reprocurement contract price.

The test of whether the contracting officer acted in a reasonably timely manner is usually determined by whether the contractor was charged a higher price due to the passage of time, i.e., was the passage of time *per se* a failure to mitigate damages against the defaulted contractor. *Id.* A contractor who claims that it has been prejudiced by a contracting officer's delay bears the burden of proving that the excess costs were greater than would have been the case if the contracting officer had acted more quickly. *Id.* The contractor must also show that it did not contribute to the delay. *See CCM Corp. v. United States*, 20 Cl.Ct. 649, 659 (1990). Plaintiff offered no proof that the reprocurement contract was more costly—thereby improperly increasing the excess costs chargeable to

plaintiff—because of the five-month period between the termination of its contract and the reprocurement award.

Based upon its observation of the witnesses and a careful review of the entire record the court is satisfied that in his exercise of the discretion granted the contracting officer in the *Termination for Default* clause of the contract Mr. Cipriani used good faith and reasonable judgment in the circumstances of the reprocurement. The court finds that the contracting officer acted in a reasonable and timely manner to award the reprocurement contract following termination of plaintiff's contract, that the reprocurement methodology and price of the reprocurement contract was reasonable, and that defendant took reasonable steps to mitigate plaintiff's damages. *See Cascade Pac.*, 773 F.2d at 294; *Astro–Space*, 470 F.2d at 1018. The five months defendant took to award the reprocurement contract was not fatal to the recovery of excess reprocurement costs. *See Astro–Space*, 470 F.2d at 1018. For the reasons discussed in the following section of this opinion, the court finds that defendant is entitled to some, but not all, of the specific reprocurement costs arising out of completion of the Canoga Park Main Post Office.

### B. Specific Excess Costs Incurred by Defendant Under the Reprocurement

#### 1. *Replacement of the Slab*

The court has expended much time discussing the concrete slab in the main workroom of the Canoga Park Main Post Office and, except as necessary to understand the issues, will not repeat that discussion in making its findings and conclusions on defendant's counterclaim for excess costs incurred in removing, redesigning and replacing the slab.

█ It is abundantly clear that plaintiff did not construct the slab in accordance with the specifications of the contract. The slab contained severe cracks due to misplaced and missing control joints, and improper placement of the rebar in the slab. It is fact that a seventy to eighty percent of the rebar lay on the sand beneath the slab and actually induced cracking; and would have continued to do so. The quality of the slab was far less than that for which defendant bargained, and defendant was justified in terminating the contract for default on that basis alone. Defendant is entitled to strict compliance with the contract requirements, *Jet Constr. Co. v. United States*, 209 Ct.Cl. 200, 531 F.2d 538, 543 (1976) (citations omitted); *Farwell Co. v. United States*, 137 Ct.Cl. 832, 148 F.Supp. 947, 949 (1957), and is "entitled to receive that for which it contracted and has the right to accept only [items] that conform to the specifications." *Cascade Pac.*, 773 F.2d at 291 (citations omitted). Defendant has a concomitant duty to reject those items that do not so conform, or to adjust the contract price accordingly to protect the public fisc. *Id.* No credible witness, including Mr. Kaplan, testified that plaintiff built the slab to the terms of the contract, and most witnesses agreed that the contracting officer was justified in directing replacement of the slab. The plain fact is that defendant did not contract for a poorly built slab that could be repaired. Prior to removal of the slab, several consultants, and engineers advised Mr. Cipriani that whatever the cause of the problem, the slab would continue to crack, and the cracking could only get worse. After the slab was removed, and the true conditions discovered, there was never any doubt that it needed to be replaced.

Several consultants and engineers employed by defendant reported that the fill beneath the slab was non-expansive and properly compacted, save two: Smith–Emery, the last to test the fill, even though it had previously tested the fill and found it to be in accordance with the terms of the contract, and Mr. Paolini, defendant's expert architectural witness, who concurred with the November 3, 1987 Smith–Emery report. Mr. Cipriani faced a dilemma. Defendant's consultants and advisors had given him diametrically opposed reports on the potential for expansion of the fill. Mr. Cipriani's duty required him to make decisions based on the needs of the Postal Service, within the confines of the contract.

The slab for which defendant had contracted was to be free of significant cracks, able to support safely heavy equipment, provide a safe workplace for postal employees, and endure for thirty years. Defendant had paid for those qualities and was entitled to no more and no less. *See Jet Constr.*, 531 F.2d at 543 (citations omitted); *Farwell*, 148 F.Supp. at 949.

Faced with conflicting reports of the nature of the fill, Mr. Cipriani made a reasoned decision—based upon professional advice from an independent source he considered knowledgeable and trustworthy that the fill was "low-to-moderately" expansive—to remove, redesign, and replace approximately 7,600 square feet of the slab to make it stronger to minimize cracking should the fill expand even slightly during the planned thirty-year life of the slab. Mr. Cipriani also made the least-costly decision of those available to him after learning of the nature of the fill. Mr. Cipriani could have strengthened the slab, or removed and replaced almost 50,000 cubic feet of fill at a significantly higher cost. He chose the less costly course. The decision was not impermissibly a "matter of whim or caprice." *Cascade Pac.*, 773 F.2d at 292 (quoting *A.B.G. Instrument & Eng'g, Inc. v. United States*, 219 Ct.Cl. 381, 593 F.2d 394, 404 (1979)). In choosing the least costly alternative, defendant mitigated plaintiff's liability for excess costs. Lending support and credence to Mr. Cipriani's decision was the testimony of Mr. Kelsen who stated that "[w]e have increased the slab thickness and the amount of slab reinforcing due to the [Smith–Emory] tests. If the compacted fill had tested non-expansive, we would have recommended replacement with the same slab and reinforcing as shown on the [original] contract documents."

For the reasons discussed above, the court finds that defendant proved by a preponderance of the evidence that plaintiff constructed a slab sadly out of conformance with the contract, and is thus entitled to recover the excess costs in- curred in removing, redesigning, and replacing the slab. *See* General Provision 11 of the contract.[64]

### 2. *Consultants' Fees*

■ Defendant and JS & A employed several consultants, engineers, and advisors to assist during the reprocurement phase of the project in addition to the engineers and consultants that JS & A inherited from Lane Architectural Group. The cost of the consultants is included in the counterclaim. Defendant explained that by the time of the reprocurement it recognized that completion of the Canoga Park Main Post Office could pose significant problems. Defendant was under pressure to complete the project as quickly as possible and feared that during the completion contract, difficult questions would arise about the extent of plaintiff's poor performance, the extent of incomplete work, the need for redesign of the slab, and other issues of which it would not be aware without professional assistance. Mr. Whalen testified that "[w]e hired a lot of lab[oratories] to do a lot of tests on that building to make sure that things were okay." Plaintiff challenged the need for some of the consultants, including those employed to investigate the adequacy of plaintiff's performance. Plaintiff's counsel asked why new consultants were employed, and suggested that the original consultants were inadequate for the task placed before them during the period plaintiff was the contractor. Mr. Ruffalo answered, "I wouldn't say they were inadequate ... [but that defendant] wanted a third outside relatively unbiased opinion," in addition to the knowledge the original consultants would bring to the reprocurement.

It is not open to dispute that Lane had not performed well and was replaced by JS & A for that reason. Plaintiff argued that Lane's derelictions must be chargeable to its consultants as well. This, plaintiff claimed, proved its contention that defen-

---

**64.** In these circumstances, there is no need to adjust the slab costs to reflect the changed design. Any savings to plaintiff would have been more than offset by the alternative of removing and replacing the fill and using the original design. Plaintiff would have borne the excess costs of replacing the defective low-to-moderately expansive fill.

dant, as Lane's employer, delayed the project. Defendant did not directly address plaintiff's argument, but repeated that it was not dissatisfied with the original consultants. "[I]t was a very touchy situation, [defendant] needed what [it] felt was a relatively unbiased opinion" on the issues and scope of the reprocurement, but felt a need to continue to use the original consultants to provide continuity to the project in Lane's absence because of time pressures. Moreover, employment of the original consultants mitigated damages in terms of additional time for planning and performance of the reprocurement contract. The information that the original consultants provided to JS & A lessened defendant's incurred costs, and thus plaintiff's, in employing the new architectural firm. In his Findings and Determination supporting the reprocurement contract, the contracting officer stated that

1. Action is necessary to mitigate any impact due to a change of engineering consultants.

2. A change of engineering consultants would seriously affect the design liabilities issue, slow the construction as new engineers become familiar with the documents and the work, and increase the cost of surveillance due to extra payments to the new consultants to review the work.

Plaintiff pointed to not one specific instance of "over-employment" of consultants, or testing, and defendant made a persuasive showing that its continued employment of the original consultants as well as new consultants to assist it in completing the project was reasonable. The court notes that the new consultants found several design errors made by Lane, the repair costs of which were deducted from the counterclaim in mitigation of damages. The court rejects plaintiff's allegation that defendant did not employ new consultants because it could not get answers it wanted from the original consultants. The court finds that defendant proved by a prepon-

derance of the evidence that it was reasonably justified in employing the consultants it needed to complete the project in good and timely order, thereby mitigating plaintiff's liability for excess costs. The counterclaim is allowed.

### 3. Deductions for Poor Workmanship: Floor Covering

As a result of its investigations and testing, defendant discovered that some of the work performed by plaintiff incorporated inferior materials, was shoddy, and not completed by plaintiff in accordance with the terms of the contract. Mr. Ruffalo testified that defendant chose not to replace a number of those items but to deduct the *pro rata* cost of the work from the contract. General Provision 51 permits the government to accept work not performed in accordance with the contract requirements with an appropriate price adjustment. Mr. Ruffalo stated that *pro rata* meant that if the item was built only partially to specifications, defendant took a deduction for the portion it determined was not built to specifications. "We deducted the amount for whatever was missing. If what was missing was fifty percent of what we would have thought would have been the original installation, that's all we would have deducted."[65] *Astro–Space Labs., Inc. v. United States*, 200 Ct.Cl. 282, 470 F.2d 1003, 1018 (1972); *Cascade Pac. Int'l v. United States*, 773 F.2d 287, 291 (Fed.Cir.1985). The *pro rata* costs were deducted from the counterclaim, but no time was deducted from the contract that would have increased the liquidated damages; both factors mitigated damages.

The redesigned slab that B.G. Construction placed in the main workroom was an inch thicker than that poured by plaintiff, but both were at the same grade level. However, the finish flooring to be placed over the slab in the main workroom was changed in the reprocurement contract to be ⅛–inch thick vinyl composition. The finish flooring specified in plaintiff's con-

**65.** Mr. Ruffalo explained, for example, that if the contract had required a two-inch manhole cover and plaintiff had provided a one-inch cov-

er, defendant would have accepted the one-inch cover and deducted fifty percent of the total cost from the contract.

tract was ½-inch thick asphalt planking.[66] To raise the finished floor in the workroom to the same level as the finished floors in the other rooms, B.G. Construction poured a liquid self-sealing underlayment over the replaced portion of the slab. The other rooms were covered with the originally specified ½-inch asphalt planking.

Plaintiff's supplier delivered the ½-inch asphalt planking to the job-site but plaintiff neither installed nor paid for it. Defendant had intended to use the asphalt planking but was instructed by its Regional Counsel to return it to the supplier pursuant to a court order obtained by the supplier in a suit it filed against plaintiff. To decrease the cost of the completion contract, and because by the time of the reprocurement contract the U.S.P.S. had changed its standard tile flooring to vinyl composition, defendant chose the less expensive ⅛-inch vinyl composition tile for use over the replaced portion of the slab. Defendant contended, however, that the liquid underlayment placed over the new portion of the slab was so expensive that it negated any cost savings. Mr. Ruffalo did not know, but "guesstimated" that there was no net gain or loss in cost in replacing the original finish flooring with the new.

■■■ Defendant deducted from the contract, and now claims, $50,400 for "[n]on-installation of asphalt plank at workroom." Mr. Ruffalo testified that this figure represents the labor costs that plaintiff would have expended had it installed the ½-inch asphalt planking as required in its contract, plus the normal ten percent markup to which plaintiff would have been entitled. Mr. Kaplan responded that the cost of installation of the asphalt planking was "absolutely not" $50,000; the cost of installing asphalt planking was more than vinyl composition tile, but not by much. Mr. Kaplan testified that the cost of installing vinyl composition tile was "less than 50 cents a square foot. Asphalt plank couldn't have been twice that." Defendant did not rebut

Mr. Kaplan's cost estimate. Assuming, for discussion purposes only, that the cost of installing the asphalt planking was one dollar a square foot, and that 7,600 square feet were covered, the most the labor and material could have cost was $14,200. The court finds that defendant is entitled to a deduction from plaintiff's contract for the cost of failing to install the asphalt planking, the cost of which was in plaintiff's contract price, but defendant will have to prove the amount with more accuracy in later proceedings. Defendant will also have to improve its proof over Mr. Ruffalo's "guesstimate" of the cost of installing vinyl vs. asphalt tile. The counterclaim is allowed.

### 4. Wiring Defects

■■■ Defendant alleged that the building contained six significant wiring defects.

#### a. Size of wire

The contract required plaintiff to comply with the National Electric Code which specifies wire sizes for some purposes. Mr. Whalen stated that plaintiff used No. 18 wire in the fire alarm system, a smaller sized wire than No. 14 which should have been used, and that use of the smaller wire was a fire hazard. Contract Drawing E–2 required use of No. 14 wire in the fire alarm system. The electrical subcontractor testified that No. 14 wire was used in the fire alarm system; he "knew for a fact" that No. 14 wire had been installed because he had purchased the wire and had it delivered to the job-site. The electrical subcontractor testified, "[w]e had not had a chance to check it out. I would do that when I did the check out of the fire alarm." The witness for the electrical subcontractor could not confirm that No. 14 wire was used because he never saw it in place: He did not install it, observe its installation, or view it after installation. Mr. Whalen, on the other hand, actually saw the No. 18 wire installed. The court finds that defen-

---

**66.** Asphalt planking is a heavy duty floor covering made for use in areas that have forklift traffic. It is not made for appearance, but for durability. The supplier estimated that the ma-

terial cost of the original asphalt planking for use in the main workroom was $20,000, approximately three times the cost of the vinyl composite tile actually installed, i.e., $6,600.

dant proved by a preponderance of the evidence that No. 18 *vice* No. 14 wire had been installed by plaintiff. The counterclaim is allowed.

### b. Installation of ground wire

Defendant claimed that plaintiff failed to install a ground wire in a number of areas in the electrical system. B.G. Construction estimated that 142 switches and outlets lacked the required ground wire. Mr. Whalen personally took the cover plate off each outlet and switch in the building and confirmed that seventy-two outlets and switches did not have a ground wire. Plaintiff's electrical subcontractor testified that the 1987 National Electric Code did not require a ground wire in flexible conduit under six feet in length, and that in 1989 when B.G. Construction rewired the building, the National Electric Code and the City of Los Angeles Code had changed to permit the exclusion of ground wire in flexible conduit up to 100 feet in length. Section 16100, entitled ELECTRICAL WORK, of the Scope of Work provided at paragraph 1.03 B that all electrical work was to meet the latest edition of the National Electric Code, "excepting where the requirements herein are more stringent." Paragraph 2.10 A of the same section required that all electrical receptacles shall be "3–wire ground type."

When the contract was awarded in 1985 the latest version of the National Electric Code was the 1984 edition, but without more information it was impossible for the court to determine whether the Code required ground wire in flexible conduit. Neither defendant nor plaintiff referred to any provision of the Code governing ground wire requirements. However, the contractual requirement that receptacles be three-wire ground type strongly implies that ground wire was required. Plaintiff's assertion that the 1987 edition of the Code did not require ground wire in flexible conduit under six feet in length was not responsive to the issue in the absence of evidence that the receptacles were served by flexible conduit less than six feet in length, or how the 1984 Code addressed the issue. On balance, the court believes that Mr. Whalen's testimony that he personally removed all faceplates in the building and found ground wire lacking in half—coupled with the requirement that all receptacles be three-wire grounded—provided a preponderance of the evidence that the contract required that all flexible circuits to be grounded, and that seventy-two were not. The counterclaim is allowed.

### c. Ground fault disrupters and placement of outlets

Defendant claimed that ground fault disrupters were not installed in electrical outlets near drinking fountains, as required. Mr. Whalen testified that the National Electric Code requires that ground fault disrupters be installed in outlets near drinking fountains, but did not cite to any provision of the Code. A ground fault disrupter contains a built-in circuit breaker so that if moisture comes into contact with the wiring, the circuit will trip, thereby preventing electrocution.[67] The outlets installed by plaintiff to provide power to the drinking fountains did not contain ground fault disrupters. The electrical subcontractor challenged defendant's conclusion that ground fault disrupters had to be installed in electrical outlets near the drinking fountains on the bases that neither the National Electric Code nor the contract contained such a requirement. The court found that the Code requires ground fault disrupters to be installed in "wet" locations but in each instance, the locations suggested are around pools, out-of-doors, in dairy barns, etc. At best, the Code is ambiguous on the use of ground fault disrupters inside office buildings, even near drinking fountains. Section 16100 of the Scope of Work, Article 3, paragraph 3.20 E. states that "[w]here required by code, all 120 volt, single phase 15 and 20 ampere receptacle outlets installed outdoors and in bathrooms shall have approved ground-fault circuit protection in compliance with Section 210–22(d) of the

---

**67.** "Electrocution" as used in the building trades means an electric shock and does not imply that

death results, though it could.

1971 [National Electric Code]." There is no mention in the Code of any need for ground fault disrupters in outlets near drinking water fountains. The court finds that defendant has not shown by a preponderance of the evidence that ground fault disrupters were to be installed in outlets near drinking fountains. Plaintiff is not liable for the cost of installing ground fault disrupters in the outlets near water fountains.

Defendant also claimed that some outlets were located too far from the drinking fountains to be plugged in but provided no credible evidence to support the allegation. Plaintiff is not liable for the cost of allegedly improperly installing electrical outlets near water fountains in the wrong location. The counterclaim is denied and dismissed.

### d. Use of grounding rod

Defendant asserted that the main electric ground for the building was improperly attached to the water pipes, whereas, according to its electrical consultant, it should have been attached to a grounding rod embedded directly in the ground. This is not the case. Plaintiff's electrical subcontractor explained that

> [l]arge commercial buildings do not use grounding rods. They use what [is called] a Ufer ground, which is a bare copper wire ... about as big as your index finger that is placed in the bottom of the footing.... Plan E–2 describes exactly how the Ufer ground would be put in that building and ... it was in fact installed exactly the way that it is depicted in E–2.

In addition, the Ufer ground wire had to be linked to the water pipes. "[Y]ou always link the grounding system to the water system. That's required in the National Electric Code. So you have, if you look at the diagram E–2 you'll see that there is [a] water [link] as part of the grounding system. It has to be." The Ufer ground was embedded in the concrete slab and was bonded to the cold water pipe in the electric room. Moreover, one of defendant's construction inspectors reported on November 15, 1985, that the "ground wire was run into the footings as re-

quired." Defendant has not proven entitlement to excess costs on this counterclaim by the preponderance of the evidence. The counterclaim is denied and dismissed.

### e. Conduit running beneath slab

When B.G. Construction removed the concrete slab it found damaged electric conduit running beneath it that had to be repaired. There was no testimony that it was improper to run the conduit under the slab even though it was not shown running under the slab in the plans. Conversely, competent testimony persuaded the court that the conduit could properly have been placed beneath the slab. However, the contract did specify that the electrical conduit be in good working order. Plaintiff provided no rebuttal to the counterclaim, but neither did defendant prove by a preponderance of the evidence that the conduit had not been damaged during the numerous core drillings or removal of the slab. In the absence of such information, the court cannot find that defendant proved entitlement to excess costs for repair of the electric conduit. The counterclaim is denied and dismissed.

### f. Light dimming system

Mr. Whalen testified that the Lutron light dimming system did not work and had to be repaired by the reprocurement contractor. The evidence presented by both parties on this claim is inconclusive. The court finds that defendant failed to prove entitlement to costs by a preponderance of the evidence. The counterclaim is denied and dismissed.

### 5. *Cracks in the Outer Wall Covering*

■ On Mr. Whalen's first visit to the job-site on October 19, 1987, he saw that the outer stucco walls of the building were severely cracked,

> [m]ore so than you would expect under a normal stucco building. Normally you would expect maybe some cracks at the ... corners of windows ... going out at a 45 degree angle, but this cracking was like a spider web. It went out in all areas horizontally and vertically.

Significant cracking occurred at the corners of the building where plaintiff used improper material to construct expansion joints at corners. Instead of using radius corners, plaintiff applied a straight piece of metal, snipped it every inch or two, bent it, and attached it around corners. This caused gaps to appear in the stucco, and potential leaks. Some of the gaps were so large that the black building paper, and even lathe, could be seen beneath the stucco. Extensive cracks appeared near expansion joints that plaintiff had improperly installed. Mr. Whalen explained how plaintiff had improperly installed the expansion joints, causing the damage.

> Expansion joints are put in to take up the movement that is inevitable in all building material, and the stucco shouldn't crack adjacent to it, because the metal itself should be moving, not the stucco ... this indicated that the metal was put in and both sides were fixed so that it was unable to expand. And so what happened was, the stucco broke away. It broke at its weak point.

Contemporary photographs and videotape admitted into evidence confirmed that cracking in the stucco, as described by Mr. Whalen, was indeed extensive.

In preparing for the reprocurement contract, defendant employed the structural engineering firm of Arche Engineering Laboratories (Arche) to inspect and investigate the structural steel placed in the building by plaintiff. Mr. Whalen testified that during his inspection and analysis of the building he discovered one of the structural steel supports was tilting, "it was not plumb ... [w]e didn't know what to expect ... [w]e wanted to insure that the building wasn't going to fall down." Arche's November 16, 1987 report made passing mention of the damage to the exterior stucco finish of the building as part of its inspection of a structural steel beam. The report stated in part:

> One potential concern worthy of additional analysis was the north exterior wall/column connection to the girder line

second from Canoga. This girder bears on a transverse beam whose supporting system was not obvious by visual inspection alone. This transverse beam may be cantilevered or simply supported, but despite its support mechanism cosmetic distress to the exterior portland cement plaster was apparent, which may be the result of movement due to settlement, the earthquake, excessive deflection, thermal expansion or construction, or some combination of these.

We are inclined to suspect that a combination of the earthquake loads coupled with the dead load deflection consistent with this sort of design has caused the cosmetic cracking. We recommend that the structural engineer of record evaluate this area further. This appears to be the only major girder support which does not bear directly upon a continuous vertical column to a pad or foundation.

Mr. Whalen disputed Arche's statement that the damage could have been caused by an earthquake. He saw no cracking in the stucco that was indicative of cracking normally found in stucco after an earthquake. Evidence of earthquake damage to stucco is "very significant." He explained that

> there's very distinctive cracking that occurs after an earthquake.... Earthquakes [provide] a lateral force and you get cracking at openings, windows and doors, and you get them ... on a 45 degree angle.
>
> Say you have two windows stacked [one atop the other], you'd get an X below the [lower] window and above the [upper] one.

Defendant viewed the Arche report as critical of the workmanship on the exterior stucco finish of the building, plaintiff viewed the cracking as a natural event, or caused by an earthquake, i.e., an act of God.[68] The court agrees with neither position. Arche specifically pointed out the cracking as possible evidence of a structural problem with a hidden beam, and that the beam should be investigated further.

---

68. Under General Provision 11(d)(1) an earthquake would be considered an act of God, there-

by releasing plaintiff from any liability for damage.

Under this interpretation, the beam had shifted, thereby moving a portion of the outer wall causing the stucco to crack. There was no conclusive proof, or even explanation, of why the beam was out of position or why the structural steel was out of plumb.

The court finds plaintiff's explanation of why the stucco cracked to be without merit. Plaintiff explained that consulting engineers accompanied by Mr. Kaplan inspected the stucco on August 26, 1987, a month after the termination for default, and observed the cracked stucco. The record contains no information about an earthquake, when one might have occurred, its magnitude, or how close it might have been to the job-site. There was no particular evidence that an earthquake actually did occur other than a passing reference to the "Whittier Earthquake" by plaintiff's counsel during cross-examination of Mr. Whalen. However, United States Geological Survey records show that an earthquake centered around Whittier, California occurred on October 1, 1987. It was in the middle of the moderate range on the Richter Scale and was strong enough to have damaged stucco on buildings in Canoga Park. The dates are the key to this issue. The damage was first noted by Mr. Kaplan, and other consulting engineers a month *before* the earthquake. Plaintiff made no reference to any other earthquake and proffered no credible other reason why the stucco cracked so extensively.

The cost of the repair is included in the counterclaim. From a review of all of the evidence, it is clear that stucco containing concrete will crack to some extent but not to the extent shown in the photographic evidence. Plaintiff was obligated by the terms of General Provision 16(b) of its contract to apply the stucco and expansion joints in a "skillful and workmanlike manner." The court finds that plaintiff did not install the stucco to the building in accordance with the terms of the contract, thereby causing the stucco to crack so extensively as to be unsightly, and create gaps exposing the building structure to water leaks. B.G. Construction repaired the stuc-

co and repainted the entire building. Defendant mitigated costs by eliminating a large trim stripe. The court finds plaintiff liable for the costs of repairs to the stucco exterior of the building. The counterclaim is allowed.

### 6. Asphalt Paving
#### a. Non-conforming paving

Defendant claimed plaintiff failed to adhere to the paving specifications of the contract in two areas.

Plaintiff installed asphalt paving that did not comply with the contract specifications, particularly at the north end of the parking lot, and the 10,000 square foot truck maneuvering area. Defendant did not explain why it suspected the paving might have been installed too thinly, but did employ a testing company to determine the thickness of the asphalt, and the base over which the asphalt was applied. The testing company reported that the asphalt and base did not meet the thickness requirements of the contract in the areas it inspected. Plaintiff's failure to meet the thickness requirements was proved when the asphalt was removed. A photograph with a measuring tape held against the side of a piece of asphalt removed from the truck maneuvering area clearly shows that the asphalt was less than two inches thick where the contract required it to be four-inches thick. The same evidence was included in a videotape taken by Mr. Whalen.

To mitigate damages, defendant chose not to remove and replace all of the pavement, but did remove and replace the pavement at the north end of the parking lot and the truck maneuvering area. Defendant could not have simply paved over the thin areas, as Mr. Kaplan and Mr. MacIntosh testified because it would have resulted in an uneven surface where water would have "ponded." To repave the entire area would have required the application of one inch of asphalt topped with "Petro-mat," or two inches of asphalt. "And there would still be ponding." In any event, an additional layer of asphalt would not have solved the problem because the base was too thin in spots to have supported traffic

on the asphalt. While not explicitly stated, it is clear from the record that the base was also removed and replaced in some parts, if not all, of the truck maneuvering area. Defendant has proven by a preponderance of the evidence that it is entitled to recover its excess costs for removing and reinstalling a portion of the asphalt pavement to bring it within contract specifications.

### b. Stubbing of conduit

The same videotape of the parking lot also purported to show where plaintiff had laid electrical and telephone conduit under the pavement but had not "stubbed" or brought the conduit up above the surface for future installation in "a maintenance facility." Defendant asserted that plaintiff simply left the conduit lying on the base, and paved over it. Plaintiff's subcontractor testified that it had stubbed the conduit, but in a different place, at defendant's direction. On balance the court finds that defendant has not proven its claim by a preponderance of the evidence and is not entitled to recover costs for stubbing the electrical and telephone conduit. The counterclaim is denied and dismissed.

### 7. *Foreign-made Material*

 In preparing for the reprocurement contract defendant discovered that plaintiff had installed fire sprinkler piping that had not been manufactured in the United States in violation of General Provision 34, the *Buy American* clause of the contract. The clause is based on the Buy American Act, 41 U.S.C. § 10a et seq., which provides that "only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured ... in the United States, shall be acquired for public use." 41 U.S.C. § 10a (1988). Executive Order No. 10,582, entitled *Prescribing Uniform Procedures for Certain Determinations Under the Buy–American Act*, states that "[f]or the purposes of this order materials shall be considered to be of foreign origin if the cost of the foreign products used in such materials

constitutes fifty per centum or more of the cost of all the products used in such materials." Exec.Order No. 10,582, 19 Fed.Reg. 8723, sec. 2(a) (1954). Thus, to be a domestic product, an article must be made in the United States, and over half of its components must have been made in the United States.

In May 1987, Mr. Whalen discovered a short section of four-inch sprinkler piping above the mechanical room with the words "Made in Taiwan" or "Taiwan" painted on it. Photographs taken by Mr. Whalen confirmed his testimony. The fire system subcontractor testified that his firm was experienced in government contracting and knew the pipe had to be made in the United States. Its supplier, accordingly, set U.S. made pipe aside in the suppliers yard so there would be no danger of using foreign-made pipe. The subcontractor testified that by the time it was permitted back onto the job-site, B.G. Construction had completed its work and the piping had been painted, or was out of sight. No one could determine the origin of the pipe, with the single exception noted by Mr. Whalen. The subcontractor could only surmise that the pipe in the mechanical room had been "inadvertently" used by his employees. Defendant did not replace the piping but did deduct $32,037, ostensibly the cost of some, but obviously not all, of the pipe. That cost is included in the counterclaim.

The court finds that defendant has failed to prove its counterclaim for impermissible use of foreign-made pipe by a preponderance of the evidence. Defendant has no proof that pipe not in compliance with the Buy American Act was used in the project, with the single exception of the short span of pipe in the mechanical room. Such *de minimis* use would not constitute a violation of the Act. *See* Ralph C. Nash & John Cibinic, 6 *The Nash & Cibinic Report* 161, 165 (1992). The counterclaim for improper use of foreign-made material is denied and dismissed.

### 8. *HVAC Problems*

Defendant claimed that plaintiff made two significant deviations from the specifi-

cations governing the heating and air conditioning system.

#### a. Size of ducts

The contract specified that heating and air conditioning ducts were to be sixteen inches in diameter. Mr. Whalen testified that plaintiff installed ducts which were either twelve or fourteen inches in diameter. When the HVAC system was first brought on-line, it was extremely noisy. Defendant sought the advice of a mechanical consultant but there is no mention in the record of whatever came of the matter. In the absence of proof of further events the court finds that defendant failed to prove this portion of the counterclaim by a preponderance of the evidence. The counterclaim is denied and dismissed.

#### b. Air controller

The "air controller" controls the flow of air throughout the HVAC system but, according to defendant, the controller installed by plaintiff did not have an "integral control function," without which it could not control the flow of air. The missing controller was added by B.G. Construction under the reprocurement contract. Defendant presented virtually no testimony of any merit on this item, but neither did plaintiff provide any credible evidence to rebut the claim. On balance the court finds that defendant did not prove by a preponderance of the evidence that the air controller was required by the contract, was missing, [or deficient] and is thus not entitled to compensation for installing the unit under the reprocurement contract. The counterclaim is denied and dismissed.

### 9. *Condensing Unit*

Defendant introduced several photographs of the air conditioning condensing unit showing damage to the cooling fins. Defendant first noticed the damage on January 16, 1987, prior to the termination for default, and brought it to the attention of plaintiff in a letter signed by Mr. Ruffalo on February 11, 1987. The February 11 letter stated that the fins were "severely damaged" and requested plaintiff to immediately "protect the unit and to propose to the USPS [sic] your remedy for the damaged condition." Mr. Ruffalo testified that the cooling fins were bent but that it is "not terribly unusual for fins to be damaged on every unit" and could be repaired with a tool that "combs," or straightens, the fins. Mr. Kaplan agreed. Mr. Ruffalo testified that he withheld either "ten or twenty thousand dollars" from a payment request shortly before the contract was terminated. The amount withheld appeared to be excessive, but Mr. Ruffalo stated that he withheld that amount upon the advice of the mechanical engineer consultant who advised him that the fin damage could indicate some internal damage as well, and that the amount withheld would be the cost if it was necessary to replace the condenser unit. Later, but before termination, Mr. Ruffalo told plaintiff "that the fins had been fixed and it was okay to bill us for that [withheld] money." There was, however, conflicting testimony about whether defendant had paid plaintiff, the amount paid, and exactly what was done to the unit. Mr. Whalen stated that B.G. Construction replaced the fins at a cost to defendant of $5,000. Plaintiff, in rebutting the claim, only confused the matter more by arguing that rather than combing the fins, defendant withheld approximately $5,000 from plaintiff's contract "in order not only to replace the fins, but other portions of the condensing unit required to be replaced by reason of replacement of the fins."

The court cannot determine from the evidence whether Mr. Ruffalo was correct that plaintiff repaired or replaced the fins, or whether Mr. Whalen was correct that B.G. Construction replaced the fins. In the circumstances, the court cannot find that defendant proved entitlement by a preponderance of the evidence to any reduction in contract price for repair or replacement of the HVAC fins, or the condensing unit. The counterclaim is denied and dismissed.

### 10. *Finish Carpentry*

The finish carpentry section of plaintiff's contract and the building plans required it to provide wood bumpers along the workroom walls, and cabinetry. Plaintiff in-

stalled no bumpers and the cabinet work was done in a slip-shod manner. Mr. Whalen testified:

> [t]he cabinets were supposed to be custom grade AWI, Architectural Woodwork Institute custom grade, and they had—the [large customer] writing desk had numerous gaps. They didn't fit tightly together against the wall. The service-line cabinets, the pullout drawer, you couldn't pull it out. For some reason, [plaintiff] had built it so you could not pull it out, and we had to correct that. There were a variety of smaller problems that were outlined in the Completion Document, that we had to make changes to the cabinets because of workmanship.

Plaintiff did not refute the finish carpentry counterclaim and the court finds that defendant has proved by a preponderance of the evidence that it is entitled to reasonable excess costs for repairing or replacing the cabinets.

### 11. *Lookout Gallery Ladders*

Plaintiff's contract specified that the ladders leading to the Lookout Gallery were to extend five feet above the floor of the Gallery. Plaintiff installed the ladders only to the floor level and B.G. Construction was required to weld another five feet of ladder to the top of the ladders. Plaintiff did not attempt to refute this counterclaim. Defendant is entitled to recover excess costs for correcting the Lookout Gallery Ladders.

### 12. *Administrative Costs*

 Courts will award damages that are reasonably foreseeable results of the contractor's default in addition to those damages typically contemplated, such as administrative costs incurred by defendant in completing the contract. *Tester Corp. v. United States*, 1 Cl.Ct. 370, 375 (1982). Most construction default cases measure damages by comparing the costs defendant incurred in having to reprocure the services of another contractor, and the costs defendant would have incurred had the original contractor completed the contract. There are a few decisions of boards of contract appeal that deny recovery of "administrative expenses" and the costs of processing the reprocurement contract documents; in those few instances where the boards denied such costs, they did so because the default termination language was more restrictive than in plaintiff's contract. *See Arthur Q. Evans, Jr.*, ASBCA 10951, 66–1 BCA ¶ 5316, 1966 WL 548 (1966). This court addressed the issue in *Tester*, holding that "the Court of Claims has refused to give a restrictive and limited interpretation of the language 'excess costs' found in the default termination clause." *Tester*, 1 Cl. Ct. at 375. *Tester* also held that costs such as for additional design and inspection, travel of government personnel, and testing were recoverable. *Id.* at 373. Apart from General Provision 11(a) the government could recover those same costs through its common law right to damages for breach of contract under General Provision 11(f). *Id.* at 375–76. Defendant could pursue all damages for breach of contract that were "foreseeable, direct, natural, and proximately results of the breach." *Id.* at 376 (citations omitted).

 Here, defendant claimed it incurred administrative costs in awarding and administering the reprocurement contract, but did not identify any specific cost items comprising the claim. The lack of specificity is not, however, fatal to the claim so long as defendant, at the quantum stage of the proceedings in this litigation, can show that the claimed administrative costs fall into the categories of costs addressed in *Tester*. The court finds that pursuant to General Provision 11(a) and (f), defendant is entitled to recover its administrative expenses incurred by reason of the default that were foreseeable, direct, natural, reasonable and proximate results of the default.

### C. Liquidated Damages

General Provision 11 and Special Provision 2 provided for the assessment of liquidated damages at the rate of $387 per day for each day that the project was incomplete beyond the original contract comple-

tion date, as amended. Defendant assessed liquidated damages from February 13, 1987, the extended completion date of plaintiff's contract, until April 24, 1988, a period of 435 days.[69] In arriving at this time period, defendant excluded the period between April 25, 1988, and when defendant took beneficial occupancy on June 6, 1988.

■ Liquidated damages are properly assessed and awarded unless plaintiff can show that (1) defendant caused or contributed to the delay, *Southwest Eng'g Co. v. United States*, 341 F.2d 998, 1000–01 (8th Cir.1965), or (2) the contract provision providing for the assessment is a penalty. *See Robinson v. United States*, 261 U.S. 486, 488, 43 S.Ct. 420, 421, 67 L.Ed. 760 (1923).

■ Any argument by plaintiff that defendant is not entitled to liquidated damages because it caused or contributed to the delay, is without merit. The court has found that plaintiff failed to prove that defendant was the cause of delay to the project or that any delay was apportioned between the parties.

■ There was no showing that the liquidated damages for delay provided for in Special Provision 2 are beyond damages reasonably contemplated by the parties at the time the contract was executed. The court must consider two factors to determine whether the provision included in the contract fixing the amount of damages payable upon breach is an enforceable liquidated damages clause. First, the amount so fixed must be a reasonable forecast of just compensation for the harm that is caused by the breach. Second, the harm that is caused by the breach must be one that is incapable or nearly incapable of accurate estimation. *See J.D. Streett & Co. v. United States*, 256 F.2d 557, 559 (8th Cir.1958) (citations omitted); *United States v. Le Roy Dyal Co.*, 186 F.2d 460, 461 (3d Cir.1950) (quoting Restatement, Contracts § 339); *Martin J. Simko*, 11 Cl.Ct. at 271–72. If the disputed liquidated damages clause does not satisfy both factors, the court will interpret the contract provision as an unenforceable penalty clause. The court must also determine whether these factors exist at the time the contract was executed rather than when the contract was breached or at some other subsequent time. *Le Roy Dyal*, 186 F.2d at 462; *P & D Contractors, Inc. v. United States*, 25 Cl.Ct. 237, 241 (1992) (citing *Cegers v. United States*, 7 Cl.Ct. 615, 620 (1985)). Courts presently look with candor upon provisions that are deliberately entered into between parties, *United States v. Bethlehem Steel Co.*, 205 U.S. 105, 119, 27 S.Ct. 450, 455, 51 L.Ed. 731 (1907), and, therefore, do not look with disfavor upon liquidated damage stipulations. *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947).

In *Bethlehem Steel* the court defined the applicable standard for determining whether a liquidated damages provision is proper by asking "what did the parties intend by the language used? When such intention is ascertained it is ordinarily the duty of the court to carry it out." *Bethlehem Steel*, 205 U.S. at 119, 27 S.Ct. at 455. Here, plaintiff failed to establish that the intention of the parties was to do anything other than to execute a valid liquidated damages provision. In *Priebe & Sons*, the court found that the contract contained a provision for liquidated damages for delay in delivery upon demand, and that "[i]t ... is apparent that the only thing which could possibly injure the government would be failure to get prompt performance when delivery was due. We have no doubt of the validity of the provision for 'liquidated damages' when applied under those circumstances." *Priebe & Sons*, 332 U.S. at 412, 68 S.Ct. at 126. Also,

[t]oday the law does not look with disfavor upon 'liquidated damages' provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by

---

**69.** Defendant calculated the liquidated damages as running from February 13, 1987, until April 24, 1988, and found the total to be 435 days. The calculations were incorrect. Plaintiff's actual amended completion date was February 15, 1987, and 1988 was a leap year. The proper period for the calculation of liquidated damages was 434 days.

breach of contract, they are enforced. They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts. And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract.

*Id.* at 411–12, 68 S.Ct. at 126 (citations omitted). In *Rex Trailer Co. v. United States*, 350 U.S. 148, 151–53, 76 S.Ct. 219, 221–22, 100 L.Ed. 149 (1956), the court concluded that

> [l]iquidated-damage provisions, when reasonable, are not to be regarded as penalties.... As this Court recognized in [*Priebe*], liquidated damages "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts...." [T]he fact that no damages are shown is not fatal.

*Le Roy Dyal,* in addressing a number of aspects of the liquidated damage issue, held that "[i]f a provision for liquidated damages is upheld the fact that actual damage did or did not occur or was not proved to have occurred does not prevent the recovery of the stipulated sum." *Le Roy Dyal,* 186 F.2d at 462; *accord Rex Trailer,* 350 U.S. at 152–53, 76 S.Ct. at 221–22.

Where the parties, as here, have by their contract agreed upon a liquidated damage provision as a reasonable forecast of just compensation for breach of contract and damages are difficult to estimate accurately, such provision will be enforced. If in the course of subsequent developments, damages prove to be greater than those stipulated, the party entitled to damages is bound by the liquidated damage agreement. *See P & D Contractors,* 25 Cl.Ct. at 241. "It is not unfair to hold the contractor performing the work to such agreement if by reason of later developments damages prove to be less or nonexistent." *Id.* Each party by entering into such contractual provision took a calculated risk and is bound by reasonable contractual provisions pertaining to liquidated damages.

The court finds that plaintiff did not demonstrate that the assessment of liquidated damages was unwarranted, contrary to law, or unreasonable in the light of the circumstances existing at the time the parties entered into the contract. There is nothing in the record which compels a contrary conclusion. There was an urgent need for the Canoga Park Main Post Office, and the time taken to complete the project, including the time taken to select and award the reprocurement contract, was reasonable in the circumstances. *See Astro–Space,* 470 F.2d at 1018; section VI.A. of this opinion, *supra.* Defendant mitigated the damages as best it could, and did not assess liquidated damages for the time added to B.G. Construction's contract for work beyond that required of plaintiff. The burden of proof to show prejudice by post-termination delay fell on plaintiff, but plaintiff introduced no evidence that the mere passage of time from the date of the default until defendant took beneficial occupancy, less the days excluded, increased its damages. The contracting officer was reasonably justified in exercising caution in planning, awarding, and administering the reprocurement contract. The court finds that defendant is entitled to assess liquidated damages at the contract rate of $387 a day for 434 days.

## D. Interest on the Counterclaims

The award of interest on counterclaims is discretionary. *Astro–Space,* 470 F.2d at 1020; *Stoeckert v. United States,* 183 Ct. Cl. 152, 391 F.2d 639, 648 (1968). The claim is premature and the court declines to rule on the issue at this time but will address the interest issue when the questions of quantum are before the court, or once the parties have agreed to quantum. The court will then consider plaintiff's financial condition, the time it took to bring this litigation to an end, the outcome of claims the court has seen as frivolous or questionable, *see, e.g.,* section V.C.11. of this opinion, *supra,* and plaintiff's good faith in the

proceedings to follow. *See Stoeckert*, 391 F.2d at 648.

## VII. CONCLUSION

As the court has previously stated, it found Mr. Whalen to be an impressive witness. In concluding his testimony on direct examination, over oftentimes confused interjections and objections by plaintiff's counsel, Mr. Whalen proffered his impression of the problems with the building, and the site, as he found it.

> From what I saw there, all of the problems boiled down to one issue, and that is, the general contractor did not comply with Section 0140, which is the Quality Control Section. And that—the reason I say that is because of all the myriad of problems with the job.
>
> I mean, its not just one or two disciplines that had problems, there were several areas from [the Lookout Gallery] Ladders to doors that didn't have stripes that matched, to—I mean, it wasn't cleaning and painting, it wasn't that kind of small stuff. It was—there were big things, and had there been any quality control whatsoever on the job, I feel these problems wouldn't have happened.
>
> So I have to say that construction was, ... based on what I've seen, what I've documented, was very poor. And I can say that, because nobody else saw what I saw. I was there, I saw it and I documented it very carefully. Nobody else associated with this project, saw the items that I saw.

Mr. Whalen's testimony captured the essence of how frustratingly troublesome this project was from the start.

Based upon its careful study of the record, having had the benefit of observing all of the witnesses over the ten days of trial, and the opportunity to reflect on the issues outside of the tussle and tension of trial, the court would be derelict in its duty if it did not give great weight to Mr. Whalen's testimony. The court believes that plaintiff could have performed all of the many corrective actions taken by B.G. Construction, but in light of plaintiff's proven poor and non-performance, defendant was well justified in turning to another contractor to complete the project. It has become abundantly clear that plaintiff did not want to perform the work in accordance with the terms and conditions of its contract and as directed by the contracting officer. The court finds that plaintiff was given a fair opportunity to complete the project but chose instead to attempt to circumvent much of the contract, and to provide defendant with far less than for what it paid.

As stated at the outset of this opinion, the court has gone to extraordinary lengths to address plaintiff's claims that, in most instances, were unsupported and presented in a random, rambling manner. The court can discern no merit to many of the issues presented by plaintiff. Many of the charges were made without citation to the record, or made with a plethora of unrelated meaningless citations. Frivolous citations by plaintiff to the *Termination for Convenience* clause of the contract as *sole* support for certain claims, and the advancement of claims clearly having no support in federal contract or common law have wasted valuable judicial resources and defendant's time and finances. Similarly, plaintiff's numerous expositions of what the law "is," or "should be," without any valid supportive reference to case law precedent or contract clauses must be ignored. The court cannot be expected to search the record unrelentingly to match evidence to plaintiff's contentions. Substantial unsworn statements by plaintiff's counsel at trial must also be ignored. Loose, undocumented attacks on defendant and its officials are not enough to prove a claim.

For the reasons stated above, plaintiff failed to prove its delay claim. Accordingly, the claim is denied and dismissed in its entirety. Plaintiff is entitled to an equitable adjustment to its contract for constructive or actual changes for those claims administratively allowed by the contracting officer which plaintiff here challenges as insufficient, and for those changes found by the court. General Provision 4, the *Claims and Disputes* clause of the contract, provides that plaintiff is entitled to interest on its allowed claims. *See* CDA, 41 U.S.C. § 611.

The court concludes that defendant met its duty to mitigate damages in the repro-

curement. Defendant is entitled to those elements of its counterclaim that the court found proven by a preponderance of the evidence pursuant to General Provisions 11(a) and (f). *See* section VI. of this opinion, *supra.*

## VIII. SUMMARY OF COST CLAIMS ALLOWED AND DENIED

The following is a summary only of the disposition of plaintiff's claims, and defendant's counterclaims. It does not include the court's findings and conclusion on the arguments made by the parties in support of their claims. Items marked with an asterisk need to be addressed further before proceedings can continue.[70] All claims and arguments not specifically addressed in this opinion were considered and subsumed in other claims.

| Page(s) | Plaintiff's Claims | Disposition |
|---|---|---|
| 406–23 | Improper Termination For Default | Denied and Dismissed |
| 423–25 | Suspension Delay | Denied and Dismissed |
| 425–35 | Project Delay | Denied and Dismissed |
| 445 | HVAC | Denied and Dismissed |
| 446 | Permanent Electric Power | Denied and Dismissed |
| 446–47 | Price Escalation (General) | Denied and Dismissed |
| 447 | Site Meeting | Denied and Dismissed* |
| 447–48 | Add'l Demolition and Field Office | Allowed |
| 448–49 | Subsurface Removal/Site Work | Allowed |
| 449–51 | Organic Material Removal | Denied and Dismissed |
| 451–54 | Temporary Fence | All'd In Part/Den'd In Part |
| 454–59 | Screen Wall Support | Denied and Dismissed |
| 459–60 | Material For Building Security | No Findings* |
| 460–63 | Fuel Storage Facility | Denied and Dismissed |
| 463–64 | Storm Drain | Allowed In Part |
| 464–68 | Photocopying Logs | No Findings* |
| 468–69 | Change Order Proposals | Denied and Dismissed |
| 452, 469–74 | Post–Termination Security | Denied and Dismissed* |
| 474–75 | Loss Of Future Income | Denied and Dismissed* |
| 475–76 | Lost Profits | Denied and Dismissed* |
| 476–77 | Percentage Of Completion | Less than 50–60% |
| | Damage To Reputation | |
| 477–78 | Subcontractors | Denied and Dismissed |
| 478–79 | Future Clients | Denied and Dismissed |
| 479 | Legal and Related Fees | Prematurely Filed |
| 479–80 | Consultant's Fees | Denied and Dismissed* |
| | Escalation Costs (Specific) | |
| 480–81 | Plumbing | No Findings* |
| 481–83 | Paving | No Findings* |
| 504 | Interest | On Allowed Claims |
| | **Defendant's Counterclaims** | **Disposition** |
| 491–92 | Replace Slab | Allowed |
| 492–93 | Consultant's Fees | Allowed |
| 493–94 | Poor Workmanship/Floor | Allowed |
| | Wiring Defects | |
| 494 | Size of Fire Alarm Wire | Allowed |
| 495 | Ground Wire | Allowed |
| 495–96 | Ground Fault Disrupters | Denied and Dismissed |
| 496 | Grounding Rod | Denied and Dismissed |
| 496 | Conduit Under Slab | Denied and Dismissed |
| 496 | Light Dimming System | Denied and Dismissed |

**70.** Items marked with an asterisk were found to be frivolous, or the court questions whether they were submitted in good faith or in accordance with the CDA certification. *See* 41 U.S.C. § 605(c) and section V.C.11. of this opinion. Other claims that fit this category are plaintiff's alleged progress on drywall installation (p. 432), delay for government-furnished equipment (p. 433), post-termination "winding down" (p. 438), subcontractor material costs (pp. 457–59), and post-termination security (p. 452).

| 496–98 | Stucco Cracks | Allowed |
|---|---|---|
| | Asphalt Paving | |
| 498–99 | Non–Conforming | Allowed |
| 499 | Stubbing Of Conduit | Denied and Dismissed |
| 499 | Foreign–Made Material | Denied and Dismissed |
| | HVAC | |
| 500 | Size of Ducts | Denied and Dismissed |
| 500 | Air Controller | Denied and Dismissed |
| 500 | Condensing Unit | Denied and Dismissed |
| 500–01 | Finish Carpentry | Allowed |
| 501 | Look–Out Gallery Ladder | Allowed |
| 501 | Administrative Costs | Allowed |
| 501–03 | Liquidated Damages | Allowed |
| 503–04 | Interest On Counterclaim | Prematurely Filed |

---

## IX. FURTHER PROCEEDINGS

■ To guide the parties in addressing damages the court notes that damage awards to contractors are calculated based upon the difference between the reasonable cost for performing the work as changed and the reason able cost for performing the work according to the original contract specifications. *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 412 F.2d 1360, 1370 (1969) (citing *Bruce Constr. Corp. v. United States*, 163 Ct.Cl. 97, 324 F.2d 516, 519 (1963)). Exact computation of damages may prove to be extremely difficult to determine. Courts have held that

> [t]he ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage *is* clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: "It is sufficient if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation."

*Electronic & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969) (citations omitted) (emphasis in original). "It is sufficient if [the plaintiff] furnishes the court with a reasonable basis for computation, even though the result is only approximate." *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965); *accord Assurance Co. v. United States*, 813 F.2d 1202, 1205 (Fed.Cir.1987); *Jackson v. United States*, 12 Cl.Ct. 363, 366–67 (1987) (citing *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 719 (1984)). However, "leniency as to the actual mechanics of computation does not relieve a contractor of its basic and essential burden of establishing the fundamental facts of ... resultant damage." *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 737 (1984).

All outstanding motions are moot with the exception of plaintiff's motion, concurred in by defendant, to replace the court reporter's incorrect exhibit list. That motion is allowed.